## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Misc. Case. No.

**In re: Department of Justice Administrative Subpoena No. 25-1431-030**

---

**DECLARATION OF DAVID BRUMBAUGH, M.D. IN SUPPORT OF CHILDREN'S HOSPITAL COLORADO'S MOTION TO QUASH SUBPOENA AND MOTION TO RESTRICT**

---

## Declaration of David Brumbaugh, M.D.

I, David Brumbaugh, M.D., declare as follows:

1. I am over the age of eighteen, competent to testify as to the matters stated herein, and make this declaration based on my personal knowledge and experience. I submit this declaration in support of Children's Hospital Colorado's Motion to Quash Subpoena and Motion to Restrict.

A.     **Personal Background**

2. I am the Chief Medical Officer at Children's Hospital Colorado ("Children's Hospital"). I have served in this role since 2020. I am a board-certified physician who specializes in the field of pediatric gastroenterology. I graduated from the Vanderbilt University School of Medicine before completing a residency and fellowship in gastroenterology at the University of Colorado. I am currently a Professor of Pediatric Gastroenterology, Hepatology, and Nutrition at the University of Colorado School of Medicine and a Fellow of the American Academy of Pediatrics.

3. As the Chief Medical Officer at Children's Hospital Colorado, my duties require me to oversee the medical staff functions of the hospital. I am responsible for the medical operations at Children's Hospital and ensuring high-quality patient care and efficient clinical operations. In collaboration with the medical staff and our administrative colleagues, I implement clinical policies and initiatives to improve healthcare delivery and patient outcomes. I also play a key role in Children's Hospital's financial management, regulatory compliance, and strategic planning for the organization's medical services.

3022066

4.  Through my work at Children's Hospital Colorado, I have become familiar with how care
    is provided and with Children's Hospital's administration.  I am also familiar with
    information about Children's Hospital's size, personnel, and systems.  I have reviewed
    Children's Hospital's most recent annual report.  I have also reviewed Administrative
    Subpoena No. 25-1431-030 (the "Subpoena"), which I understand Children's Hospital
    recently received from the U.S. Department of Justice.

B.  **Background on Children's Hospital**

5.  Children's Hospital is the premier healthcare institution in the State of Colorado and a
    leading provider of pediatric healthcare across the Rocky Mountain region.  It was
    founded in 1908 and exists today as a pediatric hospital system comprised of four
    hospitals and thirteen additional care sites within Colorado.  Children's Hospital is
    ranked among the Top 10 pediatric hospitals in the United States.  Children's Hospital
    provides a level of pediatric care that is not available at any other hospital system in
    Colorado.

6.  Children's Hospital has developed a model of care based on the belief that all families,
    including the families of gender-diverse patients, should have the right to access
    compassionate, evidence-based expert medical care that supports each child's well-being
    and specific needs to thrive.

C.  **Personnel, Structure, and Provision of Care at Children's Hospital**

7.  According to its most recent annual report, more than 9,500 people work at Children's
    Hospital.  Another 3,000 additional people volunteer at Children's Hospital.  There are
    more than 2,900 people on Children's Hospital's medical staff and an additional 300
    residents and fellows who are training in various fields of pediatric medicine.

3

8. Children's Hospital's revenue cycle staff—which includes individuals who interact with the billing process—consists of more than 600 people. The revenue cycle staff perform a variety of functions, which range from patient intake, to billing and coding, to interacting with insurers to allow for the payment of hospital-based services. More than 40 of those individuals are engaged in coding work related to patient diagnoses and treatments.

9. Given the size and multi-disciplinary focus of Children's Hospital, and to allow it to meet the particular needs of pediatric patients, Children's Hospital employs a large number of employees who have supervisory responsibilities. More than a thousand hospital personnel have management responsibilities, including individuals who hold positions that range from the Director of Food and Nutrition Services all the way up to the Chief Executive Officer.

10. A large number of personnel and medical practitioners also have the ability to perform evaluations and to prescribe medications. At an institution like Children's Hospital, the number of practitioners who have these abilities is certainly more than one thousand people.

11. According to its most recent annual report, in 2024, Children's Hospital hosted 196,987 emergency and urgent care visits; 697,194 outpatient visits; and 19,448 inpatient admissions. Children's Hospital has 632 licensed beds and provides more than 140,000 days of patient care each year.

12. Most of Children's Hospital's patients (more than 95%) are minors under the age of 18. Nearly half of the patients that Children's Hospital serves are Medicaid beneficiaries.

3022066

D.     **Medical Care for Gender-Diverse Youth and their Families**

13. I understand the Subpoena seeks information about Children's Hospital's provision of
gender-affirming care.  Gender-affirming care is care designed to support and affirm an
individual's gender identity.  It can include social, psychological, behavioral, or medical
interventions, or any combination of such care.

