# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 25-mc-00063-SKC-CYC

**IN RE: DEPARTMENT OF JUSTICE ADMINISTRATIVE SUBPOENA No. 25-1431-030**

---

### UNITED STATES'S SURREPLY IN OPPOSITION OF THE MOTION TO QUASH

---

Respondents file this surreply in opposition to Children's Hospital Colorado's Motion to Quash, Dkt. 1, and Reply, Dkt. 16. In the Reply, Petitioner repeatedly cites to and argues the applicability of a District of Massachusetts decision assessing a similar subpoena. *See In Re: Admin. Subpoena No. 25-1431-019*, 2025 WL 2607784 (D. Mass. Sept. 9, 2025) (attached as Exhibit 1) ("BCH Order"), Reply at 1, 3, 5-6 (Dkt. 16). The citation of a case not published at the time of the United States's Opposition and the arguments relied upon by CHC on the newly published case mean that the United States should have an opportunity to respond to these new arguments. Further, the United States continues to litigate the BCH Order, including by filing a Motion to Alter or Amend the BCH Order. Exhibit 2.

### BACKGROUND

Children's Hospital Colorado ("CHC") filed the Motion to Quash on August 8, 2025.  Dkt. 1.  The United States filed an Opposition on August 29, 2025. Dkt. 10. On September 9, 2025, the United States District Court for the District of Massachusetts entered an order quashing an administrative subpoena issued to Boston Children's

Hospital ("BCH Order"). On September 12, 2025, CHC filed a Reply to the United

States's Opposition where it cited the BCH Order. The United States has had no

opportunity to respond to the BCH Order in this matter as part of the Response to the

Motion to Quash.

**ARGUMENT**

CHC relies on the BCH Order and argues that the instant Subpoena lacks a proper

purpose and that this Court follow the same reasoning as the District of Massachusetts in

deciding the instant Motion to Quash.  *See In re: Administrative Subpoena*, Indext No.

25-1431-019, ECF No. 33 (D. Mass. Sept. 9, 2025) (attached as Exhibit A to CHC's

Reply Dkt. 16)(the "BCH Order"). This decision, unlike any other authority cited by

CHC in its motion to quash, suggests that the government may need to submit an

affidavit or other evidence detailing any substantiating predicates to an investigation to

show a proper purpose. Indeed, CHC states in its Reply, the United States has, in essence,

not provided any basis to conclude that the Subpoena is issued other than to "harass" and

"pressure," and cites the BCH Order stating that "The Government has not submitted any

affidavits or other evidence to show proper purpose." Dkt. 16 at 5.

1.  **The BCH Order Improperly Shifted the Burden to the Government and
    Repeatedly Relieved the "Heavy" Burden to Prove the Entire Subpoena Is
    Invalid.**

The Government's burden to show that an administrative subpoena should be

enforced "is a slight one," and the burden of a subpoena recipient to avoid enforcement

"is a heavy one." *United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1444 (10th

Cir. 1985). The BCH Order acknowledged that the burden of resisting an administrative subpoena is on the recipient, Opinion at 9-10, but the BCH Order erroneously did not hold the respondents in that case to its proof.

In the BCH Order, as here, the Government has not filed a lawsuit or otherwise requested relief from the Court, and the BCH Order does not make clear what showing the movants made to justify shifting the burden to the Government. Rather than performing an assessment of the movant's showing or even stating what such a showing would be, the BCH Order "first assessed" "whether the Government has made its *prima facie* showing of proper purpose," BCH Order at 10—but performed no such assessment of the movants' evidence or even stated what such a showing would be. This inversion of the burden of proof is the same as what CHC asks this Court to do as well. The Supreme Court has squarely held that the burden of showing an improper purpose lies with the movant, and that burden is a "heavy" one. *United States v. La Salle Nat'l Bank*, 437 U.S. 298, 316 (1978). Yet the BCH Order does not show how the movants in that case met their "heavy" burden of showing an improper purpose before analyzing whether the Government had made a sufficient showing of proper purpose.

Here CHC bears the "heavy burden" of proof throughout the proceeding as the movant to identify how the *entire subpoena* was unauthorized. As to this matter, items before the Court include:

- The Attorney General ordered the Civil Division's Consumer Protection Branch, of which the undersigned is an Assistant Director, to "undertake appropriate investigations of any violations of the Food, Drug, and

Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"

- The Assistant Attorney General issued a memorandum directing the Civil Division, of which the Consumer Protection Branch[1] is a component, to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's directive]."

- The Assistant Attorney General issued the administrative subpoena in question to CHC as part of the investigation described above.

- Causing the distribution of unapproved drugs can be an FDCA violation, which can be a federal health care offense. 21 U.S.C. § 331(d); 18 U.S.C. § 24.

These undisputed facts paint a clear picture: the Attorney General has ordered an investigation of potential FDCA health care offense violations committed in the course of gender-related care for minors, CHC provides such care and uses federally-regulated drugs in an off-label manner while providing such care, and the Assistant Attorney General for the Civil Division issued a procedurally proper subpoena in furtherance of

---

[1] Effective September 15, 2025, the Enforcement & Affirmative Litigation Branch ("EALB") replaced the Consumer Protection Branch ("CPB") in the Department of Justice. All of the legal authorities previously vested in CPB now are vested in EALB.

this investigation.  At the very least, CHC as the movant has not carried its "heavy"
burden to disprove *any* of the bulleted facts above.

### 2.  The BCH Order Erroneously Heightened the Burden on the Government

"[A]s long as the agency's assertion of authority is not obviously apocryphal, a
procedurally sound subpoena must be enforced," *United States v. Sturm, Ruger & Co.*, 84
F.3d 1, 5-6 (1st Cir. 1996) (collecting cases).  The BCH Order found that DOJ is
authorized to investigate healthcare fraud and at least some aspects of off-label use of
pharmaceuticals.  BCH Order at 11-12. Because DOJ's assertion of authority is not
"obviously apocryphal," the result of this proceeding should be simple: The subpoena
should not be quashed.  To the extent CHC argues that certain requests exceed DOJ's
authority sounds in the relevance of *those requests*—not the subpoena's overall viability.
This Court should evaluate the subpoena and the information in the record against the
subpoena's authorized purpose.

The BCH Order also applied the wrong standard by misreading *In re Sealed Case*,
42 F.3d 1412 (D.C. Cir. 1994), and *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir.
1973). At a critical juncture in the BCH Order, Opinion at 12, a contrary-to-law rule that
the Government may not send a subpoena in a "fishing expedition" to go on a "rambling
exploration" that "cast[s] about for potential wrongdoing" was established. But these
cases stand for no such general proposition: if they did, they would conflict with Supreme
Court precedent.

Instead, the disputes in those cases relate to very specific contexts in which very
specific subpoenas were issued:  The dispute in *In re Sealed Case* concerned whether the

Office of Thrift Supervision had statutory authority to subpoena the *personal* bank accounts of 1980s savings-and-loan executives whose accounts were not relevant to determining liability under the statute. *Theodore* rejected the IRS's use of so-called John Doe summonses to obtain hundreds or thousands of tax returns prepared by a high-volume preparer to evaluate those tax returns. In stark contrast to *Sealed Case*, this Court already determined that the Government does have the statutory authority to investigate the federal healthcare offenses under investigation, and in stark contrast to *Theodore*, the Government is statutorily limited by 18 U.S.C. § 3486(e) from using the health records it obtains to investigate patients. Those cases have very little to say about the issues before this Court.

In contrast to the BCH Order's misplaced reliance on the narrow relevance and scope-based holdings of inapposite cases, *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), establishes that the Government is perfectly empowered to send subpoenas within its statutory authority in order to determine whether a federal health care offense may have been committed—as it has done here with CHC, which is a large, regulated healthcare provider.

### 3. This Court Should Provide the Government an Opportunity to Make a Showing Under the BCH Order's New Standard

The BCH Order creates a new standard for subpoena enforcement in which the Government must provide articulable suspicion for its subpoena requests, ruling that the Government should have articulated its "suspicion that BCH is actually engaging in

fraudulent billing practices or off-label promotion in the first instance." BCH Order at
12.

As with the litigation involving the BCH Order, the Government here had no
reason to anticipate, much less to meet this newfound articulable suspicion standard. *See,
e.g.*, *Gimbel v. FDIC (In re Gimbel)*, 77 F.3d 593, 602 (2d Cir. 1996) ("articulable and
individualized suspicion" generally not required to enforce an administrative subpoena).
If this Court is inclined to favor CHC's arguments in this regard, the Government submits
that it should be given the opportunity to meet this new standard. *See FTC v. Gallo*, No.
653-73, 1973 U.S. Dist. LEXIS 11573, at *9 (D.D.C. Oct. 9, 1973) (ordering the
Government to submit additional information about an administrative subpoena after the
district court determined that the subpoena recipient had made an initial showing in its
brief).

The Government is amply able to meet the BCH Order's newly announced,
heightened standard. The attached affidavit proffers a variety of facts and information to
the Court which demonstrates this. *See* Hsiao Declaration (attached as Exhibit 3). The
affidavit sets out a non-exhaustive legal and factual background to the Government's
investigation as well as relevant facts about CHC and the drugs at issue. *Id*. And it
describes how there is cause to investigate whether CHC and its associates are violating
the FDCA—either directly or through a conspiracy with others (e.g., with pharmacies,
drug manufacturers, and/or distributors)—with the intent to defraud and mislead. *Id*. at
10-13.

The Government did not issue its subpoena to CHC at random. CHC houses the "TRUE Center for Gender Diversity," ("TRUE Center") a clinic that explicitly holds itself out in marketing and promotional materials (including through an internet website) as specializing in the treatment of children and adolescents who suffer from gender dysphoria, including by providing puberty blockers and cross-sex hormones to minors for non-FDA approved uses. The TRUE Center webpage describes specialty services, including "Puberty-delaying treatments," and gives written explanations of how the drugs work, describes them as safe, and describes how they are used. *Id.* at ¶ 34. This information supplements and explains the drugs at issue in the Government's investigation. The TRUE Center website also contains information related to "Hormone therapy" and explains how the use of medications may be used and their intended effects. However, such statements have not been evaluated by the FDA related to the off-label use of the drugs presumably being used and may contain arguably false and misleading information, making the distribution of these materials an act that renders the drugs misbranded.

For example, the TRUE Center webpage states that "[t]hese medicines can postpone puberty changes that do not align with one's gender identity." This assertion omits information that is potentially material to the decision of whether to undergo treatment with medication, the effects of which are serious and may be irreversible. *Id*. at ¶ 35. Other statements about the safety of treatment on Children's Hospital Colorado's website are likewise potentially false or misleading, including statements that these treatments are safely prescribed and monitored, which downplays and minimizes the

known risks and uncertainties (due to the limited data and the "very low" quality of that data). *Id.* Indeed, one of CHC's own providers has published articles describing decreased bone density, on average, among children who are given puberty blockers. The same author acknowledges risks of conditions like erythrocytosis (high red blood cell count), dyslipidemia (i.e., high cholesterol), and potential increased myocardial infarction (heart attack). *Id.* at ¶ 40.

Despite purported standards of care and so-called individualized treatment plans, many patients are able to obtain hormone replacement drugs, which can permanently alter person's physiology, upon mere referral and consent of a minor patient's guardians—often on an initial visit. According to a lawsuit filed by the ACLU under pseudonym, a former Children's Hospital Colorado TRUE Clinic patient was prescribed testosterone, a schedule III controlled substance, in March 2022 after being referred to the TRUE Center in "early 2022." *Caden Kent v. Children's Hospital Colorado*, 2024-CV-30455 Dkt. 1 ¶¶ 24-25. Consistent with concerning practices in other gender clinics, specifically that of children being "rushed" into a medical pathway without appropriate psychological evaluation—far less evaluation time than required even under the WPATH purported standards of care (which themselves have come under significant scrutiny in light of internal WPATH documents made public last year)—including being prescribed puberty blockers and hormones by endocrinologists who have not actually sought informed consent. The claims in the *Caden Kent* case indicate that the TRUE Clinic may be providing prescriptions for testosterone upon the very first encounter or early encounter with a patient.

