# EXHIBIT 1

# SUPREME COURT OF THE UNITED STATES

No. 25A319

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL. *v.* ASHTON ORR, ET AL.

ON APPLICATION FOR STAY

[November 6, 2025]

This case concerns an Executive Branch policy requiring all new passports to display an individual's biological sex at birth. The United States District Court for the District of Massachusetts preliminarily enjoined the Government from enforcing the policy, and the First Circuit declined to stay the injunction pending appeal. The Government then filed this stay application. Applying our familiar stay factors at this preliminary stage, we grant the application.

Displaying passport holders' sex at birth no more offends equal protection principles than displaying their country of birth—in both cases, the Government is merely attesting to a historical fact without subjecting anyone to differential treatment. And on this record, respondents have failed to establish that the Government's choice to display biological sex "lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group." *Trump* v. *Hawaii*, 585 U. S. 667, 705 (2018) (internal quotation marks omitted). Nor are respondents likely to prevail in arguing that the State Department acted arbitrarily and capriciously by declining to depart from Presidential rules that Congress expressly required it to follow. See 22 U. S. C. §211a.

For these reasons, the Government is likely to succeed on the merits. And the District Court's grant of class-wide relief enjoins enforcement of an Executive Branch policy with foreign affairs implications concerning a Government document. In light of the foregoing, the Government will

"suffer[] a form of irreparable injury" absent a stay. *Trump* v. *CASA, Inc.*, 606 U. S. 831, 861 (2025) (internal quotation marks omitted).

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The June 17, 2025 order of the United States District Court for the District of Massachusetts, case No. 1:25–cv–10313, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting from the grant of application for stay.

As is becoming routine, the Government seeks an emergency stay of a District Court's preliminary injunction pending appeal. As is also becoming routine, this Court misunderstands the assignment.

Our task in deciding stay applications is not simply to make a "back-of-the-napkin assessment of which party has the better legal argument." *Noem* v. *Doe*, 605 U. S. ___, ___ (2025) (JACKSON, J., dissenting from grant of stay) (slip op., at 3). Rather, the actual nub of the project (if we choose to involve ourselves in the matter at all) is to fairly determine whether the applicant's showing justifies our extraordinary intervention. To do this, we consider not only the applicant's likelihood of success on the merits, but also whether the applicant will suffer irreparable harm absent emergency intervention, as well as the relative harm to the parties and the public interest in the grant or denial of a stay. See *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Here, the balance-of-the-equities factor requires weighing the harm

to the Government from not being able to proceed immediately with its allegedly unlawful policy against the harm to the individuals who would be subjected to that policy. See *Williams* v. *Zbaraz*, 442 U. S. 1309 (1979) (Stevens, J., in chambers). Balancing the equities is an important part of the analysis because it avoids unnecessary real-world injury to people with colorable legal claims.

The Court ignores these critical limits on its equitable discretion today. The Government seeks to enforce a questionably legal new policy immediately, but it offers no evidence that it will suffer any harm if it is temporarily enjoined from doing so, while the plaintiffs will be subject to imminent, concrete injury if the policy goes into effect. The Court nonetheless fails to spill any ink considering the plaintiffs, opting instead to intervene in the Government's favor without equitable justification, and in a manner that permits harm to be inflicted on the most vulnerable party.

Such senseless sidestepping of the obvious equitable outcome has become an unfortunate pattern.[1] So, too, has my own refusal to look the other way when basic principles are selectively discarded. This Court has once again paved the way for the immediate infliction of injury without adequate (or, really, *any*) justification. Because I cannot acquiesce to this pointless but painful perversion of our equitable discretion, I respectfully dissent.

I

For the past 33 years, across six Presidential administrations, transgender Americans have been able to obtain U. S. passports with sex markers that match their gender

[1] See, *e.g.*, *Noem* v. *National TPS Alliance*, 606 U. S. ___ (2025); *Noem* v. *Vasquez Perdomo*, 606 U. S. ___ (2025); *McMahon* v. *New York*, 606 U. S. ___ (2025); *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___ (2025); *Social Security Administration* v. *American Federation of State, County, and Municipal Employees*, 605 U. S. ___ (2025); *Noem* v. *Doe*, 605 U. S. ___ (2025); *Department of Ed.* v. *California*, 604 U. S. 650 (2025) (*per curiam*).

identity. From 1992 to 2010, passport applicants who wished to obtain passports with sex markers that were different from the sex assigned to them at birth had to submit evidence of surgical reassignment. In 2010, the State Department began allowing passport applicants to submit a doctor's certification avowing that they had undergone clinical treatment for gender transition. Beginning in 2021, the State Department allowed applicants to self-select the sex marker that matched their gender identity.