14. I understand that the Subpoena seeks information about Children's Hospital's provision
of certain medical interventions, including puberty blockers and hormone treatment.
Puberty blockers are a medical intervention that can postpone puberty changes that do not
align with one's gender identity.  Hormone therapy is a treatment that allows transgender
and gender-diverse patients to undergo the physical puberty changes that align with their
gender identity.

15. I understand that gender-affirming care can significantly reduce the risks for negative
health outcomes in transgender youth and, for that reason, the American Medical
Association and American Psychiatric Association (amongst others) support access to
affirming and supportive treatment for trans- and gender-diverse youth, including, when
indicated, puberty suppression and hormone therapies.

16. Children's Hospital often provides care to gender-diverse children, adolescents, and their
families through its TRUE Center for Gender Diversity.  TRUE stands for Trust, Respect,
Understand, Emerge.  The TRUE Center provides a safe and supportive environment for
transgender youth to be their authentic selves and to share information with Children's
Hospital staff without fear of judgment or repercussions.  The TRUE Center has hosted
over 3,000 patients since 2020.  Not all of the patients who seek services at the TRUE
Center receive medical gender-affirming care.

5

17. Children's Hospital's model of care includes behavioral health services for patients seeking treatment of gender dysphoria. Children's Hospital offers these services within a multidisciplinary team setting that includes experts in adolescent medicine, nursing, endocrinology, behavioral health, and social work.

18. Many of the patients at the TRUE Center seek treatment for gender dysphoria. Gender dysphoria is a condition recognized in the American Psychiatric Association's *Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition Text Revision*. To be diagnosed with gender dysphoria, a patient must present with incongruence between their gender identity and sex assigned at birth. The incongruence must persist for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

19. Children's Hospital's model of care at the TRUE Center begins with a consultation with a behavioral health clinician as a standard practice before a patient becomes eligible for medical treatment for gender dysphoria. The behavioral health clinician assesses the patient's social, mental health, and developmental histories and determines whether the patient meets the diagnostic criteria for gender dysphoria or gender incongruence. In a separate and subsequent appointment, the patient and family participate in a comprehensive discussion with an expert medical provider who assesses the patient's medical history and the family's goals. The provider discusses treatment options available to meet those specific goals. The provider offers detailed information about the risks and benefits of each treatment option.

3022066

20. Before patients receive irreversible or partially irreversible treatments, they must undergo a readiness assessment, including an assessment of the patient's capacity to understand the risks and benefits of treatment and the potential negative outcomes from the treatment. The readiness assessment also examines any co-occurring or mental health concerns that affect a patient's treatment decisions.

21. Before a patient undergoes treatment with puberty suppressing medication or hormones, Children's Hospital obtains a legally valid authorization through consent forms that outline the risks, benefits, and alternatives to medical treatment. As a standard practice, Children's Hospital does not allow minors to consent for medical care for the treatment of gender dysphoria. Minor patients participate in these discussions and can assent to their medical care. The consent forms require the signature of the parent (or other legally authorized representative).

22. Children's Hospital has never offered gender-affirming surgeries for patients under the age of 18. In 2023, Children's Hospital determined that it would no longer offer any gender-affirming surgical services for young adults who met the readiness criteria and instead refers those patients to adult surgical providers.

23. The TRUE Center has a proven record of care for its gender-diverse patients. When transgender youth have access to appropriate healthcare, it protects their well-being. Social and medical transition of gender diverse people are both associated with a reduction in mental health problems. Studies have shown that transgender adolescents show poorer psychological well-being before treatment but show similar or better psychological functioning compared with cisgender peers from the general population after the start of specialized transgender care.

7

3022066

24. The overwhelming majority of patients who receive gender-affirming care as adolescents choose to continue their care in adulthood.  Approximately 98% of the patients continue their treatment and less than 1% regret initiating treatment.  Based on a recent review of its records, Children's Hospital has not identified any adverse events, which it defines as a negative consequence of care that results in unintended injury or illness, related to gender-affirming care.

25. Gender-affirming care is legal in the State of Colorado.  Colorado's General Assembly requires commercial insurers to include gender-affirming care, including care for minors, in its coverage.

26. Gender-affirming care, including medical gender-affirming care for minors, is currently within the scope of procedures that the federal government reimburses under the Medicaid program.

**E.    The Department of Justice Subpoena and Its Impact on Children's Hospital**

27. I understand that after Children's Hospital received the Subpoena requesting information about its provision of gender-affirming care, Children's Hospital personnel met with the TRUE Center's providers.  Because Children's Hospital would need to send litigation hold notices to dozens of personnel and to avoid panic and disruption within the community it serves, Children's Hospital acknowledged that it had received a subpoena but assured patients and providers that it was evaluating the subpoena with the assistance of outside counsel and was not making changes to its care model for the time being.