This timing coincides with a dramatic increase by CHC in furnishing puberty blockers and hormone therapies to minors in 2022, with such prescriptions being given to more than 60 minors, up from an average of between 4-14 patients in the prior three years. *Id.* at ¶ 36. *See also* https://stoptheharmdatabase.com/hospital/childrens-hospital-colorado/

Moreover, evidence exists that CHC, and its associates may have knowingly violated the FDCA—either directly or through a conspiracy with others (e.g., with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead. As specified earlier, although violations of the FDCA are strict liability misdemeanors, if done with the intent to defraud or mislead, they are felonies. CHC's website explicitly states that "gender-affirming medical care is a growing science." Hsiao Decl. at ¶ 37. It further acknowledges that it is "contributing to the academic research that informs evidence-based medicine." *Id.* These statements are in contradiction to the website's assertions that the "treatments are safely prescribed," because, in fact, the treatments are not being administer with drugs approved by the FDA for the purpose of treating gender dysphoria.

CHC concedes that gender-affirming medicine is experimental, by euphemistically calling it an "emerging science." *Id.* The statement that it is contributing to academic research that informs evidence-based medicine may be misleading because by engaging in non-FDA approved medicalization of minors, CHC may falsely convey that the medications used are undergirded by evidence-based studies and evaluated and approved in the United States for treatment of gender dysphoria. This may also conceal the risks

identified by research conducted by CHC's own providers. This falsity may provide the requisite *mens rea* for an FDCA felony, and this practice may also violate other federal criminal statutes such as 18 U.S.C. § 1035 (false statements relating to health care matters) and 18 U.S.C. § 1347 (health care fraud). It is not uncommon to charge additional federal crimes, i.e., Title 18 offenses, along with FDCA criminal offenses.

All of these items constitute the type of articulable suspicion the Court required of the Government, and because the Government could not have anticipated the standard but can meet it, the Court should revise its opinion and find that the Government meets the standard.

### 4. The BCH Order's Bad Faith Finding Is Erroneous

Finally, the BCH Order incorrectly assumed that the subpoena issued in that case is motivated "only by bad faith" and "to harass and intimidate" hospitals.  BCH Order at 14. The Attorney General did not order an unlawful investigation, there is not a single piece of evidence indicating that she did, and the BCH Order's contrary conclusion is neither supported by the facts nor by the statutes relied upon by the Government in pursuing the information it seeks.

As expressed by the Attorney General and the President, the Executive Branch has advanced a policy goal of ending gender-related pharmaceutical and surgical treatment of minors.  The Executive Branch can choose to support that policy goal—a policy goal that the Supreme Court recognizes is rational, *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1835-36 (June 18, 2025)—in a variety of ways.  This includes, of course, by conducting lawful and appropriate investigations to determine if federal law has been

violated by individuals engaging in potential misconduct.  Government officials, like all

human beings, often have multiple valid reasons for performing actions: The Attorney

General wants to investigate federal healthcare offenses (including those committed in

connection with the provision of gender-related care to minors) at the same time she

wants to curtail the practice of gender-related pharmaceutical and surgical care to minors

overall.  Nothing about that situation is improper, mutually exclusive, pretextual, or even

remarkable—CHC has not attempted to address why the Attorney General having both

goals is impermissible.

   Moreover "a court may not reject an agency's stated reasons for acting simply

because the agency might also have had other reasons." *Dep't of Com. v. New York*, 588

U.S. 752, 781 (2019) (citing *Jagers v. Federal Crop Ins. Corp.*, 758 F. 3d 1179, 1185–

1186 (10th Cir.  2014) for "rejecting argument that 'the agency's subjective desire to

reach a particular result must necessarily invalidate the result, regardless of the objective

evidence supporting the agency's conclusion'").  "Relatedly, a court may not set aside an

agency's decision solely because it might have been influenced by political

considerations or prompted by an Administration's priorities." *Id.*

   The BCH Order's finding of "harass[ment]" is unsupported by the record.  The

federal government often sends subpoenas to investigate practices that may or may not

violate federal law, and there is the obvious possibility that an entity receiving such a

subpoena will cease unlawful activities related to a controversial practice before any

enforcement action is litigated.  Other courts have recognized this phenomenon and have

correctly found it unremarkable. *Solis v. Forever 21, Inc.*, No. 12-09188, 2013 U.S. Dist. LEXIS 64462, at *21 (C.D. Cal. Mar. 7, 2013).

The Attorney General and Assistant Attorney General's actions are entitled to a presumption of regularity, *Banks v. Dretke*, 540 U.S. 668, 696 (2004), and the BCH Order erred when it assumed that the Attorney General or the Assistant Attorney General gave orders and signed subpoenas to harass and intimidate hospitals in a way that is "unrelated to investigating fraud or unlawful off-label promotion." To have done so, of course, these officials would not only need have lied in their official memos about the "appropriate[ness]" of the investigation, but they would also need to disbelieve their own justifications for these actions—that is, that at least some aspects of pharmaceutical and surgical gender-related care for minors likely violate federal law. CHC does not ask this Court to make such findings, nor does it present any evidence in support of them, and this Court should not casually making findings that the Attorney General of the United States lied in an official memorandum.

## CONCLUSION

For the reasons stated herein, the United States's investigation is valid, the Subpoena was issued pursuant to a proper purpose, and therefore the Court should deny

CHC's Motion to Quash the Subpoena.


Dated this 10th day of October 2025.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

SARMAD M. KHOJASTEH
Senior Counsel
Civil Division

LISA K. HSIAO
Acting Director

ROSS S. GOLDSTEIN
PATRICK RUNKLE
Assistant Directors

 /s/ Scott B. Dahlquist
**Scott B. Dahlquist**
Trial Attorney

United States Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:    202-532-4602
Fax:    202-514-8742
scott.b.dahlquist@usdoj.gov

Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October 2025, filed the foregoing

with the Clerk of Court using the CM/ECF system, and separately emailed to

counsel for Children's Hospital Colorado at:

Elliot R. Peters
epeters@keker.com

Cody Gray
cgray@keker.com

Katherine S. Folly
kfolly@keker.com

Aseem Mehta
amehta@keker.com

KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415-391-5400
Facsimile: 415-397-7188.

Dated this 10th day of October 2025.

/s/ *Scott B. Dahlquist*
Scott B. Dahlquist

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
In Re: Administrative Subpoena      )
                                    )         No. 1:25-mc-91324-MJJ
No. 25-1431-019                     )
                                    )
_____)

## <u>MEMORANDUM OF DECISION</u>

September 9, 2025

JOUN, D.J.

On June 11, 2025, the Department of Justice ("DOJ") served The Children's Hospital

Corporation d/b/a Boston Children's Hospital ("BCH") with an administrative subpoena issued

pursuant to 18 U.S.C. § 3486, which authorizes, in part, the issuance of an administrative

subpoena "[i]n any investigation of . . . a Federal health care offense." 18 U.S.C. §

3486(a)(1)(A)(i)(I). The subpoena was issued to BCH, along with numerous other hospitals

across the country, seeking the production of information and documents relating to the

hospital's provision of gender-affirming care ("GAC"). The subpoena was purportedly issued to

investigate whether BCH was engaged in unlawful off-label promotion of puberty blockers and

cross-sex hormones in violation of the Food, Drug, and Cosmetic Act ("FDCA") and other false

claims that may have been submitted to federal healthcare programs. The subpoena contains 15

separate requests for documents related to BCH's staff, patients, and provision of GAC. [*See*

Doc. No. 4 at 17]. Before me is BCH's Motion to Quash the subpoena, [Doc. No. 3], as well as

BCH's Motion to Seal the case, [Doc. No. 2].

## I.    BACKGROUND

BCH is one of the largest leading pediatric hospitals in the nation. It is dedicated to

improving and advancing the health and well-being of children through its work in clinical care,

biomedical research, medical education, and community engagement. [Doc. No. 4 at 9]. BCH is

also home to the first pediatric and adolescent transgender health program in the United States.

[*Id.* at 10]. Major medical organizations in a variety of specialties recognize gender dysphoria as

a medical condition in individuals who may experience a conflict between the sex they were

assigned at birth and the gender with which they identify, which can cause extreme distress and

can lead to severe depression, anxiety, and suicidal ideation. [*Id.*]. Doctors have described GAC

as a medical necessity. [*Id.* at 10–11]. BCH offers GAC in the form of physical and

psychological assessments, ongoing medical care, and therapy and support groups, and has also

invested in research and training related to GAC. [*Id.* at 10]. In Massachusetts, "[a]ccess to …

gender-affirming health care services is a right secured by the constitution and laws of the

commonwealth. Interference with this right, whether or not under the color of law, is against the

public policy of the commonwealth." Mass. Gen. Laws ch. 12, § 11I ½(b).

The Administration has taken a firm stance against GAC, making its disapproval of the

transgender community well known and terminating GAC a priority. On his first day in office,

President Donald J. Trump issued Executive Order 14168, titled "Defending Women From

Gender Ideology Extremism and Restoring Biological Truth to the Federal Government."[1] The

Executive Order declares that gender identity is a "false" idea and that the United States only

---

[1] *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, The White House (January 20, 2025), https://tinyurl.com/227z34e3.

recognizes "two sexes, male and female" which are "not changeable."[2] The Administration has issued several other executive orders prohibiting transgender individuals from serving in the military, eliminating federal funding from schools that support "gender ideology," and banning transgender women and girls from competing in sports aligned with their gender identity. [Doc. No. 4 at 13].

On January 28, 2025, President Trump issued Executive Order 14187, aimed at restricting access to medical care for transgender youth.[3] The goal of the Order is to end GAC. The Order accuses medical providers of GAC of "maiming and sterilizing" children or engaging in "mutilation," and states that "[t]his dangerous trend will be a stain on our Nation's history, and it must end."[4] On April 22, 2025, Attorney General Pamela Bondi issued a memorandum, titled "Preventing the Mutilation of American Children," directing the Civil Division of the DOJ to "act decisively to protect our children and hold accountable those who mutilate them under the guise of care" and "to undertake appropriate investigations of any violations of the [FDCA] by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"[5]

On June 11, 2025, the Civil Division issued a memorandum (hereinafter, the "Civil Division memo") that stated that the Division will use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities

---

[2] *Id.*

[3] *Protecting Children from Chemical and Surgical Mutilation*, The White House (Jan. 28, 2025), https://tinyurl.com/mwadx9cw.

[4] *Id.*

[5] Memorandum from Attorney General, *Preventing the Mutilation of American Children*, Office of the Attorney General, at 3-4 (April 22, 2025), https://tinyurl.com/2b9kaja7.

consistent with these directives," and "hold accountable those who mutilate [children] under the guise of care" and pursue investigations of "radical gender experimentation."[6] The Civil Division memo states expressly that these investigations include possible violations of the FDCA regarding drugs dispensed in connection with GAC, as well as possible violations of the False Claims Act against health care providers that bill the federal government for "impermissible services," which includes providers that attempt to "evade state bans on gender dysphoria treatments by knowingly submitting claims to Medicaid with false diagnosis codes."[7]

On June 11, 2025, the same day the Civil Division memo was issued, the DOJ served BCH with an administrative subpoena pursuant to 18 U.S.C. § 3486, seeking the production of documents related to BCH's staff and its provision of GAC. [Doc. No. 4 at 17; Doc. No. 5-1]. The 15 document requests include, but are not limited to, requests for any and all information regarding BCH's personnel, documents, and communications regarding the use of billing codes in connection with GAC for minor patients; communications with pharmaceutical manufacturers regarding the use of puberty blockers or hormones in connection with GAC for minor patients; and documents and medical records of patients, including patients' social security numbers and home addresses. [Doc. No. 4 at 17]. In addition to investigating billing fraud as outlined in the Civil Division memo, the Government claims that it is "conducting an investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones for use by minors violated federal law, including the Food, Drug, and Cosmetic Act ("FDCA")." [Doc. No. 21 at 1].

---

[6] Memorandum from Assistant Attorney General Brett A. Shumate, *Civil Division Enforcement Priorities,* Office of the Assistant Attorney General, at 2-3 (June 11, 2025), https://tinyurl.com/mr3bym4f.

[7] *Id.* at 3.