Through it all, the indisputable point of a passport remained: to "attes[t] to the identity and nationality of the bearer." 22 CFR §51.1 (2024). The State Department's sex-marker policies have thus long demonstrated that what is important for identification purposes is the bearer's gender identity *today*.

No matter. On January 22, 2025, the agency overhauled the rules for sex markers on passports, reverting to its pre-1992 practices. Its Passport Policy now requires that all new passports reflect the holders' sex *assigned at birth*. Why? Because two days earlier, on January 20, President Trump issued Executive Order No. 14168, characterizing transgender identity as "false" and "corrosive" to American society. 90 Fed. Reg. 8615 (2025). The order asserted that "the policy of the United States" is "to recognize two sexes, male and female," which it defined based on the sex assigned "at conception." *Ibid.* And the order directed the Secretary of State to require that any new government-issued identification documents reflect the holder's "biological" sex. *Id.*, at 8615–8616. The State Department responded by rescinding its prior sex-identification policies moving forward; transgender Americans who had previously obtained passports with sex markers reflecting their gender identity rather than their sex assigned at birth could continue to use those documents until they expire.

Several transgender Americans who want or need to obtain new passports filed a putative class action in the

District of Massachusetts, challenging the State Department's decision to upend 33 years of settled practice. They claimed that the Passport Policy violated the Equal Protection Clause twice over: It unlawfully discriminated on the basis of sex, and it lacked any rational basis because it was motivated by bare animus against transgender Americans. In addition, they claimed that the Passport Policy violated the Administrative Procedure Act (APA) insofar as it was arbitrary and capricious and was enacted without observance of the procedures that another statute—the Paperwork Reduction Act—requires.[2]

The District Court thoroughly examined the facts in evidence, considered applicable law, and issued a 56-page decision. It also issued an order preliminarily enjoining the Government from enforcing the Passport Policy against the plaintiffs. The court made a reasoned determination that the plaintiffs were likely to succeed on their legal claims, that they would suffer concrete and irreparable injuries without an injunction, and that, by contrast, the Government would experience no harm from an injunction temporarily preventing it from enforcing the new policy.

The Government appealed this order, and its appeal remains pending before the First Circuit. Two months later, the District Court granted the plaintiffs' motion for class certification and extended the preliminary injunction to a subset of the certified classes. The Government unsuccessfully sought a stay of the District Court's orders (from both the District Court and the First Circuit) pending appeal. So, the Government has now turned to this Court for a stay—and, for the first time, it has found an obliging audience.

[2] The Paperwork Reduction Act requires federal agencies to provide 60-day notice in the Federal Register before changing government forms that collect information. 44 U. S. C. §3506(c)(2)(A).

II

First principles of equitable relief illuminate the extent, and nature, of the Court's error in granting this stay. Stated succinctly, the indisputable touchstone of equity is fairness. See Black's Law Dictionary 679 (12th ed. 2024) (defining "equity" as "[t]he body of principles constituting what is fair and right"). Courts proceeding in equity "loo[k] for justice on both sides of the suit and beyond." P. Hoffer, The Law's Conscience 14 (1990). To do so, we consider, in addition to the merits, whether the movant will be irreparably harmed absent relief. *Amoco Production Co.* v. *Gambell*, 480 U. S. 531, 542 (1987). And we balance the harms that each party might face with and without court intervention. *Ibid.*

Where intervention is appropriate, the remedy must be tailored to "the peculiar rights of all the parties in interest." 1 J. Story, Commentaries on Equity Jurisprudence §28, p. 21 (13th ed. 1886). Indeed, the Court makes equitable determinations in light of "the necessities of the particular case." *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944). Courts exercising equity jurisdiction are not "mechanically obligated" to award relief "for every violation of law." *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982). Nor will courts sitting in equity grant relief if doing so would burden one party and be "of little advantage" to the other. *Di Giovanni* v. *Camden Fire Ins. Assn.*, 296 U. S. 64, 71 (1935).

These key principles are necessarily applicable to preliminary injunctions and other interim orders, which are forms of equitable relief. See *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 32 (2008) ("An injunction is a matter of equitable discretion"); *Trump* v. *International Refugee Assistance Project*, 582 U. S. 571, 580 (2017) (*per curiam*) ("In assessing the lower courts' exercise of equitable discretion, we bring to bear an equitable judgment of our own"). Just last Term, we emphasized, for example, that "[t]he

purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held, and to balance the equities as the litigation moves forward." *Lackey* v. *Stinnie*, 604 U. S. 192, 200 (2025) (internal quotation marks and citation omitted). A stay decision, made "before the legality" of the challenged government action "has been conclusively determined," presents a similar question. *Nken*, 556 U. S., at 434.[3] With these kinds of interim decisions, courts must, among other things, "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U. S., at 542.