8

28. Shortly after these steps, Children's Hospital set up a call center to be able to receive comments and answer questions from the TRUE Center's patients and their families. Children's Hospital also received comments from its healthcare providers. I am familiar with the feedback that Children's Hospital has received through those avenues to date.

29. Based on that feedback, I understand that the Subpoena has induced fear and panic in Children's Hospital's patients, disrupted Children's Hospital's normal operations, and caused patients at the TRUE Center to begin foregoing medical care.

30. I understand that a significant number of patients contacted Children's Hospital to demand that Children's Hospital not transmit to the federal government their confidential medical records, out of concern for their privacy and fear about how those records might be used. Children's Hospital has informed patients that it must comply with valid subpoenas. The uncertainty of whether their records will ultimately be produced through a subpoena has caused these patients and their families significant distress.

31. The confidentiality of all medical records is paramount, but the records related to gender diverse patients are among the most sensitive that Children's Hospital maintains. Transgender people suffer from high levels of stigmatization, discrimination, and victimization, contributing to negative self-image and increased rates of other mental health disorders. Transgender individuals are at higher risk of victimization and hate crimes than cisgender individuals. Suicide rates among transgender people are markedly higher than for cisgender people. Transgender children and adolescents are often victims of bullying and discrimination, which can contribute to serious adverse mental health outcomes. Disclosing individually identifiable information about these individuals' developmental and familial histories imposes harm upon these patients and their

9

families—and even disclosing the possibility and extent to which such information could
be transmitted to federal prosecutors imposes harm upon these patients and their families.

32. I also understand that patients have expressed that they are scared about losing access to
critical care they are receiving at the TRUE Center, about their physical safety, and about
being further stigmatized, targeted, and victimized by those who do not support the
transgender community.

33. Trust is paramount to the physician-patient relationship, particularly in the context of
pediatric care and care for gender-diverse families.  If patients and their families see their
sensitive health information disclosed to government agents and/or come to understand
the extent to which federal prosecutors are seeking to obtain their most sensitive health
records, their trust in Children's Hospital's providers and services will be undermined.  A
loss of trust in this context is likely to compromise patients' health outcomes.

34. Beyond patients and their families, I understand that Children's Hospital's providers have
expressed similar distress in relation to the Subpoena.  I am aware that several providers
have expressed anxiety and fear about the possibility of being targeted and/or prosecuted
in some manner for being involved in the provision of gender-affirming care, even
though the provision of gender-affirming care is lawful in Colorado.  The existence of the
Subpoena alone has hindered the ability of these providers to do their jobs and to fulfill
their obligations free of anxiety and intimidation.

35. I am also aware that the Subpoena has caused patients and providers to fear for their
physical safety, due to the fact that several hospitals have previously received threats of
violence in connection with their provision of gender-affirming care.  Such threats have
included, for example, messages wrongly insinuating that these medical providers are

10

harming children.  I am also aware that even more serious threats have been made against clinics that provide gender-affirming care (similar to the TRUE Center) throughout the United States.

36. I further understand that the combined federal actions against the transgender community, including the Subpoena and the fear brought about by its receipt, have had an impact on the number of patients who are seeking care through the TRUE Center.  In the beginning of the year, I understand the TRUE Center had a six-month waitlist for an appointment.  I have been informed that there is no longer a waitlist for services at the TRUE Center.

**F.     <u>The Subpoena would impose an enormous burden on Children's Hospital</u>**

37. Everyone employed at Children's Hospital has a company-assigned email account and communicates using email.  Children's Hospital also uses the Microsoft Office suite, including Microsoft Teams.  Children's Hospital's electronic medical record system is called Epic and is used to manage clinical, administrative, and financial functions, among other things.

38. Compliance with the Subpoena, both as written and as narrowed through negotiation with the Department of Justice, would impose a tremendous administrative and financial burden upon Children's Hospital.  It would require the production of thousands of individually identifiable patient records that contain highly sensitive information about the patients' developmental histories.  It would also require the production of thousands of patient billing records, which by their very nature contain protected health information related to patient identity and diagnoses.  It would also require the production of hundreds of personnel files.  The overwhelming majority of the personnel whose records would be disclosed are not in positions of authority to determine the scope of services

offered at Children's Hospital.  The Subpoena would also potentially require Children's
Hospital to collect and search through the electronic communications of scores of
personnel.

39. Compliance with the Subpoena would take hundreds (if not thousands) of personnel
hours across many departments at Children's Hospital, including the TRUE Center,
revenue cycle, health information systems, human resources, compliance, pharmacy,
research, and analytics resources.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct and was executed on August 8, 2025 in Aurora, Colorado.

_____
David Brumbaugh, M.D.