## II.  ANALYSIS

### A.  <u>Motion to Seal</u>

"A case filed in federal court and the documents filed in the case are presumed to be public." *Morgan v. Middlesex Sheriff's Office*, No. 14-cv-10659, 2014 WL 4104173, at *6 (D. Mass. Aug. 13, 2014). "Public access to judicial records and documents allows the citizenry to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system." *FTC v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) (citation omitted). The public's interest in accessing court files "is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." As such, "only the most compelling reasons can justify non-disclosure of judicial records." *Id.* at 410 (citation omitted).

Still, I acknowledge that "the right to inspect and copy judicial records is not absolute . . . and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) (describing the courts' "supervisory power" to ensure that records are not used for improper purposes such as to "gratify private spite or promote public scandal," promote libel, or publicize "business information that might harm a litigant's competitive standing"). However, in such circumstances, Rule 26(c) of the Federal Rules of Civil Procedure provides that parties seeking to file a document under seal must demonstrate that "good cause" exists to do so. *Dunkin Donuts Franchised Restaurants, LLC v. Agawam Donuts, Inc.*, No. 07-cv-11444, 2008 WL 427290 at *1 (D. Mass. Feb. 13, 2008). Good cause exists where the moving party demonstrates "the harm that would be sustained if the court did not allow the filing under seal." *Id.*

BCH argues that both the text of the statute and the principles of grand jury secrecy supply the bases for sealing here. I address each of these arguments in turn.

### 1.  18 U.S.C. § 3486

BCH points to Section 3486 in support of sealing, which provides that the Government "may issue an ex parte order that no person or entity disclose to any other person or entity . . . the existence of" the subpoena upon a "showing that . . . there is reason to believe that such disclosure may result in" the "endangerment to the life or physical safety of any person" or "intimidation of potential witnesses." *See* 18 U.S.C. § 3486(a)(6)(A)-(B)(i) and (B)(iv). BCH argues that if the statute permits the Government to seek issuance of this non-disclosure order, the same reasoning should apply to the subpoenaed party in these unusual circumstances. [*See* Doc. No. 2 at 5]. BCH has not pointed to a case that holds that the statute permits the subpoenaed party to seek such an order. However, even assuming BCH's position is correct, sealing is not warranted.

BCH and its employees have experienced threats of physical violence for providing GAC. BCH proffers several incidents that are cause for serious concern, including bomb threats, threats of violence and harassment, and death threats, all targeted toward BCH employees through abusive telephone calls, emails, social media posts, mail, and even messages submitted through the hospital's online appointment registration system. BCH argues that these threats constitute good cause for sealing. I empathize with BCH's position. However, it is already public knowledge that BCH provides GAC services. Making this case public does not move the needle on this score. The Government has also made public its intent to investigate GAC. On this latter point, I agree with BCH that the Government should not benefit from its own role in letting the cat out of the bag—but the bag has, nevertheless, been opened. *United States v. ISS Marine*

*Servs., Inc.*, 905 F. Supp. 2d 121, 141 (D.D.C. 2012) (unsealing allowed where the "Government's investigation . . . has been public knowledge for some time").

BCH makes an additional argument: that sealing the case is warranted because the public is only generally aware (by the Attorney General's public announcement) that the DOJ has issued these administrative subpoenas on numerous hospitals across the country but is not aware that a subpoena has been served on BCH specifically, and that such knowledge could exacerbate those existing threats. This is not an irrational fear. However, such speculative generalized fear cannot clear the high burden of sealing the entire docket for an unlimited period. Our courts cannot operate in secret. I find that the statute does not provide sufficient basis for sealing here.

### 2. Secrecy Rules In The Grand-Jury Context

BCH further argues that because the subpoena involves the investigation of a criminal federal healthcare offense, the subpoena should be analogized to the secrecy rules in the grand-jury context. "Prior to an indictment, governmental authorities are under an obligation not to reveal the existence and nature of an investigation concerning individuals who are merely suspected of criminal activities." *Gonzalez-Bernal v. United States*, 907 F.2d 246, 250 (1st Cir. 1990); Fed. R. Crim. P. 6(e). The Supreme Court has recognized that the "grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218–219 (1979).

There are similarities as well as differences between grand jury subpoenas and administrative subpoenas. See *Missouri Baptist Med. Ctr. v. U.S. Dep't of Just.*, No. 22-mc-871, 2023 WL 315021, at *2 (E.D. Mo. Jan. 19, 2023) (analogous "due to their functional similarity as an evidence-gathering tool"). Although the underlying investigation here may implicate a criminal fraud investigation, BCH has not pointed to any case holding that the secrecy principles

surrounding administrative subpoenas are as strong as they are for grand jury subpoenas. Further,

given that Section 3486 *does* provide a mechanism for non-disclosure, Congress could have

chosen to provide additional privacy protections when issuing administrative subpoenas to

investigate healthcare fraud but chose not to do so. *Connecticut Nat. Bank v. Germain*, 503 U.S.

249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means

and means in a statute what it says there."). I must respect that. What is more, this matter simply

aims to resolve the narrow question of whether the administrative subpoena seeking certain

documents and information is valid or invalid. For these reasons, keeping the docket sealed is not

warranted here.[8]

### B.   Motion to Quash

"Section 3486 authorizes the Attorney General, in any investigation relating to a federal

health-care offense, to issue an administrative subpoena requiring 'the production of any records

or other things relevant to the investigation' and 'testimony by the custodian of the things

required to be produced concerning the production and authenticity of those things.'" *In re*

*Amato*, No. 05-mc-29, 2005 WL 1429743, at *4 (D. Me. June 17, 2005) (cleaned up) (citing 18

U.S.C. § 3486(a)(1)(B)). "[T]he subject of an administrative subpoena has an opportunity to

challenge the subpoena before yielding the information." *United States v. Sturm, Ruger & Co.*,

84 F.3d 1, 3 (1st Cir. 1996).

---

[8] Nor can I allow what documents that has been filed to remain under seal. BCH has failed to "explain, on a document-by-document basis, why sealing is required and how their request satisfies the applicable legal standard." *Bradford & Bigelow, Inc. v. Richardson*, 109 F. Supp. 3d 445, 447 (D. Mass. 2015); *In re: Subpoena No. 25-1431-014*, No. 25-mc-00039 (E.D. Penn. July 25, 2025) (denying motion to seal the entirety of its motion to quash a similar administrative subpoena issued to a hospital where the hospital did not provide a line-by-line demonstration of the particularized harm allegedly at risk); *see also* District of Massachusetts Local Rule 7.2 (requiring litigants to file a motion for impoundment each time a specific document or group of documents is to be filed, and prohibiting the court from entering "blanket orders" of confidentiality any time a document is to be filed).

"The requirements for enforcement of an administrative subpoena are not onerous. In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena." *Id.*; *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950) (agency's request for documents should be approved by the judiciary so long as it "is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant"); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946) (the court must determine whether the investigation is "authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry"). "The role of a court in a subpoena enforcement proceeding is strictly limited to inquiring whether the above requirements have been met. Such proceedings are designed to be summary in nature." *United States v. Comley*, 890 F.2d 539, 541 (1st Cir. 1989) (citation omitted).

### 1. **Improper Purpose**

While the parties agree that the above standards govern whether a court can enforce an administrative subpoena, they dispute whether there is a "bad faith" exception to the issuance of such a subpoena. BCH relies on the Supreme Court's ruling in *United States v. Powell*, 379 U.S. 48 (1964) to argue that the bad faith exception applies in this case. There, the Court held that the Internal Revenue Service—which was using its subpoena power to seek production of documents from the president of a corporation—need not meet any standard for probable cause. *Id.* at 57. However, the Court held that a court may not enforce an administrative summons if to do so would "permit its process to be abused." *Id.* at 58. The Court specified that "[s]uch an abuse would take place if the summons had been issued for an improper purpose, such as to

9

harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the taxpayer." *Id.*

The Government argues that there is no freewheeling "bad faith" exception, citing cases that hold that a court need not make inquiries into the motives behind a lawful investigation. While that proposition is generally true, the Government's argument misses the mark. Evidence of bad faith is relevant to whether an investigation is being pursued for an improper purpose. For instance, in *United States v. Comley*, Comley challenged the enforcement of an administrative subpoena served upon him by the Nuclear Regulatory Commission. 890 F.2d 539. There, upon challenge, the First Circuit first assessed whether the Commission made a prima facie showing of proper purpose and then turned to Comley's argument that the Commission's issuance of the subpoena was "motivated only by bad faith in its investigation of the employee." *Id.* at 542. The First Circuit held that "[i]f Comley's assertions were supported by firm evidence, then we would have adequate justification to deny enforcement of the subpoena." *Id.* (citing *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose, such as harassment, its enforcement constitutes an abuse of the court's process.")). In line with these principles, I first assess whether the Government has made its prima facie showing of proper purpose, and then whether BCH has shown that the subpoena was issued for an improper purpose.

The Government argues that the subpoena is valid and enforceable. First, the Government argues the statute authorizes the DOJ to issue a subpoena in connection with an investigation of federal healthcare offenses, 18 U.S.C. § 3486(a)(1)(A)(i)(I). Second, the Government argues that the subpoena is procedurally sound as it was signed by the Attorney General of the United

States, served on BCH, and calls for the production of documents relevant to an investigation within 500 miles of BCH. Third, the Government argues that its requests are relevant to the purpose of its investigations "[b]ecause BCH is an acknowledged provider of the type of health care services under investigation," and as such, "the individual requests— which seek records related to the provision of those services—are also valid under the statute." [Doc. No. 21 at 14]. I find that, while the Government has made a prima facie showing that it is authorized by statute to issue a subpoena if it relates to a federal healthcare offense, significantly, the Government has failed to show proper purpose. The Government has not submitted any affidavits or other evidence to show proper purpose. *See Comley*, 890 F.2d at 541 ("[T]he affidavits of government officials have been accepted as sufficient to make out a prima facie showing that these requirements are satisfied."). Instead, the Government simply points to the April 22, 2025 Memorandum of the Attorney General directing the Civil Division "to undertake appropriate investigations" to make the argument that since the Government would not have issued the subpoena unless it was for an "appropriate" investigation, the subpoena must have been issued for a proper purpose. This logic, if followed, would preclude any form of judicial review as the Government's self-proclaimed say-so would always be sufficient to defeat a motion to quash. This is no logic at all.

Numerous statements by the Administration, executive orders, and memorandums, detail the Administration's goal of ending GAC. While portions of these statements also refer to suspicions of improper billing practices and unlawful off-label promotion, the Government has not provided any support that the information sought by the subpoena is limited to these potential healthcare offenses, as opposed to the Government's stated goal of ending GAC. To be clear, the Government cannot broadly make inquiry into the provision of GAC generally—any such

inquiry must be limited to the healthcare fraud that is authorized by the statute: fraudulent billing codes and unlawful off-label promotion. That is not the case here.

The requests seek an astonishingly broad array of documents and information that are virtually unlimited in scope. For example, Request Nos. 1, 11, and 12 seek the personnel files of nearly all 2,000 individuals who work for BCH in any capacity, not limited to their employment as it relates to GAC. They also seek all medical records and personal information of patients who have been provided with GAC, including their social security numbers and home addresses, despite the tenuous link these medical records (or their personal information) would have to potential fraudulent billing codes and unlawful off-label promotion. Requests Nos. 7-10 are similarly overbroad, seeking documents and communications with pharmaceutical manufacturers, sales representatives, marketing departments, and medical science liaisons regarding the treatment of gender dysphoria and the use of puberty blockers or hormones generally.

The Government seeks all this while not offering an iota of suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance.[9] The Government may be correct that it need not provide probable cause for its investigations, but it cannot use its subpoena power to go on a fishing expedition. *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994) (quashing subpoena to the extent that the agency sought "unfettered authority to cast about for potential wrongdoing"). *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973) ("The Government cannot go on a "fishing

---

[9] Indeed, the Government acknowledges that it "has not made a decision as to whether BCH is a target . . . BCH *may* be simply a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use. Or it *may* be a witness to whom other people or entities directed false statements on the topic of pharmaceutical treatments in gender-related care for minors. Or BCH personnel *may* have committed federal health care offenses without the knowledge of BCH management." [Doc. No. 21 at 13 (emphasis added)].

expedition" . . . and where it appears that the purpose of the summons is "a rambling

exploration" of a third party's files, it will not be enforced") (citations omitted).