Fortunately, here, the lower courts have already done this critical work. Based on its evaluation of the evidence related to the Passport Policy, the District Court reasonably determined that the plaintiffs were likely to suffer irreparable harm absent injunctive relief, and that the balance of the equities favored the plaintiffs. See 778 F. Supp. 3d 394, 426–429 (Mass. 2025). The First Circuit agreed and declined to stay the District Court's preliminary injunction. *Agatha* v. *Trump,* 151 F. 4th 9, 12–13 (2025).

At a minimum, then, the Government bears an "especially heavy burden" to obtain a stay from *this* Court. *Edwards* v. *Hope Medical Group for Women*, 512 U. S. 1301, 1302 (1994) (Scalia, J., in chambers) (internal quotation marks omitted). It can satisfy that burden only if it demonstrates that it is likely to succeed on the merits of its legal

---

[3] Equity is at the heart of preliminary-injunction and stay determinations because these decisions require courts to decide disputes about the parties' interim status while litigation over the merits of the challengers' legal claims *is ongoing*. If the government is permitted to implement a harmful policy that turns out to be unlawful, the damage is done. Courts generally endeavor to ensure that plaintiffs with colorable legal claims have a meaningful opportunity to litigate those claims and actually obtain the relief they are requesting.

claims, that it will suffer irreparable harm from the preliminary injunction, and that the harm it experiences from not being able to implement its new policy outweighs the harm that its new policy will cause the plaintiffs. See *International Refugee Assistance Project*, 582 U. S., at 580.

As stay applications go, for the reasons explained in Part III–A, *infra*, this case is easy—the Government has come nowhere close to meeting this demanding standard, especially because it has failed to demonstrate *any* harm from the District Court's injunction, let alone harm that surpasses the injury to the plaintiffs if the Passport Policy were to go into effect. But the Court somehow sees fit to grant the Government's stay request regardless, waving away its abject failure to show any irreparable harm and promoting a patently inequitable outcome to boot.[4]

## III

### A

The Government maintains that immediate implementation of the Passport Policy is necessary to ensure that sex markers on passports accurately identify the holders. According to the Government, self-selected gender identity "does not provide a meaningful basis for identification," while sex assigned at birth apparently does. 90 Fed. Reg. 8616. The Government also contends that the Passport Policy is part of the President's effort to impose a uniform definition of sex throughout the Federal Government. The preliminary injunction, the Government says, impedes the

---

[4] Not only does the Court's stay determination produce inequity, but it is also part of a broader pattern of this Court using its emergency docket to cavalierly pick the winners and losers in cases that are still pending in the lower courts. See *ante,* at 1 (order). This way of handling stay determinations jeopardizes procedural fairness as well, because the lower courts have an obligation to fully and fairly consider the merits of the plaintiffs' legal claims despite the majority's declaration of the "likely" winner. The Court's stay-related pronouncements cannot be permitted to thwart the full legal process that our judicial system requires.

President from carrying out these supposedly legitimate objectives.

Thus, the Government's asserted harm from being subjected to the injunction—its *only* asserted harm—is that the President cannot, at least for now, enact his preferred policies regarding sex markers on U. S. passports. Even assuming, *arguendo*, that this purported injury counts as irreparable harm, it does not suffice to justify the extraordinary equitable remedy of a stay pending appeal.[5]

What the Government needs (and what it does not have) is an explanation for why it faces harm unless the President's chosen policy is implemented *now*. It suggests that there is an urgent foreign policy interest in dictating sex markers on passports, but does not elaborate as to what that interest might possibly be. All the Government is able to muster is the statement that "the injunction forces the government to misrepresent the sex of passport holders to foreign nations" and to "contradict . . . biological reality." Application for Stay of Injunction 34. But how urgent can this interest be when the Passport Policy itself allows transgender Americans who already have passports with sex markers reflecting their current gender identity to continue using those passports until they expire?

The Government also insists that gender identity is not a meaningful basis for identification—strangely begging the question why sex markers are required on passports at all.

---

[5] It is far from clear that this asserted injury qualifies as irreparable harm for stay purposes. While we have suggested that the government suffers "a form of irreparable injury" when it is enjoined from effectuating a duly enacted statute, see *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers), an executive order lacks the force of a statute, and an injunction barring such an order does not generate the same sovereign injury. To think it always does would be to endorse the "facially absurd" proposition that the President is irreparably harmed any time he is temporarily prevented from doing something he wants to do. *D. V. D.*, 606 U. S., at ___–___ (SOTOMAYOR, J., dissenting from grant of stay) (slip op., at 11–12).