Context is important. For example, a statement made by a DOJ representative at the

Federal Trade Commission recently claimed that the agency was "working on" getting GAC to

"stop even in blue states."[10] After President Trump issued his Executive Order directing the

Attorney General to prioritize investigations into GAC, the White House issued an article that

boasted how several hospitals and healthcare systems have stopped providing GAC entirely.[11]

These statements have no connection to the Government's asserted purpose of stopping alleged

fraudulent billing practices or unlawful off-label promotion.

The Government's publicly stated goal of issuing these subpoenas is also in direct

contradiction with the Massachusetts constitution, which provides for the right to GAC. *United

States v. Skrmetti*, 145 S. Ct. 1816 (2025) ("We afford States wide discretion to pass legislation

in areas where there is medical and scientific uncertainty.") (citation omitted). In its Civil

Division memo, the Government noted that part of its investigation includes investigating

whether providers are attempting to "evade state bans on gender dysphoria treatments by

knowingly submitting claims to Medicaid with false diagnosis codes."[12] But Massachusetts does

not ban GAC. And there exists a diagnosis code for GAC for billing purposes. It is thus difficult

to understand what exactly the Government is trying to investigate BCH for.

---

[10] *See* FTC, *The Dangers of "Gender-Affirming Care" for Minors*, at 29 (July 9, 2025),
https://tinyurl.com/mrap7e2f.

[11] *See President Trump Promised to End Child Sexual Mutilation — and He Delivered*, The White House
(July 25, 2025), https://tinyurl.com/2dhcwjdd.

[12] The Civil Division Memo, at 3.

The Administration has been explicit about its disapproval of the transgender community and its aim to end GAC. The subpoena reflects those goals, comprising overbroad requests for documents and information seemingly unrelated to investigating fraud or unlawful off-label promotion. It is abundantly clear that the true purpose of issuing the subpoena is to interfere with the Commonwealth of Massachusetts' right to protect GAC within its borders, to harass and intimidate BCH to stop providing such care, and to dissuade patients from seeking such care. For the above reasons, I find that the Government has failed to show proper purpose and, even if it had, that BCH has demonstrated that the subpoena was issued for an improper purpose, motivated only by bad faith.

**III.      CONCLUSION**

For the above reasons, BCH's Motion to Seal is <u>DENIED</u> and BCH's Motion to Quash is <u>GRANTED</u>.

SO ORDERED.

/s/ Myong J. Joun
United States District Judge

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IN RE ADMINISTRATIVE SUBPOENA
NO. 25-1431-019

Case No.: 1:25-MC-91324-MJJ

GOVERNMENT'S MEMORANDUM IN
SUPPORT OF ITS MOTION TO ALTER
OR AMEND

The Government respectfully moves under Federal Rules of Civil Procedure 59(e) and 60(b) to alter or amend the Court's judgment. The Court made four manifest errors in its recent opinion quashing the subpoena, each of which provides an independent basis to revise its opinion and deny BCH's motion to quash: *First*, the Court manifestly erred by shifting the burden of proof to the Government. *Second*, the Court manifestly erred by heightening the burden on the Government in a manner contrary to law. *Third*, the Court manifestly erred by failing to provide the Government an opportunity to make a showing under the Court's new framework—a showing the Government can amply make, as demonstrated by this filing. *Fourth*, the Court manifestly erred by making a finding of bad faith not supported by the record.

## ARGUMENT

"Rule 59(e) itself does not state the grounds on which relief under the rule may be granted, and the district courts have considerable discretion in deciding whether to grant or deny a motion to alter or amend under Rule 59(e). That discretion requires a balancing of the need for finality of judgments with the need to render a just decision." *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004). One circumstance that warrants Rule 59(e) relief is a manifest error of law, *id*., and a motion for reconsideration should also be granted "if the court

1

'has patently misunderstood a party . . . or has made an error not of reasoning but

apprehension.'" *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008) (quoting

*Sandoval Diaz v. Sandoval Orozco,* 2005 WL 1501672, at *2 (D.P.R. June 24, 2005)).

Under Rule 60(b), a court "may relieve a party or its legal representative from a final

judgment, order, or proceeding" for six specified reasons, including "mistake, inadvertence,

surprise, or excusable neglect." *Triantos v. Guaetta & Benson, LLC*, 52 F.4th 440, 445 (1st Cir.

2022)

### 1. The Court Improperly Shifted the Burden to the Government and Repeatedly Relieved BCH of Its "Heavy" Burden to Prove the Entire Subpoena Is Invalid.

The Government's burden to show that an administrative subpoena should be enforced

"is a slight one," and the burden of a subpoena recipient to avoid enforcement "is a heavy one."

*United States v. Balanced Fin. Mgmt., Inc.*, 769 F.2d 1440, 1444 (10th Cir. 1985).  This Court

acknowledged that the burden of resisting an administrative subpoena is on the recipient,

Opinion at 9-10, but the Court erred when it did not hold BCH to its proof.

The Government has not filed a lawsuit or otherwise requested relief from the Court, and

it is unclear what showing BCH made as the movant that shifted any burden to the Government

in the first place.  Rather than performing an assessment of BCH's showing or even stating what

such a showing would be, the Court "first assessed" "whether the Government has made its

*prima facie* showing of proper purpose," Opinion at 10—but the Court first performed no such

assessment of BCH's evidence or even stated what such a showing would be.  This inversion of

the burden of proof requires the Court to reconsider its judgment.  The Supreme Court has

squarely held that the burden of showing an improper purpose of an administrative subpoena lies

with the movant, and that burden is a "heavy" one. *United States v. La Salle Nat'l Bank*, 437 U.S.

298, 316 (1978). Yet the Court did not identify how BCH had met its "heavy" burden of showing an improper purpose before analyzing whether the Government had made a sufficient showing of proper purpose. This was manifest error.

BCH bore the burden of proof throughout the proceeding as the movant to identify how the *entire subpoena* was unauthorized. The Court relieved BCH of this burden by requiring the Government to prove at the outset that "the information sought by the subpoena is limited to [] potential healthcare offenses." Opinion at 11. This is a manifest error because BCH as the movant had the "heavy" burden of showing that *each request* in the subpoena was not related to a proper purpose.

Moreover, as a factual matter and manifestly contrary to the Court's findings, Opinion at 11-12, the Government provided much more than its "self-proclaimed say-so" that it is conducting an appropriately focused investigation of federal healthcare offenses, but the Court misapprehended the factual record.[1] Fed. R. Evid. 1101(d)(3) (stating that the Federal Rules of Evidence do not apply in "miscellaneous proceedings"). Items before the Court include:

- The Attorney General ordered the Civil Division's [Enforcement and Affirmative Litigation Branch],[2] of which the undersigned is an Assistant Director, to "undertake appropriate investigations of any violations of the Food, Drug, and

---

[1] Unlike a typical administrative subpoena matter, in which the Government may need to explain an investigation to a Court because the investigation is arcane or non-public—or the subpoena recipient is a private individual whose relationship to the matter is unestablished or opaque—all of the facts and laws supporting this subpoena are public, obvious, and out in the open. To the extent the salient facts are not public, BCH itself put those facts in the record.

[2] The Consumer Protection Branch's relevant authorities have recently been transferred to the Enforcement Section of the newly created Enforcement and Affirmative Litigation Branch.

Cosmetic Act by manufacturers and distributors engaged in misbranding by making false claims about the on- or off-label use of puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'"  Opinion at 3-4.

- The Assistant Attorney General issued a memorandum directing the Civil Division, of which the Enforcement and Affirmative Litigation Branch is a component, to "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities consistent with [the Attorney General's directive]."  *Id.*

- The Assistant Attorney General issued the administrative subpoena in question to BCH as part of the investigation described above.  Opinion at 4.

- The subpoena was procedurally proper.  Opinion at 10-11.

- BCH is "one of the largest leading pediatric hospitals in the nation."  Opinion at 2.

- BCH prescribes and/or provides non-FDA-approved gender-related pharmaceuticals to children at its gender clinic.  *Id.*

- Causing the distribution of unapproved drugs can be an FDCA violation, which can be a federal health care offense. 21 U.S.C. § 331(d); 18 U.S.C. § 24.

These undisputed facts paint a clear picture:  the Attorney General has ordered an investigation of potential FDCA health care offense violations committed in the course of gender-related care for minors, BCH provides such care and uses federally-regulated drugs in an off-label manner while providing such care, and the Assistant Attorney General for the Civil

Division issued a procedurally proper subpoena in furtherance of this investigation.  At the very least, BCH as the movant did not carry its "heavy" burden to disprove *any* of the bulleted facts above.

### 2.    The Court Erroneously Heightened the Burden on the Government

"[A]s long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced," *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5-6 (1st Cir. 1996) (collecting cases).  The Court did *not* find that the agency's assertion of authority was "obviously apocryphal," and in fact the Court found that DOJ is authorized to investigate healthcare fraud and at least some aspects of off-label use of pharmaceuticals. Opinion at 11-12.

Because the Court found that DOJ is allowed to send a subpoena to BCH to investigate these potential offenses, the agency's assertion of authority is not "obviously apocryphal," and the result of this proceeding should have been simple: The subpoena should not have been quashed.  Indeed, the Court's stated concern that the breadth of some of the requests exceeds the agency's authority sounds in the relevance of *those requests*—not the subpoena's overall viability.  The Court should have evaluated the subpoena and the information in the record against what it found to be the subpoena's potentially authorized purpose.

The Court also applied the wrong standard by misreading *In re Sealed Case*, 42 F.3d 1412 (D.C. Cir. 1994), and *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir. 1973). At a critical juncture in its ruling, Opinion at 12, the Court established a contrary-to-law rule that the Government may not send a subpoena in a "fishing expedition" to go on a "rambling

exploration" that "cast[s] about for potential wrongdoing."  But these cases stand for no such general propositions: if they did, they would conflict with Supreme Court precedent.

Instead, the disputes in those cases relate to very specific contexts in which very specific subpoenas were issued:  The dispute in *In re Sealed Case* concerned whether the Office of Thrift Supervision had statutory authority to subpoena the *personal* bank accounts of 1980s savings-and-loan executives whose accounts were not relevant to determining liability under the statute. *Theodore* rejected the IRS's use of so-called John Doe summonses to obtain hundreds or thousands of tax returns prepared by a high-volume preparer to evaluate those tax returns.  In stark contrast to *Sealed Case*, this Court already determined that the Government does have the statutory authority to investigate the federal healthcare offenses under investigation, and in stark contrast to *Theodore*, the Government is statutorily limited by 18 U.S.C. § 3486(e) from using the health records it obtains to investigate patients.  Those cases have very little to say about the issues here.

In contrast to the Court's misplaced reliance on the narrow relevance and scope-based holdings of those inapposite cases, *United States v. Morton Salt Co.*, 338 U.S. 632 (1950) (the Government "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"), establishes that the Government is perfectly empowered to send subpoenas within its statutory authority in order to determine whether a federal health care offense may have been committed—as it has done here with BCH, which is a large, regulated healthcare provider.  The Court manifestly erred by acknowledging DOJ's authority in this space but then barring DOJ from investigating federal healthcare offenses plainly within its statutory authority.

6

3.   **The Court Failed to Provide the Government an Opportunity to Make a Showing Under the Court's New Standard**

This Court also committed manifest error by creating a new standard for subpoena enforcement in which the Government must provide the articulable suspicions on which it based its subpoena requests, ruling that the Government should have articulated its "suspicion that BCH is actually engaging in fraudulent billing practices or off-label promotion in the first instance."  Opinion at 12.

This Court then compounded this manifest error by not affording the Government the opportunity to meet its newly established standard, which the Government had no reason to anticipate, much less to meet. *See, e.g.*, *Gimbel v. FDIC (In re Gimbel)*, 77 F.3d 593, 602 (2d Cir. 1996) ("articulable and individualized suspicion" generally not required to enforce an administrative subpoena).  If the Court disagrees that it erred by imposing this burden on the Government, the Government respectfully submits that it should be given the opportunity to meet this new standard.  *See FTC v. Gallo*, No. 653-73, 1973 U.S. Dist. LEXIS 11573, at *9 (D.D.C. Oct. 9, 1973) (ordering the Government to submit additional information about an administrative subpoena after the district court determined that the subpoena recipient had made an initial showing in its brief).