And, in any event, it provides no evidence of harmful confusion or other problems caused by transgender Americans who are using passports with sex markers corresponding to their current gender identity. To the contrary, as the plaintiffs' experiences demonstrate, it is gender-*in*congruent passports that cause confusion and fail to provide a meaningful basis for identification.

As for the Government's suggestion that the President is harmed by not being able to impose a uniform definition of sex across various regulatory schemes, that assertion is just another species of the far-fetched contention that the President must be injured whenever he is prevented from doing as he wishes. *Department of Homeland Security* v. *D. V. D.*, 606 U. S. ___, ___–___ (2025) (SOTOMAYOR, J., dissenting from grant of stay) (slip op., at 11–12). The Government also fails to explain why it needs a uniform definition of sex, much less why such a uniform definition needs to be imposed *now* such that it cannot await the outcome of this litigation.

At the end of the day, then, despite its heavy burden to support its bid for a stay, the Government has not identified or articulated any way in which it will *actually* be harmed if it cannot enact its new Passport Policy while the parties litigate whether that policy is lawful.[6]

---

[6] The Government's failure to show any harm from not being able to implement the Passport Policy immediately, much less a harm that outweighs the harm to the plaintiffs from the issuance of a stay, is sufficient to deny the stay application. But to the extent we consider the merits, the majority's confidence that the Government will probably succeed, *ante,* at 1 (order), is unfounded. To the contrary, as the District Court and the First Circuit concluded, the Passport Policy is likely arbitrary and capricious in violation of the APA. The State Department provided *zero* explanation for its reversal of 33 years of practice. And our precedent does not support the Court's suggestion that an agency can expediently end-run the APA's requirements simply because it is following the President's orders. *Ibid.* Even when an agency is bound by the decision of the Executive, it must still consider all relevant aspects of the problem

B

For their part (and by contrast), the plaintiffs have shown they will suffer concrete injuries if the Government's Passport Policy is immediately enforced; namely, they will be unable to obtain passports with sex markers that match their gender identity. The District Court found that this is a significant harm, noting that transgender people who encounter obstacles to obtaining gender-congruent identity documents are almost twice as likely to experience suicidal ideation, and report more severe psychological distress, than transgender people who do not face such barriers.

In addition, the current record demonstrates that transgender people who use gender-incongruent passports are exposed to increased violence, harassment, and discrimination. For example, one of the plaintiffs, AC Goldberg, who is a transgender and intersex person, asserts that he has been sexually assaulted by Transportation Security Administration (TSA) officers conducting searches on his body. Another plaintiff, Chastain Anderson, attests to having been strip searched when traveling with identity documents that do not match her current gender expression. Another, Zaya Perysian, has been subjected to invasive patdowns by TSA agents to confirm her gender after they observed the disjunction between her female gender expression and the male sex marker on her passport. And two others, Ashton Orr and Ray Gorlin, have been accused of presenting fake identity documents, and were forced to out themselves as transgender and nonbinary to TSA agents.

Airport checkpoints are stressful and invasive for travelers under typical circumstances—even without the added friction of being forced to present government-issued

---

before changing its policy. See *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 591 U. S. 1, 29–32 (2020). The plaintiffs have colorable equal-protection claims as well, particularly in light of the animus evident in the Executive Order. See 90 Fed. Reg. 8615 (singling out transgender identity as "corrosive" to American society).

identification documents that do not reflect one's identity. Thus, by preventing transgender Americans from obtaining gender-congruent passports, the Government is doing more than just making a statement about its belief that transgender identity is "false." The Passport Policy also invites the probing, and at times humiliating, additional scrutiny these plaintiffs have experienced.

Given this, it is no surprise that each of the plaintiffs credibly testified that they would experience significant anxiety and fear for their safety if required to use passports that reflect their sex assigned at birth rather than their gender identity. Absent an injunction, the plaintiffs and the classes of transgender Americans they represent are forced to make a difficult choice that no other Americans face: use gender-incongruent passports and risk harassment and bodily invasions, on the one hand, or avoid all activities (travel, opening a bank account, renting a car, starting a new job) that may require a passport, on the other. The harm to these individuals from having to make that choice—before their legal challenges have even been resolved—is palpable.

* * *

The documented real-world harms to these plaintiffs obviously outweigh the Government's unexplained (and inexplicable) interest in immediate implementation of the Passport Policy. That incongruity is where equity comes in. Because granting the stay application will be "of little advantage" to the Government, *Di Giovanni*, 296 U. S., at 71, while needlessly and significantly burdening the plaintiffs, equity cannot justify the Court's intervention. But, today, the Court refuses to answer equity's call. In my view, the Court's failure to acknowledge the basic norms of equity jurisdiction is more than merely regrettable. It is an abdication of the Court's duty to ensure that equitable standards

apply equally to all litigants—to transgender people and the Government alike.