The Government is amply able to meet the Court's newly announced, heightened standard and address the Court's concerns, as demonstrated by the attached affidavit proffering a variety of facts and information to the Court. *See* Hsiao Declaration (attached).  The affidavit sets out the legal and factual background for the Government's investigation as well as relevant facts about BCH and the drugs at issue.  *Id.*  And it describes why the Government has cause to investigate whether BCH and its associates are violating the FDCA—either directly or through a

conspiracy with others (e.g., with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead. *Id*. at 10-12.

To highlight two of these items: *First*, through analysis of anonymized insurance industry claims data, the Government identified hundreds of children at BCH or its affiliates since 2015 whom the data shows were first diagnosed with central precocious puberty ("CPP") at age 10 or older, including hundreds of children who were first diagnosed with CPP between the ages of 14 and 18. *Id*. at 12. Because 10 is a normal and not a precocious age for puberty, the large scale of these late diagnoses raises suspicion that BCH incorrectly diagnosed certain children with CPP in order to mislead insurance companies or others into covering puberty blockers for older children with gender dysphoria. Misleading insurance companies or others about a patient's diagnosis in order to obtain payment for off-label pharmaceuticals could form the basis of a federal healthcare offense. This suspicion is heightened by the highly non-random distribution of these facially suspect diagnoses over time. Below is a graph showing how BCH experienced a large spike of these facially suspect diagnoses from 2020-23:



On the x axis is the year of first diagnosis, on the y axis is the number of patients, and the different colors of the graph lines represent the age of the patient at first diagnosis. *Id.* at 12. The graph demonstrates the bizarre nature of this data. For example, there is no clear explanation for why BCH would go from diagnosing almost no 11-year-olds with CPP for the years 2017-19 to diagnosing 50 11-year-old patients with CPP in 2022, and it would be rational for the federal government to want to find out why—especially because such a diagnosis could be a false basis upon which to prescribe (and have payors pay for) powerful prescription medications.

*Second*, there are public statements from BCH staff that support the alarming data above and that also raise serious questions about whether BCH made false statements about pharmaceuticals and/or illegally distributed pharmaceuticals without valid prescriptions. Dr. Amy Tishelman, the former Director of Clinical Research at the gender clinic at BCH, sued BCH in Massachusetts state court for allegedly retaliating against her after she, among other things, raised concerns that BCH was rushing kids towards life-altering medicalization, including puberty blockers. Complaint, *Tishelman v. Boston Children's Hospital*, No. 2084CV2310 (Suffolk Cty. Sup. Ct. filed Oct. 7, 2020). At trial, Dr. Tishelman testified under oath that BCH dramatically cut the length of psychological assessments before prescribing minors with puberty blockers or cross-sex hormones. Hsiao Decl. at 13. According to Dr. Tishelman's testimony, prior to 2017, assessment times were 20 hours. *Id*. A few years later, assessment times had been reduced to two and a half hours, a move she characterized as "reckless."[3] *Id*.

_____

[3] The Government notes that the dramatic slashing of assessment times appears to coincide with or immediately precede the dramatic surge in suspect CPP diagnoses described in the preceding paragraph.

Furthermore, Dr. Jeremi Carswell, one of the current leaders of the gender clinic at BCH, said at a conference presentation in 2020 that puberty blockers were being handed out "like candy." *Id*. Dr. Carswell also presented a slide at that conference suggesting some risks of puberty blockers, including "brain maturation," "bone density," and "fertility"—but around the same time, BCH apparently told patients on a BCH website that puberty blockers were "temporary" and "fully reversible" and "do not cause any permanent changes." *Id*. That apparently incorrect or misleading BCH website could be considered "labeling" in certain circumstances, which could form the basis of the federal healthcare offense.

In 2021, Laura Edwards-Leeper, another doctor who worked or works at BCH, wrote an op-ed in the *Washington Post* describing a number of alarming practices at gender clinics which she seems to have witnessed first-hand: Children being "rushed" into a medical pathway without appropriate psychological evaluation—far less evaluation time than required even under the WPATH standards of care—including being prescribed puberty blockers and hormones by endocrinologists who have not actually sought informed consent. *Id*.

All of these items constitute the type of articulable suspicion for federal healthcare offenses that the Court required of the Government; because the Government could not have anticipated the "articulable suspicion" requirement the Court imposed, the Court should revise its opinion and find that the Government meets the standard.

### 4. The Court's Bad Faith Finding Is Manifestly Erroneous

Finally, the Court manifestly erred when it incorrectly assumed that the subpoena is motivated "only by bad faith" and "to harass and intimidate" hospitals. Opinion at 14. The Attorney General did not order such an unlawful investigation, there is not a single piece of

record evidence indicating that she did, and the Court's contrary conclusion is neither supported by the facts nor by the statutes relied upon by the government in pursuing the information it seeks.

As expressed by the Attorney General and the President, the Executive Branch has advanced a policy goal of ending gender-related pharmaceutical and surgical treatment of minors. The Executive Branch can choose to support that policy goal—a policy goal that the Supreme Court recognizes is rational, *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 1835-36 (June 18, 2025)—in a variety of ways. This includes, of course, by conducting lawful and appropriate investigations to determine if federal law has been violated by individuals engaging in potential misconduct. Government officials, like all human beings, often have multiple valid reasons for performing actions: The Attorney General wants to investigate federal healthcare offenses (including those committed in connection with the provision of gender-related care to minors) at the same time she wants to curtail the practice of gender-related pharmaceutical and surgical care to minors overall. Nothing about that situation is improper, mutually exclusive, pretextual, or even remarkable—BCH did not even attempt to address why the Attorney General having both goals is impermissible. The fact that the Attorney General conceives of federal law as potentially being in conflict with Massachusetts law also seems unremarkable.

Moreover, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (rejecting argument that "the agency's subjective desire to reach a particular result must necessarily invalidate the result, regardless of the objective evidence supporting the agency's

conclusion").  "Relatedly, a court may not set aside an agency's decision solely because it might

have been influenced by political considerations or prompted by an Administration's priorities."

*Id.*

Neither is the Court's finding of "harass[ment]" supported by the record.  The federal

government often sends subpoenas to investigate practices that may or may not violate federal

law, and there is the obvious possibility that an entity receiving such a subpoena will cease

unlawful activities related to a controversial practice before any enforcement action is litigated.

Other courts have recognized this phenomenon and have correctly found it unremarkable.  *Solis

v. Forever 21, Inc.*, No. 12-09188, 2013 U.S. Dist. LEXIS 64462, at *21 (C.D. Cal. Mar. 7,

2013).

Instead of attaching the presumption of regularity and propriety that it must to the

Attorney General and Assistant Attorney General's actions, *Banks v. Dretke*, 540 U.S. 668, 696

(2004), the Court assumed that the Attorney General or the Assistant Attorney General gave

orders and signed subpoenas to harass and intimidate hospitals in a way that is "unrelated to

investigating fraud or unlawful off-label promotion."  In order to have done so, of course, these

officials would not only need have lied in their official memos about the "appropriate[ness]" of

the investigation, but they would also need to disbelieve their own justifications for these

actions—that is, that at least some aspects of pharmaceutical and surgical gender-related care for

minors likely violate federal law.  But BCH did not ask the Court to make such findings, nor did

it present any evidence in support of them, and the Court erred in casually finding that the

Attorney General of the United States lied in an official memorandum.

Instead, BCH and the Court *credited* the Attorney General's statements that she wants to end pharmaceutical and surgical gender-related treatments for minor children as accurately reflecting her state of mind, but then inexplicably *discredited* her order of an "appropriate" investigation into federal health care offenses as being pretextual, and then *ignored* her explanation of how off-label uses of pharmaceuticals and misrepresentations about their effects could violate federal health care law. The Court did not explain why it chose to credit one part of the Attorney General's statement and reject or ignore the others. This was manifest error and should be corrected.

## CONCLUSION

The Government respectfully requests that the Court revise its opinion and deny BCH's motion to quash.

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director

 */s/ Patrick R. Runkle*
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors
SCOTT DAHLQUIST
Trial Attorney

U.S. Department of Justice
Enforcement and Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044

13

Tel: (202) 353-4218
patrick.r.runkle@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2025, I served the foregoing Memorandum in Opposition via ECF to counsel of record.

Dated this 7th Day of October, 2025.

_/s/ Patrick R. Runkle_

PATRICK R. RUNKLE

# DECLARATION OF LISA K. HSIAO

Pursuant to 28 U.S.C. § 1746, I, Lisa K. Hsiao, hereby declare as follows:

## GENERAL BACKGROUND

1.     I am the Acting Director of the Enforcement and Affirmative Litigation Branch ("EALB") within the United States Department of Justice.

2.     EALB's Enforcement Section ("Enforcement") is the successor to the Consumer Protection Branch ("CPB") and is vested with all of CPB's legal authorities, including handling investigations and litigation arising under federal statutes that protect consumers' health, safety, economic security, and identity integrity. Enforcement, as the successor to CPB, is authorized to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, *et seq*. *See* 28 C.F.R. § 0.45(i) and Justice Manual 4-8.000.

3.     Through Presidentially-appointed, Senate-confirmed officers of the Department of Justice, Enforcement is authorized to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) relating to the on- or off-label use by manufacturers and distributors of drugs, including puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called "gender transition." *See* AG Bondi Memo dated April 22, 2025.

4.     The Attorney General may authorize other officers of the Department of Justice to perform certain functions of the Attorney General. *See* 28 U.S.C. § 510. In any investigation of a federal health care offense, the Attorney General may issue in writing and cause to be served a subpoena requiring the production and testimony described in 18 U.S.C. § 3486(a)(l)(B). *See* 18 U.S.C. § 3486(a)(l)(A).

5.    Pursuant to Attorney General Order Number 3591-2015, dated November 10, 2015, the Attorney General authorized the Assistant Attorney General for the Civil Division to issue and serve administrative subpoenas pursuant to 18 U.S.C. §§ 3486(a)(l)(A) and (a)(l)(B) to investigate violations of the FDCA that relate to a health care benefit program.

6.    The subpoena to Boston Children's Hospital ("BCH"), No. 25-1431-019 was lawfully issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil Division, in connection with a valid investigation being conducted in my office.

7.    The facts in this Declaration come from my personal observations, my training and experience, and information obtained from other government personnel. This Declaration is intended to demonstrate that the administrative subpoena discussed herein was issued in the furtherance of an investigation authorized by law, and that the records and other things the subpoena seeks are relevant to that investigation. Accordingly, this Declaration does not set forth all my knowledge about this matter.

## LEGAL BACKGROUND

8.    The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health, including in criminal enforcement of the FDCA. *Id. United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *See also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the Government seeks to enforce the FDCA to protect the health of children.

9.    A "federal healthcare offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or

2

conspiracy relates to a health benefit program." 18 U.S.C. § 24(a). The statute defines "health

care benefit program" to mean "any public or private plan or contract, affecting commerce, under

which any medical benefit, item, or service is provided to any individual, and includes any

individual or entity who is providing a medical benefit, item, or service for which payment may

be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under Section 3486

(commonly referred to as a "HIPAA subpoena") may be used to investigate both substantive

violations of the FDCA, as well as conspiracies to violate the FDCA if the violation or

conspiracy relates to products or services that might ultimately be paid for by a private or public

health insurance program.

10.    Administrative subpoenas issued under 18 U.S.C. § 3486 are routinely used to obtain

categories of medical, billing, and related information in federal healthcare offense

investigations. The materials requested by the subpoenas issued in this investigation fall within

that framework and include the same kinds of records—patient files, insurance submissions,

treatment documentation, and communications (such as emails)—that federal investigators

typically review to determine whether a federal health care offense may have occurred.

### FDA'S APPROVAL OF DRUGS

11.    The FDCA regulates the development, manufacturing and distribution of drugs in the

United States. For a "new drug" to enter interstate commerce, the manufacturer must first

demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both

safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction

into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

12.    A drug manufacturer obtains FDA approval for a new drug through a new drug

application ("NDA") that demonstrates that its drug is safe and effective for each of its intended

uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for

the drug in the NDA, which must include adequate directions for how to use the drug for each of its intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves an NDA, it determines that the drug is safe and effective **for the specific use or uses identified in the application.** As part of that approval, FDA also approves the product's proposed labeling, including prescribing information, as providing adequate directions for use for those approved indications. FDA's approval of a drug for one or more particular uses does **not** mean that the drug is safe and effective for unapproved uses, nor does approval mean that the labeling provides adequate directions for unapproved uses. While physicians are permitted to prescribe an FDA-approved drug for an unapproved use, such prescribing may warrant investigation because it may provide evidence of FDCA violations. Also, depending on the circumstances, prescribing for unapproved uses can itself involve FDCA violations—for example, where the physician is engaged in the distribution or labeling of an unapproved drug.

### MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL LABELING

13.    A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses.[1] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). CPB has participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009).

---

[1]    As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

14.    A drug is also misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

15.    Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter … *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles … Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature shipped by company to sales agent and then stored in agent's bedroom closet was labeling: "[I]t cannot be said that … the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling."). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

16.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). CPB has participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device).

### ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG

17.    A "new drug" is any drug that is "not generally recognized, among [qualified] experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the *labeling* thereof … ." 21 U.S.C. § 321(p)(1) (emphasis added). Even if a substance has been

on the market for years, it can be a "new drug" if used for an indication that has not been

approved by FDA and is not generally recognized as safe and effective for that indication. The

vast majority of prescription drugs on the market are "new drugs" under the FDCA.

18.     If a drug manufacturer or other person distributes (or causes the distribution of) an

approved drug for an unapproved use with labeling for that unapproved use, the manufacturer or

other person could be charged with distributing an unapproved new drug in violation of the

FDCA. 21 U.S.C. § 331(d).

### INTENT IN FDCA CRIMES

19.     A violation of 21 U.S.C. § 331 is a federal criminal offense that is punished as a strict

liability misdemeanor without any proof of criminal intent. *See Park*, 421 U.S. at 672–73; *United

States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). Through its strict liability

misdemeanor provision, the FDCA imposes rigorous criminal accountability on companies and

individuals involved with drugs that affect the health of consumers in circumstances where

consumers realistically cannot protect themselves. *See Weisenfeld*, 376 U.S. at 91; *Dotterweich*,

320 U.S. at 280–81. This heightened accountability is even more acute when the consumers at

risk are children. Consequently, any violation of Section 331, including the causing of any

prohibited act listed in Section 331, is a federal crime, even in the absence of any criminal intent.

20.     A felony FDCA violation requires the same conduct as the strict liability

misdemeanor, but with the added element of an intent to defraud or mislead. 21 U.S.C. § 333(a).

Evidence of intent to defraud or mislead—whether directed at a government agency, a patient, or

an insurance company—thus transforms a misdemeanor FDCA violation into a felony offense.

Evidence of an intent to defraud or mislead a government agency or another third-party, such as

a patient or insurer, in connection with an FDCA violation is sufficient to establish a felony

FDCA offense. Efforts to conceal a violation or evade detection also can demonstrate the requisite intent to defraud or mislead.

### THE DRUGS AT ISSUE IN THIS INVESTIGATION

21.     This investigation focuses on prescription drugs typically used in gender-related care for children and adolescents suffering from a recognized mental disorder known as gender identity disorder or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, gender dysphoria. Included in this group of prescription drugs are (1) drugs used to suppress the production of sex hormones to delay puberty—the most common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

22.     FDA has not determined these drugs to be either safe or effective for the treatment of gender dysphoria. Nor has FDA approved any of these drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these prescription drugs are FDA-approved for other indications (e.g., precocious puberty, prostate cancer, hypogonadism, etc.), FDA has not approved any NDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above, introducing such a "new drug" into interstate commerce without an FDA-approved indication is unlawful. Thus, to the extent these drugs are intended to treat gender dysphoria in minors, they constitute unapproved new drugs under federal law, and their distribution for that unapproved indication violates the FDCA and is a federal crime.

23.     Some of these drugs, including puberty blockers, are not administered orally. Rather, they are typically administered by injection by a medical professional or through an outpatient

surgical procedure to implant the drug. Puberty blockers are typically implants or injectables that require administration by a physician or nurse in a medical facility that must purchase, store, and administer the drug, placing healthcare providers in the chain of distribution of that drug. Similarly, testosterone may be, and often is, administered by injection.

24.    The United States Government is aware of credible, publicly available evidence relating to the widespread practice of prescribing cross-sex hormones and puberty blockers to treat gender dysphoria in minors that casts doubt on the safety and efficacy of this practice. The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See generally*, U.S. Dep't of Health & Human Svcs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (May 2025), https://opa.hhs.gov/gender-dysphoria-report. Specifically, HHS found that some of the pharmacologic interventions under investigation here "carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, [and] psychiatric disorders." *Id.* at 10. HHS further determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health is **very low**." *Id.* at 13 (emphasis added).

25.    The Government is also aware of other major scientific publications and national health authorities that have questioned the strength and quality of the evidence base for the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria. In the United Kingdom, for example, the British National Health Service ("NHS") commissioned an independent review led by Dr. Hilary Cass, a pediatrician and the former President of the Royal College of Pædiatrics and Child Health, to evaluate how NHS was providing care for

children experiencing gender-related distress. *See generally* NHS England, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 10, 2024), https://cass.independent-review.uk/home/publications/final-report/ ("*Cass Review*"). Dr. Cass's review concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Cass Review* at 13.

26.    With regard to puberty blockers, Dr. Cass reported that a systematic review conducted by the University of York "found no evidence that puberty blockers improve body image or dysphoria" while "a known side effect of puberty blockers on mood is that it may reduce psychological functioning." *Id.* at 179. Regarding cross-sex hormones, the *Cass Review* agreed with another systematic review that concluded that:

> There is a lack of high-quality research assessing the outcomes of hormone interventions in adolescents with gender dysphoria/incongruence, and few studies that undertake long-term follow up. No conclusions can be drawn about the effect on gender dysphoria, body satisfaction, psychosocial health, cognitive development, or fertility. Uncertainty remains about the outcomes for height/growth, cardiometabolic and bone health.

*Id.* at 184.

27.    As a result of the *Cass Review's* findings, in December 2024, the United Kingdom banned puberty blocker treatment for gender dysphoria. *See* Press Release, U.K. Dep't of Health & Soc. Care, *Ban on Puberty Blockers to be Made Indefinite on Experts' Advice* (Dec. 11, 2024), https://www.gov.uk/government/news/ban-on-puberty-blockers-to-be-made-indefinite-on-experts-advice (stating that "there is currently an unacceptable safety risk in the continued prescription of puberty blockers to children"). Press reports indicate that Great Britain is similarly considering banning cross-sex hormones for minors. *See* Alison Holt, *Cross-Sex*

*Hormones for Under 18s Could be Restricted or Banned*, BBC NEWS (May 22, 2025),

https://www.bbc.com/news/articles/cg711xevd89o.

28.    Other European countries have likewise enacted restrictions on the use of these

pharmacologic interventions for treating gender-related disorders in minors, or are considering

them. *See, e.g., Sweden Puts Brakes on Treatments for Trans Minors*, FRANCE 24 (Aug. 2, 2023),

https://www.france24.com/en/live-news/20230208-sweden-puts-brakes-on-treatments-for-trans-

minors; Siobhan Harris, *Europe & the Puberty Blocker Debate*, MEDSCAPE MED. NEWS (Apr. 25,

2024), https://www.medscape.com/viewarticle/europe-and-puberty-blocker-debate-

2024a1000831 (reporting on European countries' practices and findings including France's

National Academy of Medicine recommendation that the "greatest reserve" be used in puberty

blockers and/or hormones in children and adolescents; Sweden's conclusion that risks of puberty

blockers and hormones currently outweigh potential benefits).

29.    Both the HHS review and the UK's independent *Cass Review*—along with numerous

other systematic reviews of the evidence that the Government is aware of—justify questioning

the scientific foundation for prescribing puberty blockers and cross-sex hormones for minors as

limited and potentially problematic. It is far from certain, therefore, that prescribing these

drugs—that have not been approved by FDA for treating minors with gender-related disorders—

would ever be considered by the agency as safe and effective for that indication. To the contrary,

the available public record suggests there is serious potential for harm.

### EVIDENCE OF FDCA AND HEALTH CARE FRAUD VIOLATIONS IN PEDIATRIC GENDER-RELATED CARE

30.    From testimonies of public whistleblowers and leading national medical experts on

the subject matter, the Government is aware of potential violations of federal law in connection

with the provision of gender-related treatments for minors occurring at healthcare providers

across the country.

31.    This includes allegations and evidence of fraudulent billing practices to secure insurance coverage/payment. Such practices include, but are not limited to, providers (i) using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified" instead of "gender dysphoria" to prescribe cross-sex hormones, or "precocious puberty" instead of "gender dysphoria" to prescribe puberty blockers) because they know that certain insurance plans may not cover the off-label prescription of puberty blockers or cross-sex hormones for gender-related treatment[2]; (ii) changing or misrepresenting a patient's sex in the medical records and coding and billing for "endocrine imbalance," which is supported by accompanying bloodwork showing endocrine levels atypical of the incorrectly documented sex (but consistent with the patient's actual sex); and (iii) fraudulently making a gender dysphoria diagnosis where patients do not meet the DSM-5 diagnostic criteria, but the providers know that the carrier or plan will cover off-label prescription of cross-sex hormones or puberty blockers to treat gender dysphoria.

32.    The Government also knows of evidence and allegations of many cases where providers failed to provide adequate labeling and to provide the information necessary to obtain informed consent, actively deceived patients and parents with false claims and statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor patients and their parents the risks associated with and the science claimed to support taking the drugs described herein for gender dysphoria.

33.    The Government has also reviewed evidence (including transcripts and video recordings) from national conferences on treating transgender patients, including minors, wherein presenters describe and encourage attendees to engage in the provision of purely patient-driven care (or "embodiment goals"), with little regard for gender dysphoria diagnoses,

---

[2]    In fact, one nonprofit organization has published guidance to health care providers advising them of "coding alternatives for trans healthcare," which detailed "codes that are commonly rejected by insurance providers" and "codes that are commonly accepted by insurance providers."

assessment, or clinical criteria. These recommendations include prescribing cross-sex hormones and puberty blockers to minors. The Government is concerned that such facially deficient care may be accompanied by facially deficient or misleading labelling.

34.    BCH runs one of the largest pediatric gender clinics in the country. Given the significant number of children treated there, the Government has ample reason to suspect that potential federal healthcare offenses in the provision of gender-related medical care for minors may systematically be occurring at BCH. Beyond that, the Government is aware of information particular to BCH that raises concerns that federal healthcare offenses may be occurring there.

35.    This information includes an analysis of anonymized data relating to insurance claims submitted by clinicians at BCH. Based on the diagnosis codes, it appears that between 2015 and 2024, BCH provided a first diagnosis of central precocious puberty to over 500 minors age 10 or older, including numerous teenagers aged 14 to 18—much older than children who are typically diagnosed with precocious puberty.  The following is a simple chart of that data, with the x axis representing the year of first diagnosis, the y axis the number of patients diagnosed, and the different colors of the graph lines representing the age at first diagnosis.



36.    I have viewed a video that appears to be Dr. Jeremi Carswell stating that puberty
blockers are given out "like candy." I have also watched a portion of a presentation from Dr.
Carswell describing certain potential side effects of puberty blockers, including effects on "brain
maturation," "bone density," and "fertility."  I have seen a screen shot of a BCH website from
around the same time stating that puberty blockers are "temporary," "fully reversible" and "do
not cause any permanent changes."

37.    I have heard an audio recording of court testimony from Dr. Amy Tishelman
describing how the evaluation time for minors at BCH with apparent gender dysphoria was
dramatically reduced after 2017 from 20 hours to two and a half hours, which Dr. Tishelman
described as "reckless."

38.    I have reviewed an article that appeared in the Washington Post in 2021 written by
Laura Edwards-Leeper, a doctor at BCH, describing how children suffering from gender
dysphoria may be "rushed" into a medical pathway without adequate mental health support, and
also describing how some endocrinologists prescribe puberty blockers and hormones without
obtaining informed consent from minor patients' parents.

**THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION**

39.    The fifteen requests in the investigative HIPAA subpoena issued to BCH seek to
further the investigation described above. The requests can be broadly broken down into four
main categories: (1) requests related to personnel and corporate oversight (Request 1); (2)
requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests
related to the practice's relationships with drug manufacturers, distributors, and pharmacies
(Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15).

All the subpoenaed records and documents are relevant to the federal healthcare investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

40.    Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

41.    The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (*e.g.,* endocrine disorder) to secure health benefit program reimbursement. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

42.    The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) are probative of an intent to market or promote drugs for unapproved uses. If BCH, or one of its affiliated healthcare providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving unlawful off-label promotion. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing an intent to misbrand, including with intent to defraud or mislead.

43.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing the drugs described herein (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by FDA. Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes, fraudulent informed consent documents, etc. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records, including patient identities, can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide additional information, including claim records, creating a triangulated evidentiary record. In sum, without this information, the Government cannot fully determine the scope of the violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

### GOVERNMENT INVESTIGATIVE RESOURCES

44.      This is a bona fide, high-priority, and substantial national investigation of potential FDCA violations in the provision of gender-related care for minors. Substantial government resources have been assigned to it. It is being handled by several veteran, career prosecutors with many decades of experience in healthcare fraud and FDCA enforcement between them, supported by a team of document analysts and other forensic specialists. The Federal Bureau of Investigation has assigned agents and analysts to assist with various field activities and is employing advanced data analytics to identify prescribing patterns, potential unlawful off-label promotion, and patterns in reimbursement. The scope and coordination of these efforts reflect the seriousness with which the Government is pursuing potential violations of federal law.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 7th day of October, 2025.

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch
United States Department of Justice

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 25-mc-00063-SKC-CYC

**IN RE: DEPARTMENT OF JUSTICE ADMINISTRATIVE SUBPOENA No. 25-1431-030**

---

## DECLARATION OF LISA HSIAO

---

Pursuant to 28 U.S.C. § 1746, I, Lisa K. Hsiao, hereby declare as follows:

### GENERAL BACKGROUND

1.    I am the Acting Director of the Enforcement & Affirmative Litigation Branch ("EALB") within the United States Department of Justice.

2.    EALB's Enforcement Section ("Enforcement") is the successor to the Consumer Protection Branch ("CPB") and is vested with all of CPB's legal authorities, including handling investigations and litigation arising under federal statutes that protect consumers' health, safety, economic security, and identity integrity. Enforcement, as the successor to CPB, is authorized to oversee and conduct all civil and criminal matters arising under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301, *et seq*. *See* 28 C.F.R. § 0.45(i) and Justice Manual 4-8.000.

3.    Through Presidentially-appointed, Senate-confirmed officers of the Department of Justice, Enforcement is authorized to undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act (FDCA) relating to the on- or off-label use by manufacturers and distributors of drugs, including puberty blockers, sex

hormones, or any other drug used to facilitate a child's so-called "gender transition." See

AG Bondi Memo dated April 22, 2025.

     4.    The Attorney General may authorize other officers of the Department of Justice

to perform certain functions of the Attorney General. See 28 U.S.C. § 510. In any

investigation of a federal health care offense, the Attorney General may issue in writing

and cause to be served a subpoena requiring the production and testimony described in 18

U.S.C. § 3486(a)(l)(B). See 18 U.S.C.§ 3486(a)(l)(A).

     5.    Pursuant to Attorney General Order Number 3591-2015, dated November 10,

2015, the Attorney General authorized the Assistant Attorney General for the Civil

Division to issue and serve administrative subpoenas pursuant to 18 U.S.C.

§§ 3486(a)(l)(A) and (a)(l )(B) to investigate violations of the FDCA that relate to a

health care benefit program.

     6.    The subpoena to Children's Hospital Colorado, No. 25-1431-030 was lawfully

issued and authorized by Brett A. Shumate, Assistant Attorney General for the Civil

Division, in connection with a valid investigation being conducted in my office.

     7.    The facts in this Declaration come from my personal observations, my training

and experience, and information obtained from other government personnel. This

Declaration is intended to demonstrate that the administrative subpoena discussed herein

was issued in the furtherance of an investigation authorized by law, and that the records

and other things the subpoena seeks are relevant to that investigation. Accordingly, this

Declaration does not set forth all my knowledge about this matter.

**LEGAL BACKGROUND**

8.      The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health, including in criminal enforcement of the FDCA. *Id. United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *See also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the government seeks to enforce the FDCA to protect the health of children.

9.      A "federal healthcare offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as "a violation of, or a criminal conspiracy to violate ... section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) ... if the violation or conspiracy relates to a health benefit program." 18 U.S.C. § 24(a). The statute defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under section 3486 (commonly referred to as a "HIPAA subpoena") may be used to investigate both substantive violations of the FDCA, as well as conspiracies to violate the FDCA if the violation or conspiracy relates to products or services that might ultimately be paid for by a private or public health insurance program.

3

10.    Administrative subpoenas issued under 18 U.S.C. § 3486 are routinely used to obtain categories of medical, billing, and related information in federal healthcare offense investigations. The materials requested by the subpoenas issued in this investigation fall within that framework and include the same kinds of records—patient files, insurance submissions, treatment documentation, and communications (such as emails)—that federal investigators typically review to determine whether a federal health care offense may have occurred.

## FDA's Approval of Drugs

11.    The FDCA regulates the development, manufacturing and distribution of drugs in the United States. For a "new drug" to enter interstate commerce, the manufacturer must first demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

12.    A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates that its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for the drug in the NDA, which must include adequate directions for how to use the drug for each of its intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves a drug, FDA approves it as safe and effective for the particular use or uses in the NDA. Similarly, as part of its approval, FDA approves the labeling in the NDA as having adequate directions for the particular use or uses in the NDA. FDA's

4

approval of a drug does not mean that the drug is safe and effective for unapproved uses or that the drug has adequate directions for unapproved uses.  While it is possible for doctors to prescribe an approved drug for an unapproved use, prescriptions for unapproved uses may involve violations of the FDCA.

MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL
LABELING

13.    A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a misbranded drug with labeling that lacks adequate directions for its intended uses.[1] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). EALB has participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009).

14.    A drug can also be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

---

[1]   As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

15.    Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter … *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separate from the drug but nonetheless related to it, including any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles … Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature was labeling where it was shipped by company to sales agent and then stored in the agent's bedroom closet: "[I]t cannot be said that …the Court promulgated or intended to promulgate a requirement that there be an actual use in order that the literature constitute labeling."). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

16.    If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). EALB has participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device).

**ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG**

17.    A "new drug" is any drug that is "not generally recognized, among [qualified]

experts . . . as safe and effective for use under the conditions prescribed, recommended,

or suggested in the *labeling* thereof … ." 21 U.S.C. § 321(p)(1) (emphasis added).

18.    If a drug manufacturer or other person distributes (or causes the distribution of)

an approved drug for an unapproved use with labeling for that unapproved use, the

manufacturer or other person could possibly be charged with distributing an unapproved

new drug in violation of the FDCA. 21 U.S.C. § 331(d).

**INTENT FOR FDCA CRIMES**

19.    A violation of 21 U.S.C. § 331 is a federal criminal offense that can be

punished as a strict liability misdemeanor without any proof of criminal intent. *See Park*,

421 U.S. at 672–73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964).

Through its strict liability misdemeanor provision, the FDCA imposes rigorous criminal

accountability on companies and individuals involved with drugs that affect the health of

consumers in circumstances where consumers realistically cannot protect themselves. *See

Weisenfeld*, 376 U.S. at 91; *Dotterweich*, 320 U.S. at 280–81. This rigorous

accountability applies even more strongly when the consumers are children.

Consequently, any violation of section 331, including the causing of any prohibited act

listed in section 331, is a federal crime, even in the absence of any criminal intent.

20.    A felony FDCA violation is the same as a misdemeanor FDCA violation with

the addition of an intent to defraud or mislead. 21 U.S.C. § 333(a). Evidence of an intent

to defraud or mislead a government agency or some other third-party, such as a patient or

an insurance company, in connection with an FDCA violation can be enough to prove a felony FDCA violation. Evidence of an intent to defraud or mislead can include taking steps to avoid detection of the illegal conduct.

## THE DRUGS AT ISSUE IN THIS INVESTIGATION

21.     This investigation is focused on prescription drugs typically used in gender-related care for children and adolescents suffering from a recognized mental disorder known as gender identity disorder or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, gender dysphoria. Included in this group of prescription drugs are (1) drugs used to suppress the production of sex hormones to delay puberty—the most common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

22.     FDA has not determined these drugs to be either safe or effective for the treatment of gender dysphoria.  FDA has not approved any of these prescription drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these drugs are FDA-approved for other indications (e.g., precocious puberty, prostate cancer, hypogonadism, etc.), FDA has not approved any NDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above,

introducing a such "new drug" into interstate commerce without an approved indication

is unlawful. Thus, to the extent these drugs are marketed or promoted for treating gender

dysphoria in minors, they constitute unapproved new drugs under federal law, and their

distribution for that unapproved indication violates the FDCA and is a federal crime.

23.    Some of these drugs, including puberty blockers, are not administered orally.

Rather, they are typically administered by injection by a medical professional or through

an outpatient surgical procedure to implant the drug. That is, puberty blockers are

typically implants or injectables that require administration by a physician or nurse in a

medical facility that must purchase, store, and administer the drug, placing them in the

chain of distribution of that drug. Similarly, testosterone may be, and often is,

administered by injection.

24.    The United States government is aware of credible, publicly available evidence

relating to the widespread practice of prescribing cross-sex hormones and puberty

blockers to treat gender dysphoria in minors and casts doubt on the safety and efficacy of

those practices.  The United States Department of Health and Human Services ("HHS"),

of which FDA is a component agency, has determined that the evidence for the safety and

efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See*

*generally*, U.S. DEP'T OF HEALTH & HUMAN SVCS., TREATMENT FOR PEDIATRIC GENDER

DYSPHORIA, REVIEW OF EVIDENCE AND BEST PRACTICES (May 2025) (available at

https://opa.hhs.gov/gender-dysphoria-report) ("The HHS Report"). Specifically, this

report found that some of the pharmacologic interventions under investigation here "carry

risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone

9

density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, [and] psychiatric disorders." *Id.* at 10. HHS further determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health is **very low**." *Id.* at 13 (emphasis added).

25.    The government is also aware of other high-level, publicly available information that looks skeptically upon the efficacy of puberty blockers and other medical interventions to treat youth for gender dysphoria.  In the United Kingdom, for example, the British National Health Service ("NHS") commissioned an independent review led by Dr. Hilary Cass, a pediatrician and the former President of the Royal College of Paediatrics and Child Health, to evaluate how NHS was providing care for children experiencing gender-related distress. *See generally* NHS England, *Independent Review of Gender Identity Services for Children and Young People: Final Report* (Apr. 10, 2024), *available at* https://cass.independent-review.uk/home/publications/final-report/ ("*Cass Review*"). Dr. Cass's review concluded: "This is an area of remarkably weak evidence, and yet results of studies are exaggerated or misrepresented by people on all sides of the debate to support their viewpoint. The reality is that we have no good evidence on the long-term outcomes of interventions to manage gender-related distress." *Cass Review* at 13.

26.    With regard to puberty blockers, Dr, Cass reported that a systematic review conducted by the University of York "found no evidence that puberty blockers improve body image or dysphoria" while "a known side effect of puberty blockers on mood is that

it may reduce psychological functioning." *Id.* at 179. Similarly, with regard to cross-sex

hormones, the *Cass Review* agreed with another systematic review that concluded that:

"There is a lack of high-quality research assessing the outcomes of hormone interventions

in adolescents with gender dysphoria/incongruence, and few studies that undertake long-

term follow up. No conclusions can be drawn about the effect on gender dysphoria, body

satisfaction, psychosocial health, cognitive development, or fertility. Uncertainty remains

about the outcomes for height/growth, cardiometabolic and bone health." *Id.* at 184.

27.    As a result of the *Cass Review's* findings, in December 2024, the United

Kingdom banned puberty blocker treatment for gender dysphoria. *See* Press Release,

U.K. Department of Health & Social Care, *Ban on Puberty Blockers to be Made

Indefinite on Experts' Advice* (Dec. 11, 2024), https://www.gov.uk/government/news/ban-

on-puberty-blockers-to-be-made-indefinite-on-experts-advice  (stating that "there is

currently an unacceptable safety risk in the continued prescription of puberty blockers to

children"). Press reports indicate that the U.K. is similarly considering banning cross-sex

hormones for minors. *See* Alison Holt, *Cross-Sex Hormones for Under 18s Could be

Restricted or Banned*, BBC News (May 22, 2025),

https://www.bbc.com/news/articles/cg711xevd89o.

28.    Other European countries have likewise enacted restrictions on the use of these

pharmacologic interventions for treating gender-related disorders in minors, or are

considering them. *See, e.g., Sweden Puts Brakes on Treatments for Trans Minors*,

FRANCE 24 (Aug. 2, 2023), https://www.france24.com/en/live-news/20230208-sweden-

puts-brakes-on-treatments-for-trans-minors; Siobhan Harris, *Europe & the Puberty*

*Blocker Debate*, MEDSCAPE MED. NEWS (Apr. 25, 2024),

https://www.medscape.com/viewarticle/europe-and-puberty-blocker-debate-

2024a1000831 (reporting on European countries' practices and findings including

France's National Academy of Medicine recommendation that the "greatest reserve" be

used in puberty blockers and/or hormones in children and adolescents; Sweden's

conclusion that the risks of puberty blockers and hormones currently outweigh the

potential benefits).

29.    Both the HHS review and the UK's independent *Cass Review*—along with

numerous other systematic reviews of the evidence that the Government is aware of—

provide a basis for questioning the scientific foundation for prescribing puberty blockers

and cross-sex hormones for minors as limited and potentially problematic. It is far from

certain, therefore, that prescribing these drugs—that have not been approved by FDA for

treating minors with gender-related disorders —would ever be considered by the agency

as safe and effective. To the contrary, it appears there is a serious potential for harm.

### RELEVANT FACTS ABOUT CHILDREN'S HOSPITAL COLORADO

30.    From testimonies of public whistleblowers and leading medical experts

nationally on the subject matter, the Government is aware of potential violations of

federal law in connection with the provision of gender-related treatments for minors

occurring at healthcare providers across the country.

31.    This includes allegations and evidence of fraudulent billing practices to secure

insurance coverage/payment. Such practices include, but are not limited to, providers (i)

using the incorrect diagnosis and/or billing code (e.g., "endocrine disorder, unspecified"

instead of "gender dysphoria" to prescribe cross-sex hormones, or "precocious puberty"

instead of "gender dysphoria" to prescribe puberty blockers) because they know that

certain insurance plans may not cover the off-label prescription of puberty blockers or

cross-sex hormones for gender-related treatment[2]; (ii) changing or misrepresenting a

patient's sex in the medical records and coding and billing for "endocrine imbalance,"

which is supported by accompanying bloodwork showing endocrine levels atypical of the

incorrectly documented sex (but consistent with the patient's actual sex); and (iii)

fraudulently making a gender dysphoria diagnosis where patients do not meet the DSM-5

diagnostic criteria, but the providers know that the carrier or plan will cover off-label

prescription of cross-sex hormones or puberty blockers to treat gender dysphoria.

32.    The Government also knows of evidence and allegations of many cases where

providers failed to provide adequate labeling and to provide the information necessary to

obtain informed consent, actively deceived patients and parents with false claims and

statements regarding the drugs' effectiveness or alternatives, and misrepresented to minor

patients and their parents the risks associated with and the science claimed to support

taking the drugs described herein for gender dysphoria.

33.    The Government has also reviewed evidence (including transcripts and video

recordings) from national conferences on treating transgender patients, including minors,

---

2 In fact, one nonprofit organization has published guidance to health care providers
advising them of "coding alternatives for trans healthcare," which detailed "codes that are
commonly rejected by insurance providers" and "codes that are commonly accepted by
insurance providers."

wherein presenters describe and encourage attendees to engage in the provision of purely patient-driven care (or "embodiment goals"), with little regard for gender dysphoria diagnoses, assessment, or clinical criteria. These recommendations include prescribing cross-sex hormones and puberty blockers to minors. The Government is concerned that such facially deficient care may be accompanied by facially deficient or misleading labelling.

34.    The Government did not issue its subpoena to Children's Hospital Colorado at random. Children's Hospital Colorado houses the "TRUE Center for Gender Diversity" a clinic that explicitly holds itself out in marketing and promotional materials (including through an internet website) as specializing in the treatment of children and adolescents who suffer from gender dysphoria, including by providing puberty blockers and cross-sex hormones to minors for non-FDA approved uses. Children's Hospital Colorado prominently advertises these services under "TRUE Center for Gender Diversity," "*See, e.g.,* https://www.childrenscolorado.org/doctors-and-departments/departments/gender-diversity-center/ ("Providing comprehensive care to gender-diverse children, adolescents, and their families." Referring to "Puberty-delaying Treatments" and "Hormone therapy.")

35.    Statements on Children's Hospital Colorado's website may qualify as drug labeling under the FDCA, including its TRUE Center webpage describing specialty services.  "Puberty-delaying treatments" gives written explanations of how the drugs work, describes them as safe, and how they are used—that is, information that supplements and explains the drug. The TRUE Center website also contains information related to "Hormone therapy" and explains how the medications may be used and their

14

intended effects. These statements have not been evaluated by the FDA related to the off-label use of the drugs presumably being used, and may contain arguably false and misleading information, making the distribution of these materials an act that renders the drugs misbranded. For example, the TRUE Center webpage states that "These medicines can postpone puberty changes that do not align with one's gender identity." This assertion omits information that is potentially material to the decision of whether to undergo treatment with medication, the effects of which are serious and may be irreversible. Other statements about the safety of treatment on Children's Hospital Colorado's website are likewise potentially false or misleading, including statements that these treatments are safely prescribed and monitored, which downplays and minimizes the known risks and uncertainties (due to the limited data and the "very low" quality of that data).

36.    Although Children's Hospital Colorado purportedly adheres to certain standards of care and provides individualized treatment plans, many of its patients are given hormone replacement drugs, which can permanently alter person's physiology, upon mere referral and consent of a minor patient's guardians—often on an initial visit. According to a lawsuit filed by the ACLU under a pseudonym, a former Children's Hospital Colorado TRUE Clinic patient was prescribed testosterone, a schedule III controlled substance, in March 2022, after being referred to the TRUE Center in "early 2022." *Caden Kent v. Children's Hospital Colorado*, 2024-CV-30455 Dkt. 1 ¶¶ 24-25. In addition to this practice of prescribing cross-sex hormones soon after a patient's initial visit, the number of Children's Hospital Colorado patients given puberty blockers or hormone therapies increased dramatically during this same timeframe.  Between 2019

15

and 2022, Children's Hospital Colorado furnished these drugs to between four and fourteen patients annually; in 2022, the facility treated more than 60 children with puberty blockers or hormone therapies.

https://stoptheharmdatabase.com/hospital/childrens-hospital-colorado ("Deeper Dive" chart below "Total Hormone and Puberty Blocker Patients").

37.    Moreover, there is evidence that Children's Hospital Colorado, and its associates may have knowingly violated the FDCA—either directly or through a conspiracy with others (e.g., with pharmacies, drug manufacturers, and/or distributors)— with the intent to defraud and mislead. As specified earlier, although violations of the FDCA are strict liability misdemeanors, if done with the intent to defraud or mislead, they are felonies. Children's Hospital Colorado's website explicitly states that "gender-affirming medical care is a growing science." It further acknowledges that it is "contributing to the academic research that informs evidence-based medicine."  https://www.childrenscolorado.org/doctors-and-departments/departments/gender-diversity-center/.  These statements conflict with the website's assertions that the "treatments are safely prescribed," because, in fact, the treatments are not being administered with drugs approved by the FDA for the purpose of treating gender dysphoria. Rather, Children's Hospital Colorado concedes that gender-affirming medicine is experimental, calling it an "emerging science." The statement that the facility is "contributing to academic research that informs evidence-based medicine" may be misleading: in prescribing and administering to minors drugs for non-FDA approved uses, Children's Hospital Colorado is suggesting, falsely, that the use of these

medications is supported by evidence-based studies and has been evaluated and approved in the United States for treatment of gender dysphoria. This falsity may provide the requisite *mens rea* for an FDCA felony, and this practice may also violate other federal criminal statutes such as 18 U.S.C. § 1035 (false statements relating to health care matters) and 18 U.S.C. § 1347 (health care fraud). It is not uncommon to charge additional federal crimes, *i.e.,* Title 18 offenses, along with FDCA criminal offenses.

38.    Further, the Government is aware of insurance claims data showing that potentially fraudulent billing occurring at Children's Colorado Hospital.  For example, insurance industry claims data related to Children's Hospital Colorado shows that since 2015, Children's Hospital Colorado first diagnosed minors with central precocious puberty at age 10 or older, including at least one minor receiving the diagnosis at age 13.  According to Children's Hospital Colorado itself, these are well beyond the ages at which children are typically diagnosed with precocious puberty, shedding doubt on the legitimacy of these diagnoses. https://www.childrenscolorado.org/conditions-and-advice/conditions-and-symptoms/conditions/pediatric-puberty-disorders

39.    Additionally, Children's Hospital Colorado is affiliated with the University of Colorado Anschutz, and Children's Hospital Colorado is described as being located on the University of Colorado's campus.  https://www.cuanschutz.edu/patient-care Multiple University of Colorado providers were attendees and presenters at the national conferences discussed in paragraph 33 above.

https://medschool.cuanschutz.edu/docs/librariesprovider323/default-document-library/meet-our-team.pdf?sfvrsn=74e3f6ba_2

40.    One of Children's Hospital Colorado's own providers has published articles describing decreased bone density among children who are given puberty blockers. https://pubmed.ncbi.nlm.nih.gov/38562129/ The same author in another published article acknowledged the risks of high red blood cell counts, high cholesterol, and heart attack among transgender patients. https://pmc.ncbi.nlm.nih.gov/articles/PMC10424140/ These risks are not described in the TRUE Center's advertising.

41.    All of the foregoing information supports the Government's decision to investigate the conduct of Children's Hospital Colorado as it relates to the provision of these drugs to minors, including its relationships with other persons and entities involved in the distribution and promotion of these drugs, is a valid subject of this investigation.

### THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION

42.    The fifteen requests in the investigative HIPAA subpoena issued to Children's Hospital Colorado seek to further the investigation described above. The requests can be broadly broken down into four main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). All the subpoenaed records and documents are relevant to the federal healthcare investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

43.    Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

44.    The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (*e.g.,* endocrine disorder) to secure health benefit program reimbursement. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

45.    The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) are probative of an intent to market or promote drugs for unapproved uses. If Children's Hospital Colorado, or one of its affiliated healthcare providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information would support a FDCA theory (including conspiracy) involving unlawful off-label promotion. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing an intent to misbrand, including with intent to defraud or mislead.

19

46.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of prescribing the drugs described herein (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of off-label use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with using these drugs in a manner not approved by FDA. Absence or minimization of such warnings could establish the intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the investigative team may reveal systemic use of the same masking codes, fraudulent informed consent documents, etc. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records, including patient identities, can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or other false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide additional information, including claim records, creating a triangulated evidentiary record. In sum, without this information, the government cannot fully determine the scope of the

violations, identify patterns of misbranding or fraudulent billing, or assess whether the conduct was undertaken with intent to defraud or mislead, as required for felony liability under 21 U.S.C. § 333(a)(2).

**GOVERNMENT INVESTIGATIVE RESOURCES**

47.    This is a bona fide, high-priority, and substantial national investigation of potential FDCA violations in the provision of gender-related care for minors.  Substantial government resources have been assigned to it. It is being handled by several veteran, career prosecutors with many decades of experience in healthcare fraud and FDCA enforcement between them, supported by a team of document analysts and other forensic specialists. The Federal Bureau of Investigation has assigned agents and analysts to assist with various field activities and is employing advanced data analytics to identify prescribing patterns, potential unlawful off-label promotion, and patterns in reimbursement. The scope and coordination of these efforts reflect the seriousness with which the government is pursuing potential violations of federal law.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 10th day of October, 2025.

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation
Branch
United States Department of Justice

21