# EXHIBIT 2

# APPENDIX

Exec. Order No. 14,168 (Jan. 20, 2025), 90 Fed. Reg. 8615 (Jan. 30, 2025).............. 1a

Declaration of Matthew Pierce (Mar. 12, 2025) (D. Ct. Doc. 53-1) ........................... 5a

District court memorandum on plaintiffs' motion for preliminary injunction
    (Apr. 18, 2025) (D. Ct. Doc. 74) .............................................................. 15a

District court order of preliminary injunction (Apr. 18, 2025)
    (D. Ct. Doc. 75)...................................................................................... 71a

Second declaration of Matthew Pierce (May 14, 2025) (D. Ct. Doc. 89-1).............. 74a

District court memorandum on plaintiffs' motion for class certification and
    plaintiffs' motion to apply the preliminary injunction to the classes
    (June 17, 2025) (D. Ct. Doc. 115) ........................................................ 80a

District court order of preliminary injunction (June 17, 2025)
    (D. Ct. Doc. 116).................................................................................. 112a

Declaration of Ryan M. Dooley (July 3, 2025) (D. Ct. Doc. 123-1)........................ 115a

Declaration of Andrina M. Agnew (July 9, 2025) (D. Ct. Doc. 127-1)................... 132a

Second declaration of Ryan M. Dooley (July 9, 2025) (D. Ct. Doc. 127-2)............. 136a

District court order denying government's motion to dissolve the
    June 17, 2025 preliminary injunction and government's motion for a
    stay of that injunction (July 11, 2025) (D. Ct. Docket Entry No. 130)............ 142a

Court of appeals order denying stay pending appeal (Sept. 4, 2025) .................. 144a

## Presidential Documents

Executive Order 14168 of January 20, 2025

## Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

**Sec. 2**. *Policy and Definitions.* It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) ''Sex'' shall refer to an individual's immutable biological classification as either male or female. ''Sex'' is not a synonym for and does not include the concept of ''gender identity.''

(b) ''Women'' or ''woman'' and ''girls'' or ''girl'' shall mean adult and juvenile human females, respectively.

(c) ''Men'' or ''man'' and ''boys'' or ''boy'' shall mean adult and juvenile human males, respectively.

(d) ''Female'' means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) ''Male'' means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) ''Gender ideology'' replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true.

Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) ''Gender identity'' reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

**Sec. 3**. *Recognizing Women Are Biologically Distinct From Men*. (a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms ''sex'', ''male'', ''female'', ''men'', ''women'', ''boys'' and ''girls'' the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term ''sex'' and not ''gender'' in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in *Bostock* v. *Clayton County* (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in *Bostock* v. *Clayton County* (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

**Sec. 4**. *Privacy in Intimate Spaces*. (a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

**Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents    **8617**

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled ''Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs'' of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

**Sec. 5**. *Protecting Rights.* The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

**Sec. 6**. *Bill Text.* Within 30 days of the date of this order, the Assistant to the President for Legislative Affairs shall present to the President proposed bill text to codify the definitions in this order.

**Sec. 7**. *Agency Implementation and Reporting.* (a) Within 120 days of the date of this order, each agency head shall submit an update on implementation of this order to the President, through the Director of the Office of Management and Budget. That update shall address:

(i) changes to agency documents, including regulations, guidance, forms, and communications, made to comply with this order; and

(ii) agency-imposed requirements on federally funded entities, including contractors, to achieve the policy of this order.

(b) The requirements of this order supersede conflicting provisions in any previous Executive Orders or Presidential Memoranda, including but not limited to Executive Orders 13988 of January 20, 2021, 14004 of January 25, 2021, 14020 and 14021 of March 8, 2021, and 14075 of June 15, 2022. These Executive Orders are hereby rescinded, and the White House Gender Policy Council established by Executive Order 14020 is dissolved.

(c) Each agency head shall promptly rescind all guidance documents inconsistent with the requirements of this order or the Attorney General's guidance issued pursuant to this order, or rescind such parts of such documents that are inconsistent in such manner. Such documents include, but are not limited to:

(i) ''The White House Toolkit on Transgender Equality'';

(ii) the Department of Education's guidance documents including:

(A) ''2024 Title IX Regulations: Pointers for Implementation'' (July 2024);

(B) ''U.S. Department of Education Toolkit: Creating Inclusive and Non-discriminatory School Environments for LGBTQI+ Students'';

(C) ''U.S. Department of Education Supporting LGBTQI+ Youth and Families in School'' (June 21, 2023);

(D) ''Departamento de Educación de EE.UU. Apoyar a los jóvenes y familias LGBTQI+ en la escuela'' (June 21, 2023);

(E) ''Supporting Intersex Students: A Resource for Students, Families, and Educators'' (October 2021);

(F) ''Supporting Transgender Youth in School'' (June 2021);

(G) ''Letter to Educators on Title IX's 49th Anniversary'' (June 23, 2021);

(H) ''Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families'' (June 2021);

(I) ''Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County'' (June 22, 2021);

(J) ''Education in a Pandemic: The Disparate Impacts of COVID–19 on America's Students'' (June 9, 2021); and

(K) ''Back-to-School Message for Transgender Students from the U.S. Depts of Justice, Education, and HHS'' (Aug. 17, 2021);

(iii) the Attorney General's Memorandum of March 26, 2021 entitled ''Application of *Bostock* v. *Clayton County* to Title IX of the Education Amendments of 1972''; and

(iv) the Equal Employment Opportunity Commission's ''Enforcement Guidance on Harassment in the Workplace'' (April 29, 2024).

**Sec. 8**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02090

Filed 1–29–25; 11:15 am]

Billing code 3395–F4–P

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-1    Filed 03/12/25    Page 1 of 10

5a

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ASHTON ORR, ZAYA PERYSIAN,
SAWYER SOE, CHASTAIN ANDERSON,
DREW HALL, BELLA BOE, and REID
SOLOMON-LANE, on behalf of themselves
and others similarly situated,

*Plaintiffs,*

v.

Case No. 1-25-cv-10313-JEK

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary of
State; and UNITED STATES OF AMERICA,

*Defendants.*

### DECLARATION OF MATTHEW PIERCE

I, Matthew Pierce, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am Deputy Assistant Secretary for Passport Services of the U.S. Department of State,

Bureau of Consular Affairs, Passport Services Directorate.  I submit this declaration in connection

with the Opposition of the Defendants to Plaintiffs' "Motion to Stay Agency Action and for

Preliminary Injunction" (ECF No. 29).  The statements made herein are based on my personal

knowledge and on information provided to me in the course of my official duties with the

Department of State (the "Department").  I have served in the Passport Directorate for 17 years

and have been in my current position since November 2024.  I previously served as the Managing

Director for Passport Issuance from January 2024 to December 2024.  Before that position, I served

as the Managing Director for Passport Support Operations from November 2023 to January 2024;

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-1    Filed 03/12/25    Page 2 of 10

6a

the Director of Program Management and Operational Support from April 2022 to November 2023; the Director of the Washington Passport Agency from September 2019 to April 2022; the Division Chief for Workload and Capacity Analysis in Passport Services from February 2015 to September 2019; an analyst in the Office of Management Analysis and Coordination from May 2011 to February 2015; the Operations Officer for the Houston Passport Agency from October 2010 to May 2011; and a passport specialist at the Houston Passport Agency from December 2007 to October 2010.

2.    The Secretary of State has authority under 22 U.S.C. § 211a (the Passport Act of 1926) and Executive Order 11295 (August 5, 1966), to grant and issue U.S. passports, and to authorize U.S. diplomatic and consular officers and such other U.S. citizen employees of the Department as he may designate to issue U.S. passports.  The Secretary has authorized the adjudication of U.S. passports by Specialists serving in U.S. passport centers and agencies domestically and by Foreign Service Officers serving in U.S. Embassies and Consulates abroad.

3.    Under its regulatory authority, 22 C.F.R. § 51.20(a), the Department has prescribed certain forms to be completed by individuals applying for a U.S. passport, including Forms DS-11, DS-82, and DS-5504.  Applicants are required to complete the application, and information that the Department deems material to its adjudication of the applicant's claim of identity and citizenship must be provided.

4.    The International Civil Aviation Organization ("ICAO") is a specialized agency of the United Nations that develops and promotes standards, specifications, and policies that support the civil aviation sector.  Standards and recommended practices developed through ICAO are included in Annexes to the Convention on International Civil Aviation (the "Chicago Convention") through

2

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-9    Filed 03/12/25    Page 3 of 10

7a

a process of adoption by Member States. In 1980, ICAO added the sex marker to its uniform specifications for travel documents in Document 9303 ("Doc 9303"), incorporated by reference into Annex 9 of the Chicago Convention, to enable travel documents to be used more effectively to identify the holder. Since "sex" was added to ICAO's specifications more than forty years ago, most countries have included it on their passports. According to advocacy groups, the vast majority of countries issue passports with the sex of the holder listed as either male or female. ICAO's sex marker standard ensures interoperability among governments for machine readable travel documents.

5.    The Department introduced sex as a required identity attribute on passport application forms in 1976, directing applicants to indicate "M" for male or "F" for female. For just a brief period, beginning in April 2022 and ending in January 2025, the term "gender" replaced the term "sex" on the Department's passport application forms. During that period, however, no change was made with respect to the field caption for the sex of the holder used on U.S. passports themselves, because ICAO's Doc 9303 specifies that the caption be labelled "sex." From 1977 to 2021, U.S. passports were available only with sex markers of "M" or "F."

6.    Birth certificates and other forms of identification have long been used to confirm the identity and citizenship of U.S. passport applicants. Starting in 1992, an applicant could submit evidence of surgical reassignment in support of a sex indicated on their application form that differed from the sex listed on their birth certificate or other forms of identification. In 2010, the Department eliminated the requirement of surgical reassignment for issuance of a passport in a new sex and instead accepted a physician's certification that the applicant had had appropriate clinical treatment for gender transition.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 4 of 10

8a

7.    Consistent with Executive Order 13985, "On Advancing Racial Equality and Support for Underserved Communities Through the Federal Government," issued by former President Biden on January 20, 2021, the Department updated its procedures in June 2021 to permit passport applicants to self-select their sex marker as "M" or "F" based upon their gender identity and to no longer require medical certification if an applicant's self-selected sex marker did not match the sex on their citizenship and identity documents.

8.    Consistent with Executive Order 13985, in June 2021 the Department also began the process of changing the language on the passport application form and instructions from "sex" to "gender" and adding a third option of "X" as a gender marker for non-binary, intersex, and gender non-conforming persons.  In October 2021, the Department issued the first U.S. passport bearing an "X," and in April 2022, after revisions implemented pursuant to the Paperwork Reduction Act ("PRA") and approved by the Office of Management and Budget ("OMB"), the Department's passport application forms began to include an "X" gender marker option for applicants identifying as unspecified or another gender identity, in addition to "M" and "F," and well as a checkbox for the applicant to indicate a change in their gender.  Pursuant to the PRA, these forms are due to expire on April 30, 2025.

9.    On November 26, 2024, the Department published 60-day public comment notices for Forms DS-11 and DS-82 pursuant to the PRA.  On November 29, 2024, the Department published a 60-day notice for Form DS-5504 pursuant to the PRA.  These notices published pursuant to the PRA requested OMB's renewed approval for application forms containing the "X" gender marker option and the checkbox for the applicant to indicate a change in gender.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 5 of 10

9a

10. On January 20, 2025, President Trump rescinded Executive Order 13985 and signed an Executive Order entitled "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (E.O. 14168, or "the Executive Order").  The Executive Order explained that "[e]fforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being," and that "[t]he erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system."  Moreover, the Executive Order noted that basing Federal policy on biology, rather than identity, is "critical to scientific inquiry, public safety, morale, and trust in government itself."  The Executive Order accordingly announced that "[i]t is the policy of the United States to recognize two sexes, male and female.  These sexes are not changeable and are grounded in fundamental and incontrovertible reality."  The Executive Order provided certain definitions intended to "govern all Executive interpretation of and application of Federal law and administrative policy," including:

"(a) 'Sex' shall refer to an individual's immutable biological classification as either male or female.  'Sex' is not a synonym for and does not include the concept of 'gender identity.'

\*    \*    \*

"(d) 'Female' means a person belonging, at conception, to the sex that produces the large reproductive cell.

"(e) 'Male' means a person belonging, at conception, to the sex that produces the small reproductive cell.

"(g) 'Gender identity' reflects a fully internal and subjective sense of self, disconnected

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 6 of 10

10a

from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex."

11. The Executive Order directed each Federal agency to give the terms "sex," "male," and "female" the above meanings "when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications." The Executive Order further directed every agency and all Federal employees acting in an official capacity on behalf of their agency to use the term "sex," and not "gender," in all applicable Federal policies and documents when administering or enforcing sex-based distinctions.

12. The Executive Order further directed the Secretary of State "to implement changes to require that government-issued identification documents, including passports, ... accurately reflect" the holder's biological sex, as either male or female. The Executive Order provided that all federal agencies with forms that require an individual's sex "shall list male or female, and shall not request gender identity."

13. Moreover, the Executive Order directed the Department of Health and Human Services ("HHS") to provide guidance to the U.S. Government, external partners, and the public on the sex-based definitions set forth in the Executive Order, which HHS did on February 19, 2025. HHS's guidance similarly defines "sex" to mean "[a] person's immutable biological classification as either male or female." Instead of "at conception," HHS's guidance defines "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)" and "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." It further provides that some females or males may have

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 7 of 10

11a

productive systems that do not produce eggs or sperm "due to factors such as age, congenital disorders or other developmental conditions, injury, or medical conditions that cause infertility." It also states that "[r]are disorders of sexual development do not constitute a third sex because these disorders do not lead to the production of a third gamete. That is, the reproductive system of a person with such a disorder does not produce gametes other than eggs or sperm."

14.  While the Department of State adjudicates identity using a variety of documents, it does not have the capacity to adjudicate "sex at conception" and must defer to definitions and guidance from other agencies, including HHS, when interpreting the Executive Order.

15.  Consistent with directives set out in E.O. 14168, on January 22, 2025, the Department instructed all domestic passport agencies that the Department would no longer issue U.S. passports with an "X" marker and to hold all non-urgent applications seeking an X marker or seeking a sex marker other than the applicant's biological sex at birth to ensure consistent adjudication. On January 23, 2025, these instructions were transmitted to all U.S. diplomatic/consular posts abroad. The instructions advised that additional implementation guidance would be forthcoming, but that overseas posts and passport agencies should contact the Passport Directorate's Office of Adjudication for applicants having urgent travel needs.

16.  On January 29, 2025, the Office of Personnel Management ("OPM") provided initial guidance to all federal departments and agencies regarding E.O. 14168.  The guidance required the Department, not later than 5:00 p.m. EST on January 31, 2025, (i) to review all agency forms that require entry of an individual's sex and ensure that all list male and female only, and not gender identity, removing requests for "gender" and substituting requests for "sex"; and (ii) to ensure that all applicable agency policies and documents, including forms, use the term "sex" and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 8 of 10

12a

not "gender." The guidance required the Department to report to OPM no later than 12:00 p.m. EST on February 7, 2025, on all steps taken to implement the guidance, including a list of actions taken to comply with the guidance and the Executive Order, and a description of plans to fully comply with the guidance and the Executive Order.

17.   To remain compliant with E.O. 14168, after receiving guidance from OMB's Office of Information and Regulatory Affairs in late January 2025 the Department uploaded prior versions of the DS-11, DS-82 and DS-5504 application forms that offered only the sex marker of "M" or "F." The Department also removed paper Forms DS-11, DS-82, and DS-5504 that offered "X." The Department advised domestic passport acceptance agents, domestic passport agencies and centers, and foreign posts that it was in the process of updating these forms through the PRA process.

18.   On February 7, 2025, the Department resumed processing of the affected applications, employing guidance on how to adjudicate biological sex at birth. Sex at birth, which can generally be adjudicated using a birth certificate, is ascertainable and as such is how the Department has interpreted its obligations under E.O. 14168. The Department also defers to definitions and guidance from other agencies, including HHS.

19.   In evaluating how to implement this policy, the Department was cognizant of its prior history of permitting an applicant to self-select a gender identity which could differ from the applicant's biological sex according to E.O. 14168. In recognition of the President's policy objectives identified in the Executive Order, the Department determined that it was appropriate to adopt instead the Executive Order's directive, which has since been supported by HHS's definition, that sex is immutable and that "sex" is not a synonym for and does not include the

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 53-49    Filed 03/12/25    Page 9 of 10

13a

concept of "gender identity." Moreover, the Executive Order indicates a government-wide shift to using one uniform definition of "sex," so a change in the Department's policies was also needed to support the goal of uniformity. As noted above, the policy set forth in the Executive Order of recognizing only two sexes and of referring to individuals by their immutable biological classification as either male or female now "govern[s] all Executive interpretation of and application of Federal law and administration policy." OPM has also issued guidance to ensure consistency across the Federal government. The Department's compliance with the Executive Order's directive and OPM's guidance furthers that interest.

20. On February 14, 2025, the Department published 30-day public comment notices for Form DS-11 and DS-82 pursuant to the PRA. On February 18, 2025, the Department published a 30-day notice for Form DS-5504 pursuant to the PRA. These notices indicated that to comply with E.O. 14168, the Department was updating these passport application forms to replace the term "gender" with "sex" and to request the applicant's biological sex at birth, male "M" or female "F." Accordingly, the "X" marker option and the checkbox for indicating a change in gender will be removed from the forms. The public comment period for Form DS-11 will end on March 17, 2025, and the public comment periods for Forms DS-82 and DS-5504 will end on March 20, 2025.

21. The steps outlined above, which have been taken to implement E.O. 14168, will, once completed, reinstate the Department's pre-2021 practice of issuing passports with only an "M" or "F" sex marker and will, consistent with HHS's guidance under the Executive Order, require passports to reflect sex at birth.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 68-1149    Filed 03/12/25    Page 10 of 10

14a

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:    March 12, 2025.

Matthew Pierce

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 7149    Filed 04/18/25    Page 1 of 56
15a

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA,<br><br>        Defendants. | No. 1:25-cv-10313-JEK |

<u>**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO STAY AGENCY ACTION AND FOR PRELIMINARY INJUNCTION**</u>

**KOBICK, J.**

For over thirty years, transgender Americans have been able to obtain a passport from the Department of State that reflects their gender identity rather than the sex they were assigned at birth. Initially, from 1992 to 2010, an applicant had to submit evidence of surgical reassignment to obtain such a passport. In a revised policy adopted in 2010, the State Department required transgender applicants to submit only a certification from a physician that they were receiving appropriate clinical treatment for gender transition to receive such a passport. And in 2021, the State Department again revised its policy to allow transgender applicants to receive a passport with a sex marker reflective of their gender identity without medical documentation, and to further

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 744    Filed 04/18/25    Page 2 of 56

16a

allow intersex, non-binary, and gender non-conforming applicants to select "X" as their sex marker rather than an "M" for male or an "F" for female.

On January 20, 2025, President Trump signed Executive Order 14168, which declares that "[i]t is the policy of the United States to recognize two sexes, male and female," with the terms "male" and "female" defined to mean "a person belonging, at conception, to the sex that produces the [small and] large reproductive cell[s]," respectively. The order asserts that it is a "false claim that males can identify as and thus become women and vice versa," and states that a person's gender identity "does not provide a meaningful basis for identification." The order directed the Secretary of State to make "changes to require that government-issued identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the order. In late January 2025, to comply with the Executive Order's directive, the State Department made two substantive changes to its prior passport policy. First, it withdrew the option for Americans to obtain a passport reflective of either their gender identity or their sex assigned at birth, and instead required all passports to reflect only applicants' sex assigned at birth. Second, it removed the option for intersex, non-binary, and gender non-conforming applicants to select "X" as the sex marker on their passports. This Memorandum and Order refers to these changes as the "Passport Policy."

The plaintiffs—seven transgender or non-binary Americans—brought this lawsuit to challenge Executive Order 14168 and the State Department's Passport Policy. They claim that the Executive Order and Passport Policy offend the equal protection principles safeguarded by the Fifth Amendment to the United States Constitution, and further violate the Fifth Amendment rights to international travel and informational privacy. The plaintiffs also contend that the Passport Policy runs afoul of the Administrative Procedure Act because it is arbitrary and capricious and was adopted without complying with the procedural requirements of the Paperwork Reduction

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 3 of 56

17a

Act. Pending before the Court is the plaintiffs' motion to stay the Passport Policy or for a preliminary injunction.

The plaintiffs have made a substantial showing that they are likely to succeed on the merits of their equal protection claim. The Executive Order and the Passport Policy on their face classify passport applicants on the basis of sex and thus must be reviewed under intermediate judicial scrutiny. That standard requires the government to demonstrate that its actions are substantially related to an important governmental interest. The government has failed to meet this standard. It does not defend its actions based on the express purposes set forth in the Executive Order, and it has not substantiated, with evidence or developed argument, its claim that its facially discriminatory policies bear a substantial relationship to an interest in maintaining uniform data on sex across government agencies. The plaintiffs have also demonstrated a likelihood of success on their separate argument that, under any standard of review, the Executive Order and Passport Policy are based on irrational prejudice toward transgender Americans and therefore offend our Nation's constitutional commitment to equal protection for all Americans. In addition, the plaintiffs have shown that they are likely to succeed on their claim that the Passport Policy is arbitrary and capricious, and that it was not adopted in compliance with the procedures required by the Paperwork Reduction Act and Administrative Procedure Act.

Six of the seven plaintiffs have demonstrated that they are likely to suffer irreparable harm if the Passport Policy is not enjoined pending full adjudication on the merits of this lawsuit. The balance of the equities and public interest strongly favor entering an injunction as to these plaintiffs. The Court will therefore grant the request for a preliminary injunction as to these plaintiffs, but will deny the plaintiffs' further request for a stay of the Passport Policy under 5

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 71    Filed 04/18/25    Page 4 of 56
pg 20 of 149

18a

U.S.C. § 705, because, as formulated, their request exceeds the scope of relief made available under that statute.

## BACKGROUND

### I.    Statutory and Regulatory Framework.

A.    General Background.

A United States passport is a "travel document . . . issued under the authority of the Secretary of State attesting to the identity and nationality of the bearer." 22 C.F.R. § 51.1. The Secretary of State grants and issues passports to United States citizens "under such rules as the President shall designate and prescribe." 22 U.S.C. § 211a. To obtain a passport, an individual must "submit a written application which shall contain a true recital of each and every matter of fact which may be required by law or by any rules authorized by law to be stated as a prerequisite to the issuance of any such passport." *Id.* § 213. First-time passport applicants must submit a Form DS-11, applicants seeking to renew their passport must submit a Form DS-82, and certain applicants seeking to change their name or correct identifying information must submit a Form DS-5504 (collectively, the "passport forms"). *See* ECF 53-1, ¶ 3; 22 C.F.R. § 51.20(a). A passport applicant has the burden of establishing, among other things, their identity, 22 C.F.R. § 51.23(a), and that they are a U.S. citizen or non-citizen national, *id.* § 51.40. It is a crime to "willfully and knowingly" make a false statement in a passport application "with intent to induce or secure the issuance of a passport." 18 U.S.C. § 1542.

B.    Passport Sex Markers: 1976-2024.

Passports have been issued "since the earliest days of the Republic." *Haig v. Agee*, 453 U.S. 280, 293 (1981). For most of the country's history, however, American citizens have been permitted to travel abroad without a passport. *See Kent v. Dulles*, 357 U.S. 116, 121 (1958). Indeed,

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 144    Filed 04/18/25    Page 5 of 56

19a

American citizens could travel anywhere in the western hemisphere without a passport before 1961. *See Zemel v. Rusk*, 381 U.S. 1, 3 (1965). Not until 1978 did Congress enact a statute, 8 U.S.C. § 1185, declaring it unlawful for an American citizen to enter or depart from the United States without a valid passport. *See Agee*, 453 U.S. at 300 & n.47; 8 U.S.C. § 1185(b).

Two years earlier, in 1976, the State Department first "introduced sex as a required identity attribute" on passports, instructing applicants to indicate their sex as either male ("M") or female ("F"). ECF 53-1, ¶ 5. In 1992, the State Department began permitting applicants to select a sex marker that differed from their sex assigned at birth. *See id.* ¶ 6. Applicants were initially required to submit "evidence of surgical reassignment" to change their sex marker, but the State Department eliminated this requirement in 2010, when it began accepting "a physician's certification that the applicant had had appropriate clinical treatment for gender transition." *Id.* In 2021, it further revised its policy concerning passport markers, making two substantive changes: (1) applicants would be allowed to self-select their sex marker based on their gender identity; and (2) non-binary, intersex, and gender non-conforming applicants would be permitted to select a third sex marker, "X," in lieu of an "M" or "F" marker. *See id.* ¶¶ 7-8. The State Department also began using the term "gender" instead of "sex" on the passport forms, though it continued to use the term "sex" on passports it issued. *See id.*

The State Department updated the passport forms to reflect these changes and, in accordance with the Paperwork Reduction Act, published 60-day comment notices regarding these changes in the Federal Register. *See* 86 Fed. Reg. 51257 (Sept. 15, 2021), at 51434 (Form DS-82), 51434 (Form DS-5504), and 51435 (Form DS-11). The notices stated: "The Department's new policy permits passport applicants to select the gender marker on their passport without presenting medical documentation of gender transition. This policy change includes updating forms to add a

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 6 of 56

20a

third gender marker 'X' for applicants identifying as non-binary, intersex, and/or gender non-conforming (in addition to the existing 'M' and 'F' gender markers)." *Id.* at 51434, 51435. The State Department began using the revised passport forms in April 2022, after receiving approval from the Office of Management and Budget ("OMB"). ECF 53-1, ¶ 8. In November 2024, the State Department issued 60-day comment notices requesting that OMB renew the forms, which are scheduled to expire on April 30, 2025. *See id.* ¶¶ 8-9; 89 Fed. Reg. 93389 (Nov. 26, 2024), at 93389 (Form DS-11), 93390 (Form DS-82); 89 Fed. Reg. 94867 (Nov. 29, 2024) (Form DS-5504).

     C.    <u>Executive Order 14168.</u>

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Executive Order" or "EO"). 90 Fed. Reg. 8615 (Jan. 20, 2025). The first section, titled "Purpose," asserts that "ideologues" are engaged in a protracted effort to undermine "the biological reality of sex" to the detriment of "women." EO § 1. The first two paragraphs of this section read in full:

> Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.
>
> This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of ''woman'' improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them,

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 7449    Filed 04/18/25    Page 7 of 56
pg 23 of 149

21a

replacing longstanding, cherished legal rights and values with an identity-based, inchoate social concept.

*Id.* Based on these premises, the Executive Order states that the Trump Administration will "recognize women are biologically female, and men are biologically male." *Id.*

In view of these purposes, the Executive Order asserts that "[i]t is the policy of the United States to recognize two sexes, male and female," which "are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It then sets forth the following definitions:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

*Id.*

The Executive Order requires federal agencies to use the term "sex" instead of "gender" in all federal policies and documents when "administering or enforcing sex-based distinctions." *Id.* § 3(c). Accordingly, it directs the "Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, [to] implement changes to require that government-issued

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 8 of 56
pg 24 of 149

22a

identification documents, including passports . . . accurately reflect the holder's sex," as that term is defined in the Executive Order. *Id.* § 3(d). It further directs the Secretary of Health and Human Services ("HHS") to develop "clear guidance" expanding on the definitions set forth in the Executive Order. *Id.* § 3(a).

In accordance with the Executive Order, HHS released a document defining "sex" and related terms on February 19, 2025. *See* Dep't of Health & Hum. Servs., *Defining Sex: Guidance for Federal Agencies, External Partners, and the Public Implementing Executive Order 14168* (Feb. 19, 2025).[1] HHS defines "sex" as "a person's immutable biological classification as either male or female"; it defines "female" as "a person of the sex characterized by a reproductive system with the biological function of producing eggs (ova)"; and it defines "male" as "a person of the sex characterized by a reproductive system with the biological function of producing sperm." *Id.* at 2.

D.    The Passport Policy.

Pursuant to the Executive Order, the State Department made two substantive changes to its prior passport policy: (1) it removed the option for applicants to obtain a passport with a sex marker reflecting either their gender identity or sex assigned at birth, and replaced it with the requirement that a passport must reflect an applicant's sex assigned at birth; and (2) it removed the option for non-binary, intersex, or gender non-conforming applicants to obtain a passport with an "X" sex marker. *See* ECF 53-1, ¶¶ 15, 20-21. On January 22, 2025, two days after the Executive Order was issued, the State Department informed all domestic passport agencies of these changes. *See id.* ¶ 15. The same instructions were issued to all diplomatic posts abroad the following day. *Id.*

---

[1] *See* https://perma.cc/N5V8-CHEC.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 7149    Filed 04/18/25    Page 9 of 56

23a

In late January 2025, the State Department replaced the passport forms available on its website, which offered an "X" sex marker, with earlier versions of the forms, which offered only "M" and "F" sex markers. *See id.* ¶ 17.[2] In mid-February 2025, the State Department issued 30-day comment notices indicating that, in accordance with Executive Order 14168, it had updated the passport forms to: (1) "replace the term 'gender' with 'sex'"; (2) "request the applicant's biological sex at birth," rather than permitting applicants to self-identify their sex; and (3) offer only "M" and "F" sex markers. 90 Fed. Reg. 9652 (Feb. 14, 2025) (Form DS-11); 90 Fed. Reg. 9800, 9800-01 (Feb. 18, 2025) (Forms DS-82 and DS-5400); *see* ECF 53-1, ¶ 20.

Because the State Department "does not have the capacity to adjudicate 'sex at conception,'" it relies on HHS's definitions of "male" and "female," rather than the Executive Order's definitions of these terms. ECF 53-1, ¶¶ 14, 21. The State Department asserts that the determination of an applicant's sex assigned at birth "can generally be adjudicated using a birth certificate," *id.* ¶ 18, but the Department may also conduct further investigation into an applicant's sex assigned at birth by looking to other documents or by calling the applicant, *see* ECF 30-4, ¶ 12.

## II.    **Factual Background.**

The following facts, which are undisputed, are drawn from the complaint, as well as affidavits and expert declarations submitted by the plaintiffs.

The plaintiffs are seven transgender or non-binary American citizens. ECF 1, ¶¶ 9, 16-22. The term "transgender" refers to individuals whose gender identity differs from the sex they were assigned at birth. ECF 30-1, ¶ 46. The term "non-binary" refers to individuals whose gender

---

[2] The following statement, titled "2025 Notice," is currently posted on the "Passport Forms" page of the State Department's website: "You may use all forms available on our site, including ones that expired before 2025. We are currently working to update our forms and will post the new versions as soon as they are available." U.S. Dep't of State, Bureau of Consular Affs., *Passport Forms* (last visited Apr. 18, 2025), https://perma.cc/27FP-2R9F.

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 7149 Filed 04/18/25     Page 10 of 56

24a

identity is neither exclusively male nor exclusively female. *Id.* ¶ 49. Non-binary people are, according to the plaintiffs, a subset of transgender people because their gender identity does not match their sex assigned at birth. *See* ECF 65, at 18. An individual's sex is typically assigned at birth based on the appearance of their external genitalia. *See* ECF 30-1, ¶ 47.

Many transgender and non-binary people experience gender dysphoria, a medical condition defined as "the significant emotional distress or impairment in social, occupational, or other important areas of functioning that stems from the incongruence between a person's gender identity and sex designated at birth, and/or body characteristics." *Id.* ¶ 53. Gender dysphoria is a recognized diagnosis by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, and it can be effectively managed when appropriately treated. *Id.* ¶¶ 54, 56. Treatment protocols for gender dysphoria are detailed in two leading evidence-based clinical guidelines: the Endocrine Society Clinical Practice Guideline for Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons, and the World Professional Association for Transgender Health Standards of Care for the Health of Transgender and Gender Diverse People. *Id.* ¶ 57. These guidelines reflect professional consensus about the psychological, psychiatric, hormonal, and surgical management of gender dysphoria, and they are supported by all major American medical associations. *Id.* The recognized standard of care for gender dysphoria consists of individualized treatment designed "to bring a person's body and expression of their sex in line with their gender identity." *Id.* ¶ 58. Such treatment is multimodal and may involve, among other things, social transition, hormone treatment, and gender-affirming surgeries. *See id.* ¶ 59. Social transition entails "living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity." *Id.* ¶ 77.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-49    Filed 04/18/25    Page 11 of 56

25a

Plaintiffs Zaya Perysian, Chastain Anderson, and Bella Boe[3] are transgender women whose sex assigned at birth was male. ECF 30-3, ¶ 4; ECF 30-6, ¶ 5; *see* ECF 30-5, ¶ 5. Each has a driver's license with a female sex marker, and Boe previously obtained a passport with a female sex marker. ECF 30-3, ¶ 9; ECF 30-5, ¶¶ 7, 13; ECF 30-6, ¶ 10. Anderson and Perysian submitted expedited applications to renew their passports and obtain female sex markers on December 27, 2024 and January 23, 2025, respectively. ECF 30-3, ¶ 10; ECF 30-6, ¶ 10. They have received their renewed passports, but the passports bear male sex markers, rather than the female sex markers that they requested. ECF 30-3, ¶ 12; ECF 30-6, ¶ 11. Boe also applied to renew her passport on January 25, 2025, but as of the date of her declaration, she had not received a new passport. ECF 30-5, ¶ 13.

Plaintiffs Ashton Orr and Reid Solomon-Lane are transgender men whose sex assigned at birth was female. ECF 30-4, ¶ 5; ECF 30-8, ¶ 5. Each has a driver's license with a male sex marker, and Solomon-Lane's current passport also has a male sex marker. ECF 30-4, ¶ 8; ECF 30-8, ¶¶ 10-11. On January 16, 2025, Orr submitted an expedited application to renew his passport and obtain a male sex marker. ECF 30-4, ¶ 12. However, on February 11, 2025, a representative from the State Department called him to investigate his sex assigned at birth. *Id.* That representative informed Orr that, pursuant to the Executive Order, the State Department would only issue him a passport with a female sex marker. *Id.* He was given the opportunity to withdraw his renewal application and have his current passport, which has a female sex marker, returned to him. *Id.* Later that day, Orr received an email from the State Department informing him that his application is "on hold" until he provides "additional information" to complete his application. *Id.* at 7. Solomon-Lane has

[3] The Court allowed plaintiffs Bella Boe and Sawyer Soe's unopposed motion to proceed under pseudonym on March 18, 2025. ECF 60.

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 74-9   Filed 04/18/25     Page 12 of 56

26a

not attempted to renew his passport, which will expire in 2028, nor has he expressed an intention to do so. *See* ECF 30-8, ¶ 11.

Plaintiff Drew Hall is a non-binary person who expresses themselves in a feminine manner and whose sex assigned at birth was male. ECF 30-7, ¶¶ 5, 7. They have a driver's license and social security card with a female sex marker. *Id.* ¶ 10. On January 9, 2025, Hall applied to renew their passport and obtain an updated sex marker, and they received an email informing them that their application had been approved on February 11, 2025. *See id.* ¶ 12. As of the date of their declaration, they had not received their new passport, however, and they do not know what sex marker will be listed on it. *Id.* Plaintiff Sawyer Soe is also non-binary, and they feel that this term accurately captures their gender because it encompasses both masculine and feminine expression. ECF 30-9, ¶ 5. Their sex assigned at birth was female, and their previous passport, which expired in August 2019, had a female sex marker. *Id.* ¶¶ 5, 9. Soe has obtained a driver's license with an "X" sex marker, and they hope to also obtain a passport with an "X" marker. *Id.* ¶¶ 8, 11. They have not yet applied to renew their passport, but they will be required to travel internationally within the next two months. *See id.* ¶ 10.

Each of the plaintiffs would fear for their safety if required to travel with a passport bearing a sex marker that corresponds to their sex assigned at birth, rather than to their gender identity and expression. *See* ECF 30-3, ¶¶ 14-15; ECF 30-4, ¶ 15; ECF 30-5, ¶¶ 13-14; ECF 30-6, ¶¶ 12-13; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶¶ 11-12; ECF 30-9, ¶ 11. Three plaintiffs—Orr, Anderson, and Perysian—previously faced harassment or discrimination when travelling with identity documents bearing a sex marker corresponding to their sex assigned at birth rather than their gender identity. ECF 30-3, ¶ 8; ECF 30-4, ¶ 10; ECF 30-6, ¶ 13. In January 2025, a Transportation Security Administration ("TSA") officer accused Orr of presenting a false identification document when he

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 13 of 56

27a

flew from West Virginia to New York, because the male sex marker on his driver's license did not match the female sex marker on his passport. ECF 30-4, ¶ 10. Similarly, in 2017, TSA agents pulled Anderson aside when she presented a driver's license with a male sex marker at an airport security checkpoint in Richmond, Virginia. ECF 30-6, ¶ 13. Anderson was isolated in a cubicle, where she waited for thirty minutes until a manager came in and performed a strip search of her body. *Id.* Perysian avers that before updating her driver's license, she was patted down by TSA agents who sought to confirm her gender after observing the disjunction between her female gender expression and the male sex marker on her identity documents. *See* ECF 30-3, ¶ 8. These experiences were "devastating" for Perysian, and they have occurred less frequently since she obtained a driver's license with a female sex marker. *See id.*

Each of the plaintiffs has, or until recently had, plans to travel internationally in 2025. Perysian, Orr, and Boe had planned to go on international trips in February and March of 2025, but they cancelled their respective trips because they were unable to obtain passports with sex markers matching their gender identities and other identity documents. *See* ECF 65, 27:23-28:12; ECF 30-4, ¶¶ 13-14; ECF 30-5, ¶¶ 9, 13-14; ECF 30-3, ¶¶ 10, 14. Soe, who works for a video game developer with a global presence, plans to travel internationally for work within the next three months, and Anderson has plans to attend a professional conference in France in October 2025. *See* ECF 30-9, ¶¶ 4, 10; ECF 30-6, ¶ 9. Hall, who is pursuing a Ph.D. at the University of British Columbia, travels between Canada and the United States several times a year, and they plan to travel to Wisconsin in May for a wedding and in July for an academic conference. ECF 30-7, ¶¶ 4, 9. Solomon-Lane plans to visit Montreal within the next year to visit friends, and he frequently travels internationally to visit his mother-in-law, who owns a home in Ireland. ECF 30-8, ¶ 9.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 7-449   Filed 04/18/25    Page 14 of 56
28a

III.  <u>**Procedural History.**</u>

The plaintiffs filed their putative class action complaint on February 7, 2025, naming as

defendants Donald J. Trump, in his official capacity as President of the United States; the United

States of America; Marco Rubio, in his official capacity as Secretary of State; and the Department

of State. ECF 1. They intend to seek certification of the following classes of individuals under

Federal Rule of Civil Procedure 23:

> a.  All people who currently want, or in the future will want, to apply for, apply to
>     renew, or apply to change a U.S. passport and wish to use an "M" or "F" sex
>     designation on their passport that aligns with their gender identity but does not
>     match how the Executive Order defines their sex; and
> b.  All people who currently want, or in the future will want, to apply for, apply to
>     renew, or apply to change a U.S. passport and wish to use an "X" sex
>     designation.

ECF 1, ¶ 185.

Against all defendants, the complaint asserts claims for discrimination based on sex and

transgender status, in violation of the Fifth Amendment, *id.* ¶¶ 193-211 (Count 1); infringement of

the Fifth Amendment right to travel abroad, *id.* ¶¶ 212-20 (Count 2); infringement of the Fifth

Amendment right to privacy, *id.* ¶¶ 221-27 (Count 3); and a violation of the First Amendment right

to free speech and expression, *id.* ¶¶ 228-35 (Count 4). Against Secretary Rubio and the State

Department (the "Agency Defendants"), the complaint asserts three claims for violations of the

Administrative Procedure Act ("APA"). It alleges that the Passport Policy and related agency

actions violate the APA because they are "contrary to constitutional right, power, privilege, or

immunity," 5 U.S.C. § 706(2)(B), ECF 1, ¶¶ 236-39 (Count 5); arbitrary and capricious, 5 U.S.C.

§ 706(2)(A), ECF 1, ¶¶ 240-46 (Count 6); and without observance of procedure required by the

Paperwork Reduction Act, 5 U.S.C. § 706(2)(D), ECF 1, ¶¶ 247-51 (Count 7). The complaint

seeks, among other things, declaratory judgment that the Passport Policy and Executive Order

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 15 of 56

29a

violate the plaintiffs' constitutional rights and that the Passport Policy violates the APA; and an injunction that prevents the defendants from enforcing the Passport Policy or Executive Order, insofar as it applies to passports, and requires the defendants to permit applicants to self-attest to their sex and have the ability to select an "X" sex marker. *See* ECF 1, at 56-57.

On February 18, 2025, the plaintiffs filed a motion to stay agency action and for a preliminary injunction. ECF 29. In support of their motion, the plaintiffs submitted, among other things, a memorandum of law, ECF 30; the declaration of Sarah D. Corathers, MD, the Clinical Director of the Division of Pediatric Endocrinology at Cincinnati Children's Hospital, ECF 30-1; the declaration of Ayden Scheim, Ph.D., an Assistant Professor of Epidemiology and Biostatistics in the Dornsife School of Public Health at Drexel University, ECF 30-2; and declarations filed by each of the named plaintiffs, ECF 30-3 to 30-9.[4] Pursuant to 5 U.S.C. § 705, the plaintiffs ask the Court to stay enforcement of the Passport Policy during the pendency of this litigation and to require the defendants to issue passports consistent with the prior passport policy. *See* ECF 29, at 1-2. Pursuant to Federal Rule of Civil Procedure 65(a), the plaintiffs ask the Court to enjoin the Agency Defendants from enforcing the Passport Policy against them during the pendency of this litigation. *Id.* at 2. They also ask for an order requiring the State Department to process and issue passports to them in accordance with its prior passport policy. *See id.* After receiving the government's opposition, ECF 53, which included a declaration submitted by Matthew Pierce, the Deputy Assistant Secretary for Passport Services in the Bureau of Consular Affairs at the State Department, ECF 53-1, and the plaintiffs' reply, ECF 62, the Court held a hearing and took the

---

[4] The plaintiffs contend in their motion that they are likely to succeed on the merits of Counts 1, 2, 3, 6, and 7 of their complaint, but did not move on Counts 4 and 5.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 14-9    Filed 04/18/25    Page 16 of 56

30a

motion under advisement, ECF 64. The parties submitted supplemental briefs regarding the plaintiffs' request for a stay after the hearing. ECF 67-1, 69.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiffs must demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first and second factors are "the most important," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and courts consider them in tandem, *see Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## DISCUSSION

**I.    Likelihood of Success on the Merits.**

    A.    Equal Protection Claim.

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Implicit in this provision is a guarantee of equal protection of the laws. *See Sessions v. Morales-Santana*, 582 U.S. 47, 52 & n.1 (2017); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 231-32 (1995). Courts analyze Fifth Amendment equal protection claims against the federal government in "'precisely the same'" manner as Fourteenth Amendment equal protection claims against state and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 17 of 56

31a

local governments. *Morales-Santana*, 582 U.S. at 52 n.1 (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975)).

The plaintiffs claim that Executive Order 14168 and the Passport Policy deprive them of their guarantee of equal protection by discriminating against them on the basis of sex and on the basis of transgender status without adequate justification. They further contend that the Executive Order and Passport Policy spring from unlawful animus toward transgender individuals. The government disagrees, contending that the Executive Order and Passport Policy do not classify on the basis of sex or transgender status, lack indicia of animus toward transgender people, and must be upheld under rational basis review.

    *1. Level of Scrutiny.*

The plaintiffs first contend that the Passport Policy discriminates against them on the basis of sex. Laws, governmental policies, or executive orders that expressly classify on the basis of sex or gender are subject to heightened judicial scrutiny. *See Morales-Santana*, 582 U.S. at 58 ("Laws granting or denying benefits 'on the basis of . . . sex' . . . differentiate on the basis of gender, and therefore attract heightened review under the Constitution's equal protection guarantee." (quoting *Califano v. Westcott*, 443 U.S. 76, 84 (1979))). To sustain the constitutionality of such policies, the government must advance an "'exceedingly persuasive justification,'" demonstrating that the classification "'serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.* at 58-59 (quoting *United States v. Virginia*, 518 U.S. 515, 531, 533 (1996) ("*VMI*")). "[C]lassifications based on gender" and sex call for this intermediate standard of scrutiny because a person's gender and sex "generally provid[e] no sensible ground for differential treatment." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-49    Filed 04/18/25    Page 18 of 56

32a

The State Department's Passport Policy made two substantive changes to its prior policy: (1) where it once allowed applicants to obtain a passport with a sex marker reflecting their gender identity or sex assigned at birth, it now allows applicants to obtain a passport reflecting only their sex assigned at birth; and (2) where it once allowed non-binary, intersex, and gender non-conforming applicants to obtain a passport with an "X" sex marker, it has now eliminated that option. In making both substantive changes in conformance with Executive Order 14168, the State Department has drawn classifications based on sex. As to the first policy change, applicants are explicitly treated differently based on their sex assigned at birth. A person who identifies as female can receive a passport marked "F" if her sex assigned at birth was female, but not if her sex assigned at birth was male. Likewise, a person who identifies as male can receive a passport marked "M" if his sex assigned at birth was male, but not if his sex assigned at birth was female. Put more concretely, plaintiffs Zaya Perysian and Chastain Anderson, transgender women, were denied passports marked "F" because their sex assigned at birth was male, but an otherwise identically situated person who likewise identifies as female could receive a passport marked "F" if her sex assigned at birth was female. The differential treatment—in whether the applicant can obtain a passport with a sex marker that reflects their gender identity—is entirely dependent on the applicant's sex assigned at birth. Viewed from any angle, that amounts to a classification based on sex.

This conclusion accords with the logic undergirding the Supreme Court's holding in *Bostock v. Clayton County* that, for purposes of a Title VII claim, discrimination against a person for being transgender is necessarily discrimination on the basis of sex. 590 U.S. 644, 660-61, 669 (2020). The Court explained that if an employer fires a transgender woman who was assigned male at birth, but retains an otherwise identically situated woman assigned female at birth, "the

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 19 of 56

33a

individual employee's sex plays an unmistakable and impermissible role in the discharge decision," because "transgender status" is "inextricably bound up with sex." *Id.* at 660-61. This same logic led the Tenth Circuit to conclude that when Oklahoma reversed a policy allowing transgender people to obtain birth certificates consistent with their gender identity, its new policy "intentionally discriminate[d] . . . based in part on sex." *Fowler v. Stitt*, 104 F.4th 770, 789 (10th Cir. 2024). Under the policy, a transgender woman could not get a birth certificate reflective of her gender identity, but if her sex assigned at birth had been female rather than male, she could get a birth certificate that matched her gender identity. *Id.* So, too, for a transgender man. *Id.* Under the Equal Protection Clause, as under Title VII, the inescapable conclusion was that the Oklahoma policy classified on the basis of sex. *Id.* at 793-794 (collecting cases applying *Bostock*'s reasoning to equal protection claims).[5]

The second change effected by the Passport Policy—that is, the reversal of the availability of an "X" marker on passports—likewise draws a classification based on sex. When it adopted forms allowing applicants to select "X" for their sex in 2021, the State Department explained that the "third gender marker 'X'" is "for applicants identifying as non-binary, intersex, and/or gender non-conforming." 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8 (the "third option of 'X' as a gender marker [was] for non-binary, intersex, and gender non-conforming persons"). The forms followed litigation that highlighted the complexity of medical evidence on biological sex, especially for intersex people, and the State Department's recognition that "some individuals are born neither male nor female." *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). The "X" option thus

---

[5] The government makes no developed argument in this case that *Bostock*'s reasoning does not apply to equal protection claims; indeed, its brief did not mention *Bostock*. But the Tenth Circuit, like other Courts of Appeals, has cogently explained why the logic holds in equal protection and Title VII cases alike. *See, e.g., Fowler*, 104 F.4th at 789-94; *Kadel v. Folwell*, 100 F.4th 122, 153-54 (4th Cir. 2024) (en banc).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149 Filed 04/18/25    Page 20 of 56

34a

supplemented the existing "M" and "F" sex markers, allowing three options for the "sex" field on passports. 86 Fed. Reg. at 51436; *see* ECF 53-1, ¶ 8. Consequently, in 2021, the State Department recognized a conception of sex broader than the binary male and female markers it had previously used on passports. *See id.* But four years later, in Executive Order 14168, it became "the policy of the United States to recognize two sexes, male and female." EO § 2. In conformance with the Executive Order, the State Department reversed its prior policy and announced it would likewise recognize only two sexes, male and female. ECF 32-5; *see* ECF 53-1, ¶¶ 15, 17. That change—the withdrawal of the recognition of a more expansive conception of sex—is a straightforward classification based on sex. Whereas before, the State Department classified sex as broader than the male/female binary, it now classifies sex based only on the male/female binary.

These sex-based classifications are not incidental to the Passport Policy; rather, the sex-based line drawing is the very purpose of the Executive Order and Passport Policy. The Executive Order states plainly that the federal government now must recognize that "women are biologically female," "men are biologically male," and there are only "two sexes, male and female." EO §§ 1-2. And it directs the Secretary of State to require that passports adhere to those sex-based classifications. *Id.* § 3(d). The Secretary of State, in turn, adopted the Passport Policy to comply with the directive set forth in the Executive Order. ECF 53-1, ¶ 15. And the State Department's webpage describing the policy to the public—titled "Sex Marker in Passports"—leaves no doubt that the policy exists to make sex-based classifications. ECF 32-5. In accordance with the Executive Order, and as implemented by the State Department, the Passport Policy was designed and intended to enforce conformity to an individual's sex assigned at birth.

The government resists the conclusion that the Passport Policy classifies on the basis of sex, contending that the policy "'does not prefer one sex over the other.'" ECF 53, at 17 (quoting

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 21 of 56

35a

*L. W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 480 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024)). But that misstates the inquiry, because "the Equal Protection Clause 'protect[s] *persons*, not *groups*.'" *Parents Involved in Cmty. Sch. v. Seattle Schs. Dist. No. 1*, 551 U.S. 701, 743 (2007) (quoting *Adarand*, 515 U.S. at 227); *see also United States v. Windsor*, 570 U.S. 744, 774 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any *person* the equal protection of the laws." (emphasis added)). It is not enough for the government to disclaim a sex classification because, in its telling, males as a group and females as a group are treated equally. *See Adarand*, 515 U.S. at 227; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994). Rather, the focus of the inquiry must be whether, as applied to an individual, there exists a classification based on sex. Put otherwise, "any individual suffers an injury when he or she is disadvantaged by the government because of his or her [sex], whatever that [sex] may be." *Adarand*, 515 U.S. at 230. Here, the plaintiffs have been personally disadvantaged by the government—they can no longer obtain a passport consistent with their gender identity—because of their sex assigned at birth, while similarly situated people can obtain passports consistent with their gender identity if they have a different sex assigned at birth. The Constitution's "principle of consistency simply means that whenever the government treats any person unequally because of his or her [sex], that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Id*. at 229-30.

The government also maintains that the Passport Policy "'does not impose any special restraints on, and does not provide any special benefits to, applicants due to their sex.'" ECF 53, at 17 (quoting *Gore v. Lee*, 107 F.4th 548, 555 (6th Cir. 2024)). By now, it should be clear that this argument is mistaken. A person who identifies as female and is assigned female at birth can obtain

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 149     Filed 04/18/25     Page 22 of 56

36a

a passport reflecting her identity as female, while plaintiffs Zaya Perysian, Bella Boe, and Chastain Anderson cannot obtain a passport reflecting their identity as female, simply because they were assigned male at birth. Likewise, a person who identifies as male and is assigned male at birth can obtain a passport reflecting his identity as male, while plaintiffs Ashton Orr and Reid Solomon-Lane cannot obtain a passport reflecting their identity as male, simply because they were assigned female at birth. And a person who identifies as male or female, and who was assigned one of those sexes at birth, can obtain a passport reflecting their gender identity, while plaintiffs Drew Hall and Sawyer Soe cannot obtain a passport reflecting their non-binary gender identity, simply because they were assigned, respectively, male and female at birth. The Passport Policy does indeed impose a special disadvantage on the plaintiffs due to their sex, and the Court therefore concludes that it discriminates on the basis of sex.[6]

### 2. Application of Intermediate Scrutiny.

The conclusion that the Passport Policy discriminates on the basis of sex does not require invalidation of the policy; it simply requires the government to justify its adoption of the policy under intermediate scrutiny. *VMI*, 518 U.S. at 531-33. To defend a policy that classifies on the basis of sex or gender, the government bears the burden to demonstrate that the policy is substantially related to an important government objective. *See id.* at 533; *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 9 (1st Cir. 2012). The government's justification for

---

[6] The plaintiffs also contend that the Passport Policy warrants heightened scrutiny because transgender status should be recognized as a quasi-suspect class, and the policy discriminates against them on the basis of transgender status. Because the Court has already concluded that the Passport Policy is subject to heightened scrutiny because it classifies on the basis of sex, it need not, at this juncture, consider this distinct and factually intensive contention. *See Bowen v. Gilliard*, 483 U.S. 587, 602-03 (1987) (setting forth factors to consider in determining whether a group constitutes a suspect or quasi-suspect class); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (same); *City of Cleburne*, 473 U.S. at 441 (same).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 23 of 56

37a

the discriminatory policy "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *VMI*, 518 U.S. at 533. And "[f]ocusing on the differential treatment for denial of opportunity for which relief is sought," the Court must "determine whether the proffered justification is exceedingly persuasive." *Id.* at 532-33 (quotation marks omitted).

The State Department began implementing the Passport Policy two days after the issuance of Executive Order 14168 so as to remain "compliant" and "[c]onsistent with [the] directives set out" in that order. ECF 53-1, ¶¶ 15, 17. To determine the government's justification for the Passport Policy, then, the Court must look to the Executive Order. Section 1 of the Executive Order, titled "Purpose," sets forth three reasons for the government-wide change in policy regarding the definition of sex. First, the government asserts that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers." EO § 1. Second, the government wishes to stop what it characterizes as an "attack" on "women"—defined as people "belonging, at conception, to the sex that produces the large reproductive cell"—"by depriving them of their dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). Third, the government believes that the "erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system." *Id.* § 1. Based on these purposes, the Executive Order directs the Secretary of State to update passports to reflect the holder's sex, as that term is defined in Section 2 of the order. *Id.* § 3(d).

The government does not attempt to justify the Passport Policy by reference to any of these express purposes of the Executive Order. Nor could it. It is obvious that the Passport Policy, which denies some applicants passports that reflect their gender identity, has no relation to any claimed

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 24 of 56

38a

interest in keeping transgender women out of women's domestic abuse shelters, women's workplace showers, and other intimate single-sex places. Similarly, there is no connection between the State Department's prior policy—which allowed applicants to obtain personal-use passports consistent with their gender identity—and any deprivation of cisgender women's "dignity, safety, and well-being." *Id.* §§ 1, 2(b), 2(d). The sex listed on one person's passport has nothing to do with the dignity, safety, or wellbeing of another person. *Cf. Massachusetts*, 682 F.3d at 14-15 (rejecting the argument that denying federal recognition to same-sex marriages has any connection to the wellbeing of opposite-sex marriages). The government further offers no explanation for how a policy that allowed all individuals to obtain passports reflective of their gender identity had a "corrosive impact" on women and "the validity of the entire American system." EO § 1. Any such argument would strain logic, and so it is not surprising that the government does not try to justify the Passport Policy by reference to the stated purposes of the Executive Order.

Instead, the government claims that the Passport Policy advances a different purpose: maintaining a consistent definition of sex across the federal government. Passport data would not be useful for other agencies, the government asserts, if the State Department used a different definition of sex than other agencies. While this goal of consistency is not stated as an express purpose of the Executive Order or the Passport Policy, the government's aim to impose a uniform definition of sex across the federal government is apparent from the face of the Executive Order. That objective does not, however, rank as an important governmental interest that can sustain the constitutionality of the Passport Policy. Settled precedent instructs that a mere claim that a discriminatory policy is justified by an administrative convenience, like a desire for uniformity in data, cannot justify sex- and gender-based classifications. *See, e.g.*, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 152 (1980) ("the requisite showing has not been made" under heightened

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 25 of 56

39a

scrutiny "by the mere claim that it would be inconvenient to individualize determinations about widows as well as widowers"); *Craig v. Boren*, 429 U.S. 190, 198 (1976) (Supreme Court decisions "have rejected administrative ease and convenience as sufficiently important objectives to justify gender-based classifications"). The government has introduced no evidence that, to the extent the definition of sex varied across federal agencies before the Executive Order, significant problems emerged. It has not argued that the State Department's prior policy allowing passport applicants to select "M," "F," or "X" consistent with their gender identity inhibited other agencies' functioning. Nor has the government introduced evidence that other agencies in fact rely on the State Department's records of passport applicants' sex, and to the extent they do, how they use that data.[7] On the record before the Court, there is no evidence of a substantial relationship between the Passport Policy and the asserted governmental interest in maintaining a consistent definition of sex across the federal government.

The "Constitution recognizes higher values than speed and efficiency," and the government has failed to proffer an exceedingly persuasive justification for the Passport Policy's sex-based discrimination. *Stanley v. Illinois*, 405 U.S. 645, 656-57 (1972). The plaintiffs are therefore likely to succeed on the merits of their equal protection claim.

---

[7] At the hearing on the plaintiffs' motion, the government pointed to the Tenth Circuit's statement in *Zzyym v. Pompeo* that "law enforcement . . . often uses passport data to identify victims and to locate criminal suspects." 958 F.3d at 1027. The government has not introduced comparable evidence in this case. But even if it had, the State Department updated its policy in 2021 to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity *after* the court in *Zzyym* acknowledged the government's interest in making passport data useful for other federal agencies. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding its potential interest in uniformity of data across federal agencies, the State Department concluded that this interest did not justify a binary sex policy that denied intersex, non-binary, and gender non-conforming individuals the option of a third sex marker.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74149 Filed 04/18/25    Page 26 of 56

40a

> ### 3. *Animus.*

The plaintiffs further contend that, apart from the sex-based discrimination, the Passport Policy, and the Executive Order it implements, violate the guarantee of equal protection because they bear the hallmarks of policies driven by a bare desire to harm transgender Americans.

In a series of cases, the Supreme Court has invalidated on rational basis review government actions that burdened "historically disadvantaged or unpopular" groups, when the governmental justification for its action "seemed thin, unsupported, or impermissible." *Massachusetts*, 682 F.3d at 10. The first, *U.S. Department of Agriculture v. Moreno*, involved a statute that excluded from the food stamp program households containing unrelated individuals, the legislative history of which indicated that Congress wished to prevent "'hippie communes'" from participating in the program. 413 U.S. 528, 530-34 (1973). The Court rejected the government's argument that the statute furthered its interest in minimizing fraud and warned that the "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* at 534-38. In the second case, *City of Cleburne v. Cleburne Living Center, Inc.*, the Court invalidated a city's requirement that the proposed operator of a group home for people with intellectual disabilities obtain a special use permit, where the city's zoning ordinance did not require the same permit for comparable uses of the land. 473 U.S. at 447-50. Rejecting as illegitimate the city's asserted interests in avoiding negative reactions from property owners located near the group home, protecting group home residents from harassment by neighbors, keeping the home out of a flood plain, limiting the size of the home, and lessening congestion in the streets, the Court concluded that the city's policy rested on an "irrational prejudice" that offended equal protection principles. *Id.* at 449-50. The third case, *Romer v. Evans*, concerned a state constitutional amendment that prohibited state or local government action designed to protect gay and lesbian citizens and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-149    Filed 04/18/25    Page 27 of 56

41a

repealed local ordinances that protected against discrimination on the basis of sexual orientation. 517 U.S. 620, 623-24 (1996). Unimpressed with the state's asserted interests in conserving resources and respecting citizens' freedom of association, the Court struck down the amendment because it "impos[ed] a broad and undifferentiated disability on a single named group" and because its "sheer breadth" suggested that it was born of animosity toward "the class it affects." *Id.* at 632-35. Recently, the Court reaffirmed this line of precedent, explaining that when a court cannot "'discern a relationship'" between a challenged policy and a legitimate state interest or when the policy is "'inexplicable by anything but animus,'" the governmental action is incompatible with the right of equal protection. *Trump v. Hawaii*, 585 U.S. 667, 706 (2018).

The plaintiffs are likely to succeed on their claim that the Executive Order, and the Passport Policy implementing that order, spring from the same sort of animus toward transgender Americans. Multiple considerations lead to this conclusion. First, on its face, the Executive Order announces that, for each and every purpose under federal law—regardless of medical nuance, reliance interests, or policy objectives—transgender women are not women and transgender men are not men. The order asserts that "women are biologically female, and men are biologically male," and it defines "women" and "men," respectively, only as persons "belonging, at conception, to the sex that produces the large reproductive cell" and "small reproductive cell." EO §§ 1, 2(b)-(e). It describes the "biological category of 'woman'" as "true" and calls it a "false claim that males can identify as and thus become women and vice versa." *Id.* §§ 1, 2(f). And it appears to deny "that it is possible for a person to be born in the wrong sexed body." *Id.* § 2(f). The order also facially demeans transgender people's identity, stating that one's gender identity "does not provide a

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 44149     Filed 04/18/25     Page 28 of 56

42a

meaningful basis for identification." *Id.* § 2(g).[8] Viewed as a whole, the language of the Executive

Order is candid in its rejection of the identity of an entire group—transgender Americans—who

have always existed and have long been recognized in, among other fields, law and the medical

profession. *See, e.g.*, *Bostock*, 590 U.S. at 653-54 (recognizing transgender Americans); *Kosilek v.

Spencer*, 774 F.3d 63, 68-69 (1st Cir. 2014) (same); ECF 30-1, ¶¶ 42-43, 51, 53-54.

Second, Executive Order 14168 imposes a "broad and undifferentiated disability" on a

discrete group of people. *Romer*, 517 U.S. at 632. The order makes it the official "policy of the

United States" to recognize only "two sexes" based on people's "immutable biological

classification as either male or female." EO §§ 2, 2(a). Transgender Americans—individuals who,

by definition, have a gender identity different from their sex assigned at birth—are uniquely

affected by this policy, even though the Executive Order does not in so many words identify them

as the targeted group. *See* ECF 30-1, ¶ 48.[9] Sweeping in scope, the Executive Order directs federal

agencies to eradicate any use of the term "gender" in federal policies and documents, EO § 3(c);

orders agencies to "remove all statements, policies, regulations, forms, communications, or other

internal and external messages that promote or otherwise inculcate gender ideology," *id.* § 3(e);

and forbids the use of federal funds "to promote gender ideology," *id.* § 3(g). It requires that

"government-issued identification documents, including passports, visas, and Global Entry cards,"

as well as all transgender federal employees' personnel records, reflect only a person's sex, as

---

[8] It is undisputed that gender identity is fundamental to defining the category of transgender people, who are, definitionally, people whose gender identity diverges from their sex assigned at birth. ECF 30-1, ¶ 48.

[9] Erasing any doubt, OMB cited Executive Order 14168 soon after its issuance to proclaim that the "use of Federal resources to advance . . . transgenderism . . . is a waste of taxpayer dollars." Memorandum from Acting Director of the Office of Management and Budget Matthew J. Vaeth to the Heads of Executive Departments and Agencies, *Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs*, M-25-13 (Jan. 27, 2025), https://perma.cc/DP3B-9CK3.

Case No. 1:25-mc-00063-SKC-CYC   Document 23-2   filed 11/14/25   USDC Colorado
Case 1:25-cv-10313-JEK   Document 71-449   Filed 04/18/25   Page 29 of 56

43a

defined in the order. *Id.* § 3(d). It orders that detained transgender women be moved from women's prisons or detention centers to men's prisons or detention centers, *id.* § 4(a), and strips all federal transgender prisoners of their access to gender-affirming medical care, *id.* § 4(c). It further directs rescission of prior Executive Orders addressing, among other topics, "Transgender Equality," "Supporting Transgender Youth in School," "Supporting Intersex Students," and "Confronting Anti-LGBTQI+ Harassment in Schools." *Id.* § 7(c). As in *Romer*, the "sheer breadth" of the Executive Order's impact—in this case, on transgender Americans—suggests it is "inexplicable by anything but animus toward the class it affects." 517 U.S. at 632; *see Hawaii*, 585 U.S. at 706.

Third, the government does not defend the Passport Policy by reference to the Executive Order's express purposes. Rather, the government relies on, as discussed, the argument that the Passport Policy and Executive Order advance a governmental interest in data consistency across federal agencies. In the 2020 case *Zzyym v. Pompeo*, the government invoked that same interest, among others, in defense of the State Department's prior policy that allowed applicants to obtain a passport consistent with a male or female gender identity, but did not allow for a third sex marker for intersex, non-binary, or gender non-conforming applicants. 958 F.3d at 1027. Although the Tenth Circuit found some of the governmental rationales for the binary sex policy unsupported, it did conclude that because law enforcement agencies may access passport data and a non-binary sex policy could introduce disuniformity across agencies, the State Department's reliance on that rationale was supported by the administrative record. *Id.* The court then remanded because it could not determine whether the State Department had relied on permissible or impermissible rationales for the policy. *Id.* at 1033-35. On remand, the State Department chose to change its policy to allow applicants to select an "M," "F," or "X" sex marker consistent with their gender identity. *See* 86 Fed. Reg. at 51436. Thus, notwithstanding the Tenth Circuit's recognition of a potential interest in

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-149    Filed 04/18/25    Page 30 of 56

44a

uniformity of data across federal agencies, the State Department concluded in 2021 that this interest was *not* weighty enough to justify a binary sex policy that denied intersex, non-binary, and gender non-conforming people the option of a third sex marker. The government has introduced no evidence or argument that any resultant inconsistency in data across federal agencies has given rise to problems, for law enforcement agencies or otherwise, in the years the policy was in effect. In view of that history and the evidentiary void, the Court cannot "discern a relationship" between the Passport Policy and any genuine interest in maintaining a uniform definition of sex across data kept by the State Department and other federal agencies. *Hawaii*, 585 U.S. at 706.

Fourth, Executive Order 14168 and the Passport Policy were part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language. *Cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533-35 (1993) ("reject[ing] the contention" that a court's inquiry into whether a government acts with "hostility" toward religious belief "must end with the text of the laws at issue," and looking as well to a resolution adopted by the city council around the same time as the challenged ordinances); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (to determine whether a facially neutral government action is based on discriminatory intent, a court may look to the "historical background of the decision," "particularly if it reveals a series of official actions taken for invidious purposes"). Executive Order 14183, issued on January 27, 2025, prohibited transgender people from serving in the armed forces without an exemption. 90 Fed. Reg. 8757 (Jan. 27, 2025). It declared that "adoption of a gender identity inconsistent with an individual's sex conflicts with a soldier's commitment to an honorable, truthful, and disciplined lifestyle," and that "[a] man's assertion that he is a woman, and his requirement that others honor this falsehood, is not consistent with the humility and selflessness required of a service member." *Id.* § 1. Executive

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-49 Filed 04/18/25    Page 31 of 56

45a

Order 14187, titled "Protecting Children From Chemical and Surgical Mutilation," issued on January 28, 2025, effectively banned all gender-affirming medical care for transgender youth by federally funded institutions. *See* 90 Fed. Reg. 8771 (Jan. 28, 2025). It directed federal agencies to "immediately take appropriate steps to ensure that institutions receiving Federal research or education grants end the chemical and surgical mutilation of children," with the term "chemical and surgical mutilation" defined to include many treatments for gender dysphoria. *Id.* §§ 2(a), 2(c), 4; *see* ECF 30-1, ¶ 59. And finally, Executive Order 14201, titled "Keeping Men Out of Women's Sports," issued on February 5, 2025, faulted "sport-specific governing bodies" that either lack an "official position or requirements regarding trans-identifying athletes" or "allow men to compete in women's categories." 90 Fed. Reg. 9279 (Feb. 5, 2025). The order, which relies on the definitions of sex and other terms in Executive Order 14168, misgenders transgender women in its title and throughout the body of the order. *Id.* §§ 1, 4. Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans. *See Windsor*, 570 U.S. at 770 (the Defense of Marriage Act violated equal protection principles in part because of the "strong evidence of [the] law having the purpose and effect of disapproval of th[e] class" of married gay and lesbian couples).

Americans are engaged in robust conversations about sex, gender, and identity that are characteristic of a free and open society. The Court expresses no view on whether the government interests underlying Executive Orders 14183, 14187, and 14201 may justify the burden they impose on transgender Americans. But neither can it ignore the moral disapproval conveyed in those orders or the depth and breadth of recent federal action affecting transgender people. Executive Order 14168 and the Passport Policy are part of a coordinated and rapid rollback of rights and protections previously afforded to transgender Americans, suggesting that these

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-9 149 Filed 04/18/25    Page 32 of 56

46a

challenged actions are built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth. For all of these reasons, and under any standard of review, such targeting of a politically unpopular group runs afoul of our Nation's constitutional commitment to equal protection.

      B.    <u>Right to Travel and Invasion of Privacy Claims.</u>

      The plaintiffs next claim that the Passport Policy and Executive Order infringe their rights to international travel and informational privacy under the Due Process Clause of the Fifth Amendment. *See Kent*, 357 U.S. at 125 ("The right to travel," including the right to travel abroad, "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment."); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (noting two kinds of privacy interests that may be constitutionally protected: "the individual interest in avoiding disclosure of personal matters" and "the interest in independence in making certain kinds of important decisions"). The law is unsettled regarding the standard of review applicable to government actions alleged to infringe the right to international travel. *Compare Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1119-22 (10th Cir. 2021) (holding that there is no fundamental right to international travel and evaluating the statute authorizing revocation of plaintiff's passport under rational basis review), *with Eunique v. Powell*, 302 F.3d 971, 976 (9th Cir. 2002) (McKeown, J., concurring) (arguing that burdens on international travel should be evaluated under intermediate scrutiny), *and Woodward v. Rogers*, 344 F. Supp. 974, 988 (D.D.C. 1972) (the denial of a passport to an applicant who refused to swear an "Oath of Allegiance" violated the right to international travel because the requirement was "not reasonably justified" and "[could] be served by far less restrictive means"), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973). The law is also unsettled regarding the scope of the privacy rights described in *Whalen. See Nat'l Aeronautics & Space Admin. v. Nelson*,

Case No. 1:25-mc-00063-SKC-CYC   Document 23-2   filed 11/14/25   USDC Colorado
Case 1:25-cv-10313-JEK   Document 74   Filed 04/18/25   Page 33 of 56

47a

562 U.S. 134, 138 (2011) (assuming without deciding the existence of a "constitutional privacy 'interest in avoiding disclosure of personal matters'" (quoting *Whalen*, 429 U.S. at 599-600)); *id.* at 162 (Scalia, J., dissenting) ("[T]here is no constitutional right to 'informational privacy.'"); *see also Gore*, 107 F.4th at 561-65 (surveying cases and explaining that any constitutionally protected right to informational privacy must be narrowly construed); *id.* at 578-84 (White, J., dissenting) (surveying cases and concluding that transgender status falls within ambit of constitutionally protected informational privacy interests).

Under the doctrine of constitutional avoidance, federal courts must avoid deciding "constitutional issues where alternative grounds for resolution are available." *Am. Civil Liberties Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013); *see Mills v. Rogers*, 457 U.S. 291, 305 (1982) ("It is this Court's settled policy to avoid unnecessary decisions of constitutional issues."). The Court has already explained that the plaintiffs are likely to prevail on the merits of their Fifth Amendment equal protection claim. Having so concluded, the Court will decline, at this juncture, to address the plaintiffs' separate informational privacy and right to travel claims under the Fifth Amendment, as resolution of the constitutional disputes attending those claims would have no further effect on the plaintiffs' entitlement to the relief requested in their motion.

C.    Administrative Procedure Act Claims.

The plaintiffs separately claim that the Passport Policy violates the Administrative Procedure Act because it is arbitrary and capricious and was adopted "without observance of procedure required by" the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq. See* 5 U.S.C. §§ 706(2)(A), (D). The State Department and Secretary Rubio, as the Agency Defendants, respond that these claims are not subject to judicial review or, in the alternative, that the plaintiffs have not

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 34 of 56

48a

demonstrated a likelihood of success on either APA claim. The plaintiffs have the better of each of these arguments.

### 1.  *Reviewability of the Passport Policy.*

The Agency Defendants contend that the plaintiffs' APA claims are not amenable to judicial review for three distinct reasons: (1) the Passport Policy is a presidential action, not an agency action, and therefore is not subject to review under the APA; (2) the Passport Policy is the type of action "traditionally regarded as committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); and (3) the Passport Policy implicates a foreign affairs decision made by the federal government.

The APA permits judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Presidential actions, like executive orders, are not, however, subject to APA review because "the President is not an agency within the meaning of the [APA]." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). The Agency Defendants argue that because the Passport Policy implements Executive Order 14168, it is similarly not reviewable under the APA.

This argument finds no foothold in the text of the APA or on-point case law. Under the APA, the term "agency" is defined as "each authority of the Government of the United States," which includes the State Department. 5 U.S.C. § 701(b)(1). The APA contains no exception for agency actions, like the State Department's Passport Policy, that carry out an executive order. *See id.* § 704. As the Ninth Circuit recently explained, "final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see id.* (neither the Supreme Court nor any Court of Appeals has ever "excepted a final rule from APA review because it carried out a presidential directive"); *accord Chamber of Com. of U.S.*

Case No. 1:25-mc-00063-SKC-CYC   Document 23-2   filed 11/14/25   USDC Colorado
Case 1:25-cv-10313-JEK   Document 149   Filed 04/18/25   Page 35 of 56

49a

*v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) ("[T]hat the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA[.]"). Indeed, the First Circuit recently rejected a similar argument that an OMB directive was unreviewable under the APA simply because it implemented executive orders. *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025) ("[T]he District Court did not review the *President's* actions for consistency with the APA. Rather, it reviewed—and ultimately enjoined—the *Agency Defendants'* actions under the Executive Orders.").

The Agency Defendants nonetheless maintain that the Passport Policy is unreviewable because the Passport Act gives the President "broad discretionary authority" to issue rules for passports. ECF 53, at 7. Under the Passport Act, "[t]he Secretary of State may grant and issue passports . . . under such rules as the President shall designate and prescribe for and on behalf of the United States." 22 U.S.C. § 211a. This permissive language recognizes the Executive's "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26. But the key Supreme Court decision barring judicial review of discretionary presidential action, *Franklin v. Massachusetts*, "is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties." *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993). The final step of executive action that directly affected the plaintiffs here was the Passport Policy, not Executive Order 14168. The Executive Order directed the State Department to "implement changes to require that government-issued identification documents, including passports, . . . accurately reflect the holder's sex." EO § 3(d). The State Department, in turn, "evaluat[ed] how to implement this policy" and, deferring in part to HHS's guidance, "interpreted its obligations under E.O. 14168" as being met by defining "[s]ex at birth, which can generally be adjudicated using a birth

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 36 of 56

50a

certificate," instead of "'sex at conception,'" which it lacks "the capacity to adjudicate." ECF 53-1, ¶¶ 14-15, 18. The State Department thus made at least three independent determinations in formulating the Passport Policy: (1) it departed from the Executive Order's definition of "female," "male," and "sex," which depend on the size of the reproductive cells produced by a person at "conception," EO §§ 2(a), (d)-(e); (2) it chose to defer to HHS's guidance on the meaning of these terms, which likewise does not turn on "sex at conception"; and (3) it determined what sources of evidence to consult in order to assess a person's sex at birth.

These facts distinguish this case from *Detroit International Bridge Company v. Government of Canada*, upon which the Agency Defendants principally rely. *See* 189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) (subsequent history omitted). In *Detroit International*, the court held that the State Department's issuance of a permit for an international bridge was presidential action not subject to APA review. *Id.* at 98-105. Even though the President had issued an executive order allowing the State Department to issue such permits, the court reasoned, the Department's role was purely ministerial because it "exercised discretionary authority committed to the President by" the International Bridge Act of 1972, which required the President alone to approve these bridges. *Id.* at 96-97, 100-02; *see* 33 U.S.C. § 535(b) ("No bridge may be constructed, maintained, and operated . . . unless the President has given his approval thereto."). Here, by contrast, the State Department's implementation of the President's Executive Order does not constitute a "ministerial act" in which "nothing is left to the exercise of the official's discretion or judgment." *In re Soares*, 107 F.3d 969, 974 (1st Cir. 1997); *see* Ministerial, *Black's Law Dictionary* (12th ed. 2024) (defining "ministerial" as "involving an act that involves obedience to instructions or laws instead of discretion, judgment, or skill"). The government's declaration confirms, as explained, that the State Department exercised judgment in interpreting

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 37 of 56

51a

and complying with the Executive Order. ECF 53-1, ¶¶ 14-15, 18; *see Milligan v. Pompeo*, 502 F. Supp. 3d 302, 314 (D.D.C. 2020) (distinguishing *Detroit International* where the State Department needed "to exercise its judgment" implementing a presidential proclamation).

The Agency Defendants next contend that even if the policy constitutes agency action, it is not reviewable because the APA excludes judicial review of "agency action . . . committed to agency discretion by law." 5 U.S.C. § 701(a)(2). "The APA establishes a 'basic presumption of judicial review [for] one suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16-17 (2020) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)). To honor this presumption, the agency-discretion exception has been read "'quite narrowly,'" *id.* at 17 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)), and confined "to those rare 'administrative decision[s] traditionally left to agency discretion,'" *id.* (quoting *Lincoln*, 508 U.S. at 191).

The Passport Act, as discussed, affords the Executive "substantial discretion" to issue passports. *Agee*, 453 U.S. at 294 & n.26 (citing 22 U.S.C. § 211a). But "while the power of the Secretary of State over the issuance of passports is expressed in broad terms," Congress did not "give him unbridled discretion to grant or withhold a passport from a citizen for any substantive reason he may choose." *Kent*, 357 U.S. at 127-28. To the contrary, the State Department's passport decisions are subject to judicial review and can be struck down if they fail "to pass scrutiny by the accepted tests." *Id.* at 129. In *Kent v. Dulles*, for example, the Supreme Court overturned the State Department's refusal to issue passports based on political beliefs or associations. *Id.* at 130. In subsequent cases, the Supreme Court reviewed whether actions taken by the State Department with respect to passports complied with the Passport Act, looking to whether the agency's action was "sufficiently substantial and consistent to compel the conclusion that Congress has approved it."

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 38 of 56

52a

*Agee*, 453 U.S. at 306 (quotation marks omitted) (Secretary's revocation of passport complied with Passport Act); *see also Zemel*, 381 U.S. at 10-13 (Secretary's refusal to validate passports for travel to Cuba was consistent with Passport Act). And in a case relied upon extensively by the Agency Defendants here, *Zzyym v. Pompeo*, the Tenth Circuit reviewed an APA challenge to the State Department's prior binary sex policy for passports to assess whether the policy was arbitrary and capricious. 958 F.3d at 1022-32; *see also Shachtman v. Dulles*, 225 F.2d 938, 940-41 (D.C. Cir. 1955) (finding that "the discretion residing in the Secretary [under 22 U.S.C. § 211a] is subject in its exercise to some judicial scrutiny," including whether the reason for refusing a passport "was arbitrary"). These precedents compel the conclusion that the Passport Act furnishes a "meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney*, 470 U.S. 821, 830 (1985), and that the State Department's determinations with respect to passports are "not one of those areas traditionally committed to agency discretion," *Dep't of Commerce v. New York*, 588 U.S. 752, 772 (2019).

Finally, the Agency Defendants contend that the Passport Policy should not be subject to judicial review because passports implicate foreign affairs. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Agee*, 453 U.S. at 292. Nevertheless, in the course of exercising its power of judicial review, the Supreme Court has distinguished cases involving "passport refusals based on the character of the particular applicant" from those implicating "foreign policy considerations affecting all citizens." *Zemel*, 381 U.S. at 13. In *Kent*, the Court "held that Congress had not authorized the Secretary of State to inquire of passport applicants as to affiliation with the Communist Party." *Regan v. Wald*, 468 U.S. 222, 240 (1984). By contrast, in *Zemel*, the Court upheld "a refusal by the Secretary of State to validate the passports of United States citizens for travel to Cuba." *Id.* at 241.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149  Filed 04/18/25    Page 39 of 56

53a

The Agency Defendants fail to explain how the Passport Policy pertains to foreign relations rather than a characteristic of passport applicants. The Passport Policy was adopted to implement Executive Order 14168, which set a policy on sex across the federal government, including for all domestic purposes. Nothing in the Executive Order mentions foreign relations, and the government's declaration in this case does not justify the Passport Policy on foreign affairs or national security grounds; instead, it avers that the policy was promulgated to comply with Executive Order 14168. *See* ECF 53-1, ¶¶ 15, 17. Accordingly, the Court concludes that the Passport Policy is based on "characteristic[s] peculiar" to applicants like the plaintiffs—namely, their sex and gender. *Zemel*, 381 U.S. at 13. It is not, therefore, a matter so intertwined with foreign relations that it is insulated from judicial review. *See Zzyym*, 958 F.3d at 1022-34 (reviewing State Department rules regarding passports); *Salem v. Pompeo*, No. 19-cv-363-LDH-CLP, 2024 WL 1364320, at *4 (E.D.N.Y. Mar. 31, 2024) (same).

### 2. Whether the Passport Policy Is Arbitrary and Capricious.

The Agency Defendants do not dispute that, to the extent the Passport Policy is reviewable, it is a "final agency action" subject to APA review. *See* 5 U.S.C. § 704. For an agency action to be "final," the action "must mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted); *see Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st Cir. 1998) (final agency action "must be a definitive statement of the agency's position with direct and immediate consequences" (brackets and quotation marks omitted)). Both conditions are met here. The State Department finalized the Passport Policy in late January 2025, when, among other things, it instructed all domestic and foreign passport agencies that the Policy would take immediate effect, updated its

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 40 of 56

54a

website with information concerning the Policy, and replaced the passport forms on its website with earlier versions of those forms, which conformed to the Policy but are expired. *See* ECF 53-1, ¶¶ 15-17. Expedited passport applications have been processed in accordance with the Passport Policy since as early as January 24, 2025, and all passport applications have been processed in accordance with the Policy since February 7, 2025. *See* ECF 53-1, ¶ 18. The Passport Policy is thus the "consummation" of the Agency Defendants' decisionmaking process from which "legal consequences" have already begun to flow. *See Bennett*, 520 U.S. at 178 (quotation marks omitted).

The APA authorizes courts to "hold unlawful and set aside" final agency actions found to be arbitrary and capricious. 5 U.S.C. § 706(2)(A). "'The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained.'" *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). "An agency action is arbitrary and capricious when the agency 'relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.'" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quoting *Assoc'd Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997)). The APA provides for a narrow and deferential scope of review, and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 41 of 56

55a

The plaintiffs contend that the Passport Policy is arbitrary and capricious because, among other things, the Agency Defendants have failed to offer a reasoned explanation for their decision to reverse the State Department's prior passport policy.[10] While an agency "'may change its existing position on an issue,'" it must provide "a reasoned explanation for the change" that addresses any factual findings undergirding the changed policy that contradict those supporting the prior policy. *Housatonic River Initiative v. U.S. Env't Prot. Agency, New Eng. Region*, 75 F.4th 248, 270 (1st Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), and citing *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *accord Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 917 (2025). The agency must also "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of California*, 591 U.S. at 33. The record contains no evidence that the Agency Defendants fulfilled these obligations here. The Passport Policy—posted on the Department of State's website—does not make factual findings, does not explain why the facts supporting the Department's prior passport policy no longer carry weight, and does not address reliance interests affected by its

---

[10] The government argues that, for purposes of assessing the plaintiffs' likelihood of success on their APA claims, the Court should not consider any of the declarations submitted by the plaintiffs and should "instead focus on the materials that were before the Department when it developed the Policy." ECF 53, at 6. Ordinarily, judicial review of agency action is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The Court cannot, however, ascertain the materials that were before the State Department when it developed the Passport Policy because the government has not yet filed the administrative record. And when asked at the motion hearing whether the State Department had considered any materials other than the Executive Order, counsel for the government demurred. *See* ECF 65, at 57:12-59:7. It would, therefore, be appropriate to consider the declarations as "supplemental evidence" to the extent that they would facilitate the Court's comprehension of the Passport Policy. *City of Taunton v. EPA*, 895 F.3d 120, 127 (1st Cir. 2018). But this issue is, ultimately, beside the point, because the Court's analysis of the plaintiffs' APA claim is limited to the materials submitted by the government.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 42 of 56

56a

reversal of the prior policy. *See* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22. Instead, it merely suggests that the policy was adopted in accordance with Executive Order 14168. *See id.* Further, there is no evidence before the Court that, in adopting the Passport Policy, the Agency Defendants took steps to identify facts bearing on its policy change, attempted to identify potential reliance interests, or sought to determine how any such interests may be impacted by the policy changes.[11]

Quite the contrary: the record indicates that the State Department considered virtually nothing aside from the Executive Order's directive when it developed the Passport Policy. *See* 90 Fed. Reg. 9652 (Feb. 14, 2025) (stating only that the passport forms had been revised "[t]o comply with E.O. 14168"); 90 Fed. Reg. 9800 (Feb. 18, 2025) (same); ECF 53-1, ¶¶ 15-21 (similar). The Agency Defendants do not dispute this characterization of their decisionmaking process, and indeed affirm that the Passport Policy was adopted and announced mere days after the President signed Executive Order 14168. *See* ECF 53, at 10-12; ECF 53-1, ¶¶ 10, 15-17. Instead, they argue that because the State Department issues passports "under such rules as the President shall designate and prescribe," 22 U.S.C. § 211a, the Executive Order's directive is reason enough, for

---

[11] A comparison between the State Department's prior actions in relation to identity fields on passports and its current Passport Policy process underscores the lack of reasoned decisionmaking here. The State Department does not require that passports bear an applicant's name assigned at birth; rather, it allows passport applicants to apply for, and receive, passports with a changed name that reflects their current identity. In adopting its current policy on name changes on passports, now codified at 22 C.F.R. § 51.25, the State Department issued a notice of proposed rulemaking that set a 60-day comment period for interested members of the public to weigh in on the proposed changes to the regulation. *See* 72 Fed. Reg. 10095 (Mar. 7, 2007). The notice explained that the revisions to the regulation were "intended to clarify what is required of an applicant whose name has changed and to reflect more accurately Department practice in this regard." *Id.* at 10096. After the comment period ended, the Department issued a notice of final rule in the Federal Register that, among other things, addressed comments submitted by the public. *See* 72 Fed. Reg. 64930, 64930-31 (Nov. 19, 2007). Through this process, the Department solicited feedback, which allowed it to consider any pertinent facts and whether any reliance interests in the prior rule were implicated by its changes.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 43 of 56

57a

purposes of arbitrary-and-capricious review, to justify their adoption of the Passport Policy. That argument fundamentally misstates the law. Even in a domain, such as this, where Congress has "confer[red] broad authority" on an agency, the agency remains subject to the requirements of the APA and its actions remain subject to review for arbitrariness. *Dep't of Commerce*, 588 U.S. at 771-77 (reviewing agency action under the arbitrary and capricious standard even though the relevant statute left "much to the Secretary's discretion"); *see also Su*, 121 F.4th at 16 ("[T]here is . . . nothing untenable about analyzing the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order."). The Agency Defendants' position would contravene settled precedent and would improperly insulate wide swaths of agency action from judicial review, so long as the government could point to a related executive order and a conferral of broad authority on an agency.

The State Department has included sex on passports for roughly fifty years. *See* ECF 53-1, ¶ 5. For over half that time—from 1992 to January 2025—it has permitted applicants, with various requirements for medical documentation, to select a sex marker that differs from their sex assigned at birth. *See id.* ¶¶ 5-10. In announcing that it would reverse course and issue passports with sex markers that only correspond to an applicant's sex assigned at birth, the State Department jettisoned its practice of more than thirty years with no explanation of the facts on which it premised its new determination and no consideration of the reliance interests in its prior policy. On this record, the Court cannot conclude that the State Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotation marks omitted). The plaintiffs are, accordingly, likely to succeed on the merits of their claim that the Passport Policy is arbitrary and capricious, in violation of the APA.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-149  Filed 04/18/25    Page 44 of 56

58a

### 3. Whether the Passport Policy Complies with the Paperwork Reduction Act.

The plaintiffs next claim that the Passport Policy was adopted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), because the Agency Defendants failed to comply with the procedures set forth in the Paperwork Reduction Act ("PRA") when they replaced the passport forms on the State Department's website. The Agency Defendants replaced the forms in effect on January 19, 2025 with earlier forms that had been promulgated in accordance with a prior passport policy that did not allow the option of an "X" sex marker. *Compare* ECF 33-2 to 33-4 (passport forms promulgated under the prior passport policy indicating that applicants can self-identify their gender and choose an "M," "F," or "X" marker), *with* ECF 33-5 to 33-7 (passport forms used immediately before the prior passport policy, which require applicants to identify their sex by choosing either an "M" or "F" marker).

The PRA provides, in pertinent part, that federal agencies must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information, to solicit comment to," among other things, "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency." 44 U.S.C. § 3506(c)(2)(A). Instruments for collecting such information under the PRA "include tax forms, Medicare forms, financial loan applications, job applications, questionnaires, compliance reports, and tax or business records." *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 33 (1990); *see* 44 U.S.C. § 3502(3) (defining "collection of information"). The parties agree that the passport forms are covered by the PRA, and the Agency Defendants concede that the State Department uploaded prior versions of the forms without first issuing a 60-day notice. *See* ECF 53, at 4-5; ECF 53-1, ¶¶ 17, 20 (noting that the State Department uploaded prior versions of the forms in late-January and published 30-day comment notices in

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 45 of 56

59a

mid-February); ECF 30, at 16-17. Given these undisputed facts, the plaintiffs have established a substantial likelihood of succeeding on their claim that the Agency Defendants uploaded the prior versions of the passport forms "without observance of procedure required by [the PRA]," in violation of the APA. 5 U.S.C. § 706(2)(D).

The Agency Defendants' counterarguments are unpersuasive. They first contend that APA review is impliedly foreclosed because although the PRA authorizes an individual to challenge the validity of information collection forms when defending against an enforcement action, it does not create a private cause of action. *See* ECF 53, at 16 (citing 44 U.S.C. § 3512(b) and 5 U.S.C. § 702). But whether the PRA establishes a private right of action is not pertinent here, because the plaintiffs do not assert a direct claim under the PRA. Rather, they assert an APA claim alleging that the State Department's issuance of new forms without the requisite 60-day notice under the PRA was taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); *see* ECF 1, ¶ 250. The APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014), and courts have routinely concluded that such suits include APA claims alleging violations of the PRA, *see, e.g.*, *Hyatt v. OMB*, 908 F.3d 1165, 1172-75 (9th Cir. 2018) (finding jurisdiction to hear plaintiff's PRA petition under the APA); *Drs. for Am. v. Off. of Pers. Mgmt.*, No. 25-cv-322-JDB, 2025 WL 452707, at *7 (D.D.C. Feb. 11, 2025) (plaintiff "established a substantial likelihood of success as to its PRA-notice claim" alleging that the government "violated the APA by acting contrary to . . . the PRA").

The Agency Defendants next contend that the plaintiffs "cannot argue that the State Department failed to go through proper procedures" because the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements. ECF 53, at 16. In

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 74     Filed 04/18/25     Page 46 of 56

60a

addition to its notice and comment requirements, however, the PRA provides that an "agency shall not conduct or sponsor the collection of information unless," among other things, the Director of the OMB "has approved the proposed collection of information." 44 U.S.C. § 3507(a)(2). And the "Director may not approve a collection of information for a period in excess of 3 years." *Id.* § 3507(g). The Agency Defendants concede that the Director's approval of the prior passport forms, which were promulgated in 2021, has expired. *See* ECF 53, at 4, 16; ECF 33-5 to 33-7 (copies of the passport forms currently posted to the State Department's website, each of which lists an expiration date between November 2022 and December 2023). Thus, although the prior passport forms were promulgated in accordance with the PRA's notice and comment requirements, the Agency Defendants were nevertheless required to obtain the Director's approval before they began using those forms again in January 2025. *See* 44 U.S.C. § 3507(a)(2). Because the Agency Defendants failed to do so, the plaintiffs have established a substantial likelihood of success on their claim that the Agency Defendants violated the APA by failing to comply with the PRA.

## II.     **<u>Irreparable Harm.</u>**

The plaintiffs assert that, absent injunctive relief while this case is adjudicated, they will experience irreparable harm. Irreparable harm is "an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) (noting that to establish a likelihood of irreparable harm, "[i]t is usually enough if the plaintiff shows that its legal remedies are inadequate"). The plaintiffs must "demonstrate that irreparable injury is *likely*," rather than merely *possible*, "in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). That said, "the injury need not have been inflicted . . . or be

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 47 of 56

61a

certain to occur;" "a strong threat of irreparable injury before trial is an adequate basis." Charles A. Wright, Arthur R. Miller, Mary K. Kane & Alexandra D. Lahav, 11A Fed. Prac. & Proc. § 2948.1 (3d ed. Apr. 2025 update). Irreparable harm is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Vaquería Tres Monjitas*, 587 F.3d at 485.

Every plaintiff except for Soe has been diagnosed with gender dysphoria, a medical condition that describes "the significant emotional distress" and impairment in functioning "that stems from the incongruence between a person's gender identity and sex designated at birth." ECF 30-1, ¶ 53; *see* ECF 30-3, ¶ 5; ECF 30-4, ¶ 6; ECF 30-5, ¶ 6; ECF 30-6, ¶ 6; ECF 30-7, ¶ 6; ECF 30-8, ¶ 6. Gender dysphoria can be effectively managed with appropriate treatment, ECF 30-1, ¶ 56, and the recognized standard of care is "designed to bring a person's body and expression of their sex in line with their gender identity," *id.* ¶ 58. Part of this treatment "includes living one's life consistently with one's gender identity, including using identity documents." *Id.* ¶ 77. Indeed, the plaintiffs report that obtaining gender-concordant identity documents has decreased their feelings of anxiety and distress and improved their feelings of safety and comfort—largely because they need not fear being outed when presenting identity documents that reflect their gender identity and expression. *See* ECF 30-3, ¶¶ 6, 8-9; ECF 30-4, ¶¶ 7-8; ECF 30-5, ¶¶ 7-8; ECF 30-6, ¶¶ 7-8; ECF 30-7, ¶¶ 8, 10-11; ECF 30-8, ¶¶ 7, 10-11; ECF 30-9, ¶ 8.

The plaintiffs' inability to obtain passports bearing sex markers consistent with their gender identity and expression is thus likely to impede efforts to treat and manage their gender dysphoria. *See* ECF 30-1, ¶ 77. Each plaintiff avers that they would experience anxiety or distress, or fear for their safety, if required to use a passport with a sex marker that corresponds to their sex assigned at birth rather than their gender identity. *See* ECF 30-3, ¶¶ 8, 12, 14; ECF 30-4, ¶¶ 7, 14-15; ECF

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-9    Filed 04/18/25    Page 48 of 56

62a

30-5, ¶¶ 8-11; ECF 30-6, ¶¶ 8, 12-15; ECF 30-7, ¶¶ 14-15; ECF 30-8, ¶ 11; ECF 30-9, ¶¶ 8, 11.

Empirical research substantiates these concerns. According to meta-analyses commissioned by the

World Health Organization and conducted by the plaintiffs' expert epidemiologist, Dr. Scheim,

possessing gender-concordant identity documents is "associated with a 47% reduction in the odds

of serious psychological distress." ECF 30-2, ¶ 30. Dr. Scheim further reports that transgender

individuals "who had changed the gender marker on their passport were 18% less likely to meet

criteria for serious psychological distress, 16% less likely to have seriously considered suicide in

the past year, and 34% less likely to have attempted suicide in the past year, as compared to those

who had the correct gender [marker] on some of their documents but had not corrected their

passport." *Id.* ¶ 37.

Transgender individuals are also more likely to experience violence or harassment if

required to use passports bearing a sex marker corresponding to their sex assigned at birth. *See id.*

¶ 22 ("In the 2015 United States Transgender Survey . . . 32% of respondents who had presented

an identity document that did not match their gender presentation had at least one negative

experience, including verbal harassment (25%), denial of service (16%), being asked to leave a

venue (9%), and assault (2%)."); *see generally* ECF 31-2 (2015 United States Transgender

Survey). Among transgender people who passed through airport security in a single year, those

who used a passport bearing a sex marker corresponding to their sex assigned at birth were over

10% more likely to be questioned about their name or gender than those who used a passport with

an updated sex marker. *See* ECF 30-2, ¶ 23 (reporting that 6% of those with an updated marker

were questioned, as compared to 17.6% of those without an updated marker). Three of the plaintiffs

have already experienced harassment when presenting identity documents bearing sex markers

corresponding to their sex assigned at birth. In 2017, Anderson was detained by TSA agents and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 65 of 149 Filed 04/18/25    Page 49 of 56

63a

strip searched when she presented a driver's license displaying her sex assigned at birth. *See* ECF 30-6, ¶ 13. In January of this year, Orr was accused by TSA agents of presenting a "fake identification document" because his passport bore a female sex marker whereas his driver's license bore a male sex marker. ECF 30-4, ¶ 10; *see also id.* ¶ 9 (Orr noting that, in 2023, an Icelandic car rental agency initially refused to rent him a car because the sex markers on his driver's license and passport did not match). And Perysian avers that prior to updating her driver's license, she experienced "significant harassment" when airport employees noticed the disjunction between her gender expression and the sex marker on her driver's license, including pat downs by TSA agents seeking to confirm her gender. *See* ECF 30-3, ¶ 8.

These are not speculative harms. Each of the plaintiffs plans to travel internationally in 2025—Perysian, Anderson, and Soe for work, *see* ECF 30-3, ¶¶ 10, 13; ECF 30-6, ¶ 9; ECF 30-9, ¶ 10; Orr for medical care, *see* ECF 30-4, ¶ 13; Hall for their Ph.D. program, *see* ECF 30-7, ¶ 9; Boe for an extracurricular, *see* ECF 30-5, ¶ 9; and Solomon-Lane to visit family and friends, *see* ECF 30-8, ¶ 9. Perysian, Orr, and Boe already cancelled international travel plans scheduled for February and March of 2025 because they were unable to obtain passports bearing sex markers corresponding to their gender identities. *See* ECF 30-3, ¶¶ 10, 13-14; ECF 65, at 27:23-28:12. Anderson and Soe risk losing opportunities for professional advancement if they also conclude that they are unable to travel with a passport that does not bear a sex marker corresponding to their gender identity. *See* ECF 30-6, ¶¶ 9, 14-15; ECF 30-9, ¶¶ 10-11.

Absent a preliminary injunction, Perysian, Orr, Anderson, Boe, Hall, and Soe will be unable to obtain passports bearing sex markers that align with their gender identity and expression. These plaintiffs will thus be required to choose between forgoing international travel plans— including the medical appointments, and academic and professional opportunities, giving rise to

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-149 Filed 04/18/25    Page 50 of 56

64a

those plans—or travelling with passports bearing sex markers that correspond to their sex assigned at birth. If the plaintiffs use such passports, they are likely to experience worsened gender dysphoria, anxiety, and psychological distress, and they will face a greater risk of experiencing harassment and violence. Injuries like these cannot be accurately measured or compensated by money damages or other legal remedies. The Court therefore concludes that each of these plaintiffs has demonstrated that they are likely to experience irreparable harm absent a preliminary injunction. *See Ross-Simons of Warwick*, 102 F.3d at 19 ("If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel."). Solomon-Lane, however, currently possesses a valid passport that bears a sex marker consistent with his gender identity. ECF 30-8, ¶ 11. While he would likely experience the aforementioned harms if required to travel with a passport bearing a sex marker that corresponds to his sex assigned at birth, he is not at risk of experiencing those harms while using his current passport, which does not expire until 2028. *See id.*; *see also* U.S. Dep't of State, *Sex Marker in Passports*, (last visited Apr. 18, 2025), perma.cc/B38H-QS22 ("All passports—including those with an X marker or those listing a sex different from your sex at birth—will remain valid for travel until their expiration date."). The Court thus concludes that Solomon-Lane is not likely to experience irreparable harm prior to the full adjudication of this case on the merits, and, accordingly, is not entitled to preliminary injunctive relief.

## III.    **Balance of the Equities and the Public Interest.**

The final factors, the balance of the equities and the public interest, also favor the plaintiffs. The plaintiffs have demonstrated that they are likely to face significant hardships absent a preliminary injunction, including psychological distress, lost professional and medical opportunities, and the increased risk of experiencing harassment or violence. The government

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 51 of 56

65a

contends, in vague terms, that the injunctive relief sought by the plaintiffs will impair the State Department's ability to operate effectively, but it has not produced any evidence specifically supporting this contention. Nor does the record support such an inference. The plaintiffs seek an injunction requiring the State Department to issue them passports pursuant to the policy in effect as of January 19, 2025—i.e., to issue them passports with an "M," "F," or "X" sex marker that aligns with their gender identity. Such passports would bear sex markers that match the plaintiffs' gender expression as well as the sex markers on the plaintiffs' driver's licenses and other identity documents. *See* ECF 30-3, ¶ 9; ECF 30-4, ¶ 8; ECF 30-5, ¶ 7; ECF 30-6, ¶¶ 7, 10; ECF 30-7, ¶ 10; ECF 30-9, ¶ 8. There is no evidence that this relief, which is narrow and limited to the named plaintiffs, is likely to "impair" the State Department's effective functioning. Nor is there evidence that the State Department's functioning was impaired during the nearly three years that it processed and issued passports in precisely the manner requested by the plaintiffs. The Court accordingly concludes that the balance of the equities and the public interest support the injunctive relief sought by the plaintiffs. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994))).

**IV.    <u>Scope of Relief.</u>**

The plaintiffs request two forms of interim equitable relief: a stay of agency action issued pursuant to 5 U.S.C. § 705 and a preliminary injunction as to the individual plaintiffs issued pursuant to Rule 65(a). Section 705 provides that "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74-149 Filed 04/18/25    Page 52 of 56

66a

rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The provision codified

courts' "traditional authority" to grant stays pending review of an agency action or court order.

*Sampson v. Murray*, 415 U.S. 61, 68 n.15, 76 (1974). The principles governing a "traditional stay

granted by an appellate court pending review of an inferior court's decision" thus also govern "the

authority of courts charged by statute with judicial review of agency decisions." *Id.* at 73-74 (citing

*Scripps-Howard Radio v. Fed. Commc'ns Comm'n*, 316 U.S. 4 (1942)); *see All. for Hippocratic

Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255-56 (5th Cir. 2023) ("Circuit courts have

interpreted [5 U.S.C. § 705] as providing something akin to the general stay power recognized by

Rule 18 of the Federal Rules of Appellate Procedure." (citing *Ohio v. Nuclear Regul. Comm'n*, 812

F.2d 288, 290 (6th Cir. 1987), and *In re GTE Serv. Corp.*, 762 F.2d 1024, 1026 (D.C. Cir. 1985))),

*rev'd and remanded on other grounds sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*,

602 U.S. 367 (2024).

An order staying an agency rule or policy pending full adjudication on the merits is similar

to a preliminary injunction prohibiting enforcement of that rule or policy. *See Nken*, 556 U.S. at

428. "Both can have the practical effect of preventing some action before the legality of that action

has been conclusively determined." *Id.* Stays and preliminary injunctions nevertheless "serve

different purposes." *Id.* While an injunction "is a means by which a court tells someone what to

do or not to do," a stay "operates upon the [administrative] proceeding itself" by "halting or

postponing some portion of the proceeding, or by temporarily divesting [a rule or policy] of

enforceability." *Id.*; *see* Stay, Black's Law Dictionary (12th ed. 2024) (defining stay as the

"postponement or halting of a proceeding, judgment, or the like"). Put differently, although an

agency may effectively be required to *refrain from acting* pursuant to either form of equitable

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74149    Filed 04/18/25    Page 53 of 56

67a

relief, an agency may only be affirmatively *directed to act* pursuant to an injunction. *See Nken*, 556 U.S. at 429.

An example offered by the Supreme Court in *Scripps-Howard Radio v. Federal Communications Commission* illustrates this distinction. There, the Court contrasted a request to stay the Federal Communications Commission's ("FCC") decision to *grant* an application to modify a radio station's broadcasting license with a request to stay the FCC's decision to *deny* such an application. *See* 316 U.S. at 14. The Court explained that while the FCC's decision to grant an application to modify a license would be "susceptible of being stayed on appeal," its decision to deny the application would not be susceptible to a stay, because "[a] stay of an order denying an application would in the nature of things stay nothing." *Id.* at 14, 16. In other words, a stay cannot "operate as an *affirmative authorization* of that which [an agency] has refused to authorize." *Id.* at 14 (emphasis added); *accord Sampson*, 415 U.S. at 76.

In their request for a stay under 5 U.S.C. § 705, the plaintiffs seek two distinct forms of relief. They first ask the Court to "stay enforcement of the [Passport] Policy during the pendency of this litigation." ECF 29, at 1. This is a prototypical example of a stay. While such an order would "have the practical effect of preventing" the government from enforcing the Passport Policy, it would achieve "this result by temporarily suspending the source of [the government's] authority to act," not by affirmatively "directing [the government's] conduct." *Nken*, 556 U.S. at 428-29. Second, the plaintiffs ask the Court to "require the Agency Defendants to process and issue passports consistent with the [prior passport policy], including permitting (i) changes to the sex designation on passports, including allowing individuals to self-attest to what their sex is, and (ii) the use of an 'X' sex designation on passports." ECF 29, at 1-2. This is a prototypical example of an injunction: the plaintiffs are requesting an order that affirmatively "directs the conduct of

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 74     Filed 04/18/25     Page 54 of 56

68a

[the government], and does so with the backing of [the Court's] full coercive powers." *Nken*, 556 U.S. at 428; *cf. Scripps-Howard*, 316 U.S. at 14. This latter form of relief—which would apply to "*all* processing of passport applications, renewals, or changes," ECF 67-1, at 1 (emphasis added)—is considerably broader than the preliminary injunctive relief sought under Rule 65(a), which would apply only "as to Plaintiffs," ECF 29, at 2.

The plaintiffs' latter request for affirmative relief, which is in the nature of injunctive relief rather than a stay, exceeds the scope of relief made available by Section 705. An order staying the Passport Policy would be distinct from an order directing the State Department to reinstate its prior passport policy that existed as of January 19, 2025. The plaintiffs nevertheless contend, in support of their request for affirmative relief under Section 705, that "courts routinely 'reinstate . . . rules previously in force'" when "granting APA challenges to agency action." ECF 67-1, at 2 (quoting *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987)). It is well established that "'[w]hen a court *vacates* an agency's rules'" under 5 U.S.C. § 706(2), "the vacatur restores the status quo before the invalid rule took effect and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew.'" *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 103-04 (D.D.C. 2018), *aff'd sub nom. Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510 (D.C. Cir. 2020) (quoting *Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004)) (emphasis added); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (the effect of vacatur was to "automatically resurrec[t]" the prior standard). But vacatur of a rule or policy under Section 706 following full adjudication on the merits is distinct from an order staying a rule or policy under Section 705 pending adjudication on the merits. Thus, where courts have stayed agency action under Section 705, they have regarded any additional affirmative relief as in the nature of injunctive relief. *See, e.g.*, *Gomez v. Trump*, 485

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 55 of 56

69a

F. Supp. 3d 145, 202-05 (D.D.C. 2020) (holding that plaintiffs established entitlement to stay of State Department's "No-Visa Policy" and, separately, to preliminary injunction requiring State Department to process certain visa applications submitted by all "eligible applicants"); *Maryland v. U.S. Dep't of Agric.*, No. 25-cv-0748-JKB, 2025 WL 800216, at *22-24 (D. Md. Mar. 13, 2025) (staying large-scale reductions of force and issuing temporary restraining order requiring reinstatement of all government workers terminated pursuant to those reductions).

The plaintiffs have not, however, affirmatively requested or explained why they are entitled to injunctive relief that extends beyond the scope of their request under Rule 65(a). Instead, they limited their request for injunctive relief to the individual plaintiffs. *See* ECF 29, at 2. The Court will, accordingly, deny the plaintiffs' request for a stay under Section 705 because it seeks affirmative relief in the nature of a preliminary injunction, and the plaintiffs have forfeited the argument that they are entitled to an affirmative injunction that would effectively reinstate the State Department's prior passport policy nationwide. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (an "injunction [should be] no broader than necessary to achieve its desired goals").

Pursuant to Rule 65(a), the plaintiffs request a preliminary injunction preventing the government from enforcing the Passport Policy and Executive Order "as applied to passports against Plaintiffs," and requiring the State Department to process and issue passports to the plaintiffs consistent with the prior passport policy. ECF 29, at 2. They specifically request an order requiring the State Department to "permit (i) changes to the sex designation on Plaintiffs' passports, including allowing Plaintiffs to self-attest to what their sex is, or (ii) an 'X' designation on any of the Plaintiffs' passports where that is requested by the Plaintiff." *Id.* The Court concludes that the plaintiffs are entitled to such relief. As discussed, the plaintiffs have established a

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 56 of 56

70a

substantial likelihood of success on the merits of their claim that Executive Order 14168 and the Passport Policy violate their Fifth Amendment equal protection rights, and that the Passport Policy violates the APA. With the exception of Solomon-Lane, the plaintiffs are also likely to suffer irreparable harm absent a preliminary injunction, and the balance of the equities weighs in their favor. Further, the preliminary injunction requested by the plaintiffs accords with the government's position regarding the appropriate scope of relief. *See* ECF 69, at 1 ("Defendants maintain that if any relief is warranted, it should be a targeted injunction at the particular agency action held to be invalid . . . [and] limited to the plaintiffs against whom the Department is held to have taken unlawful action.").

## CONCLUSION AND ORDER

For the foregoing reasons, the plaintiffs' Motion to Stay Agency Action and for a Preliminary Injunction, ECF 29, is GRANTED IN PART and DENIED IN PART. A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: April 18, 2025                    UNITED STATES DISTRICT JUDGE

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 75    Filed 04/18/25    Page 1 of 3
pg 73 of 149

71a

### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, and REID SOLOMON-LANE, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) No. 1:25-cv-10313-JEK |

### <u>ORDER OF PRELIMINARY INJUNCTION</u>

**KOBICK, J.**

For the reasons set forth in the Memorandum and Order issued today, ECF 74, the plaintiffs'

motion to stay agency action and for preliminary injunction, ECF 29, is GRANTED IN PART and

DENIED IN PART. The plaintiffs are likely to succeed on the merits of their claim that the Passport

Policy, as defined in the Memorandum and Order, *see* ECF 74, at 2, 8, and Executive Order 14168

violate the equal protection principles safeguarded by the Fifth Amendment to the United States

Constitution; their claim that the Passport Policy is arbitrary and capricious, in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A); and their claim that the Passport Policy was

adopted without observance of the procedure required by the Paperwork Reduction Act, in

violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D). Plaintiffs Ashton Orr, Zaya

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 04/18/25    Page 2 of 3
72a

Perysian, Sawyer Soe, Chastain Anderson, Drew Hall, and Bella Boe have demonstrated that each of the remaining factors governing their request for preliminary injunctive relief weighs in their favor. Orr, Perysian, Soe, Anderson, Hall, and Boe are likely to experience irreparable harm absent a preliminary injunction because they do not currently possess passports with sex markers that correspond to their gender identities and expressions, and they will not be able to obtain such passports absent an injunction. In addition, the balance of the equities and the public interest favor an injunction for these plaintiffs. Plaintiff Reid Solomon-Lane is not, however, likely to suffer irreparable harm absent a preliminary injunction because he currently possesses a valid passport bearing a sex marker that corresponds to his gender identity and expression, and his passport remains valid until 2028. Solomon-Lane is therefore not entitled to a preliminary injunction.

Accordingly, pursuant to Federal Rule of Civil Procedure 65(a), the Court ORDERS as follows:

1.      Defendants Marco Rubio, in his official capacity as Secretary of State, and the Department of State (jointly, the "Agency Defendants"), as well as all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of the Agency Defendants, are ENJOINED from enforcing the Passport Policy as to plaintiffs Orr, Perysian, Soe, Anderson, Hall, and Boe. The Agency Defendants are further ENJOINED as to plaintiffs Orr, Perysian, Soe, Anderson, Hall, and Boe to process and issue passports consistent with the State Department's policy as of January 19, 2025, and to permit (a) changes to the sex designation on Orr, Perysian, Soe, Anderson, Hall, and Boe's passports, including allowing these plaintiffs to self-attest to their sex, and (b) an "X" sex designation on any passport where that is requested by Orr, Perysian, Soe, Anderson, Hall, or Boe.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 74    Filed 04/18/25    Page 3 of 3

73a

2.      The plaintiffs' request for a stay of the Passport Policy under 5 U.S.C. § 705 is

DENIED.

3.      This preliminary injunction shall take effect immediately upon the docketing of this

Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the

United States Court of Appeals for the First Circuit, or the United States Supreme Court orders

otherwise.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: April 18, 2025                    UNITED STATES DISTRICT JUDGE

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 89-1    Filed 05/14/25    Page 1 of 6

74a

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**ASHTON ORR**, et al.,

    *Plaintiffs,*

v.

**DONALD J. TRUMP**, in his official capacity
as President of the United States et al.,

    *Defendants.*

Civil Action No. 1:25-cv-10313

## SECOND DECLARATION OF MATTHEW PIERCE

    I, Matthew Pierce, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

    1.   I am Deputy Assistant Secretary for Passport Services of the U.S. Department of State, Bureau of Consular Affairs, Passport Services Directorate. I submit this declaration in connection with Defendants' Opposition to Plaintiffs' Motion to Apply the Preliminary Injunction to the Classes (ECF No. 79). The statements made herein are based on my personal knowledge and on information provided to me in the course of my official duties with the Department of State (the "Department"). I have served in the Passport Directorate for 17 years and have been in my current position since November 2024.

    2.   I have previously submitted a declaration dated March 12, 2025, in connection with Defendants' Opposition to Plaintiffs' Motion to Stay Agency Action and for Preliminary Injunction in this matter. ECF No. 53-1. I hereby incorporate my statements from that declaration.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 89-1    Filed 05/14/25    Page 2 of 6

75a

3.    Consistent with the Executive Order 14168, the Department's current Passport Policy permits issuing passports with only an "M" or "F" sex marker and, requires U.S. passports to reflect the holder's biological sex at birth.

4.    In compliance with the preliminary injunction issued by the District Court on April 18, 2025 (ECF No. 75) (the "Preliminary Injunction"), the Department has provided instructions for five of the six original named Plaintiffs granted relief by the Court—Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, and Bella Boe—to replace their U.S. passports with the sex marker, "F" or "M," based on their self-selection on their recent passport applications.[1]    The Department has further provided instructions for the remaining Plaintiff granted relief by the Court—Sawyer Soe—to apply for a new U.S. passport with an "X" sex marker.[2]

5.    In their Motion for Class Certification (ECF No. 77) ("Class Certification Motion"), Plaintiffs seek certification of two classes:  (1) all people who "currently want, or in the future will want, a U.S. passport issued with an "F" or "M" sex designation that is different from the sex assigned to that individual under the Passport Policy—the "M/F Designation Class"[3]; and (2) all people who "currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation"—the "X Designation Class."[4]

---

[1] To comply with the Preliminary Injunction, the Department provided these five Plaintiffs with passport replacement forms (Forms DS-5504, ver. 2022) for which OMB approval was extended to May 31, 2025.

[2] To comply with the Preliminary Injunction, the Department provided Plaintiff Soe with a passport application form (Form DS-11, ver. 2022) for which OMB approval was extended to May 31, 2025.  At the time of adjudication for issuance of passports complying with the Preliminary Injunction (or, in the case of Plaintiff Sawyer Soe, issuance of a new passport complying with the Preliminary Injunction more than 15 years after issuance of a previous passport), each Plaintiff will be subject to the Department's standard name-check procedures to verify their continuing eligibility to be issued a U.S. passport under applicable statutes and regulations.

[3] In the Class Certification Motion, Plaintiffs seek to have Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, Bella Boe, Reid Solomon-Lane, Viktor Agatha, David Doe, AC Goldberg, and Chelle LeBlanc represent the M/F Designation Class.

[4] In the Class Certification Motion, Plaintiffs seek to have Plaintiffs Sawyer Soe and Ray Gorlin represent the X Designation Class.

2

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 78949    Filed 05/14/25    Page 3 of 6

76a

6.    In their Motion to Apply the Preliminary Injunction to the Classes (ECF No. 79), Plaintiffs seek to obtain the same relief granted by the Court to six named Plaintiffs in the Preliminary Injunction to an indeterminate number of U.S. citizens and nationals entitled to U.S. passports who may fall into one of the two putative classes.  Specifically, assuming the Court certified those two classes, Plaintiffs seek to extend the preliminary relief to a "PI Class" consisting of members from both classes if: "(a) they do not have a currently-valid passport; (b) they need to renew their current passport because it expires within one year; (c) they need to make changes to their passport to have the sex designation on it align with their gender identity or to reflect a name change; or (d) they need to apply to receive another passport because their passport was lost, stolen, or damaged."  ECF No. 80 at 6.

7.    Were the Court to grant the motion, the scope of the proposed injunctions sought by Plaintiffs would impose a significant administrative burden on the Department prior to any ruling on the merits, especially if it needs to review the individual circumstances of each applicant to evaluate the applicant's likelihood of injury.  Indeed, although the proposed PI Class definition does not reference the need to determine the PI Class members' irreparable injury, Plaintiffs motion to expand the PI is hinged on the PI Class members suffering "the same irreparable injury as those six of the Original Plaintiffs."  ECF No. 80 at 1.

8.    The Department would expect to receive potentially thousands of passport applications from members of the PI Class for a passport with a sex marker inconsistent with the Passport Policy, *i.e.*, a passport with a "M" or "F" sex marker that is inconsistent with the applicant's biological sex or a passport with an "X" sex marker. The Department does not maintain statistics on the number of passport applicants who, based on supporting evidence of surgical or clinical

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 88-9     Filed 05/14/25     Page 4 of 6

77a

treatment, sought or were issued "M" or "F" sex markers on passports prior to June 30, 2021, that did not reflect their biological sex at birth. Estimates of the number of transgender Americans from the Household Pulse Survey, the Williams Institute, the Gallup Poll, and the Pew Research Center range from 0.6% to 1.6% of the adult population. Although it is difficult to estimate the likely number of persons to request a passport with an X gender marker, from April 11, 2022, to January 19, 2025, the Department issued more than 44,000 U.S. passports with an "X" sex marker, an average of more than 1,300 per month.

9.     Were the Court to grant Plaintiffs' motion, it would be administratively burdensome for the Department to track every passport issued in compliance with such order for purposes of restoring the status quo ex ante if the Government were to ultimately prevail on the merits in this case. For example, depending on their supporting documentation, for first-time passport applicants seeking a passport with a sex marker that differs from their biological sex at birth and who select either an "M" or an "F" (and not an "X"), absent self-identification by the class member there may be no way to identify their passports for later replacement in the event the Government prevails in this litigation.

10.    When adjudicating a passport renewal application, the Department also does not currently have an automated system to identify from historic applications (except the application immediately before the renewal application) whether the applicant previously changed their sex marker. If a change in passport sex marker occurred prior to the passport being renewed, the only way at present to verify whether a particular renewal applicant had such a previous change in their passport sex marker is to retrieve and manually review their historic applications, a time-consuming and labor-intensive process. It would be impracticable for the Department to engage

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 89-1    Filed 05/14/25    Page 5 of 6

78a

in such a manual review of all previous applications as part of the adjudication of each application to renew a U.S. passport.

11. Moreover, if the Court were to issue a more limited preliminary injunction focused on applicants who would otherwise incur irreparable harm, it still would not be feasible for the Department to assess whether the applicants would suffer any irreparable harm. The Court's preliminary injunction was predicated on not only the original six Plaintiffs' imminent travel plans, but also the fact that most have been diagnosed with gender dysphoria, all "would experience anxiety or distress, or fear for their safety, if required to use a passport with a sex marker that corresponds to their sex assigned at birth rather than their gender identity," and some have experienced harassment. ECF 74 at 47. Passport adjudicators would either need to make the requisite irreparable harm determination—which they are not equipped to do—or be required to issue passports in contravention of the Executive Order simply on the basis of an applicant's representation that they are a PI Class member.

12. Further, the Department of State and all other federal agencies, were ordered by the President on January 20 to follow and implement E.O. 14168. The Court's April 18 Preliminary Injunction and any similar court orders that may arise from Plaintiffs' Motion to Apply the Preliminary Injunction to the Classes to issue passports with an "X" marker or to issue passports in a sex other than the applicant's biological sex would create a conflict between the Department and other federal agencies that issue identification documents reflecting the holder's sex. This would result in inconsistencies within the federal government and frustrates the governmental interest in uniformity.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 83-9    Filed 05/14/25    Page 6 of 6

79a

13. In sum, the proposed extension of the preliminary injunction to the PI class, if granted, would impose a significant burden on the Department, be nearly impossible to completely reverse, and undermine the uniformity throughout the government that the Department seeks in implementing the Executive Order.


I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 14, 2025.

Matthew Pierce

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 159    Filed 06/17/25    Page 1 of 32
pg 82 of 149
80a

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, REID SOLOMON-LANE, VIKTOR AGATHA, DAVID DOE, AC GOLDBERG, RAY GORLIN, AND CHELLE LEBLANC, on behalf of themselves and others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:25-cv-10313-JEK |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND MOTION TO APPLY THE
PRELIMINARY INJUNCTION TO THE CLASSES**

**KOBICK, J.**

At issue in this case are two changes that the State Department made to its policy concerning passport sex markers pursuant to Executive Order 14168 (Jan. 20, 2025). Whereas the State Department previously permitted transgender passport applicants to self-select male ("M") or female ("F") sex markers that correspond to either their gender identity or sex assigned at birth, it now requires that passports reflect only the holder's sex assigned at birth. And whereas the State Department previously allowed intersex, non-binary, and gender non-conforming applicants to

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 2 of 32

81a

select "X" as the sex marker on their passports, it now issues passports only with an "M" or "F"

marker. Jointly, these changes constitute the "Passport Policy."

On April 18, 2025, the Court entered a preliminary injunction barring enforcement of the

Passport Policy against six of the seven original plaintiffs and requiring the State Department to

issue those plaintiffs passports consistent with their gender identities. The plaintiffs subsequently

amended the complaint to add five additional plaintiffs, each of whom is transgender or non-binary,

like the original plaintiffs, and two of whom are also intersex.

Pending before the Court are the plaintiffs' motions to certify two classes under Federal

Rule of Civil Procedure 23(b)(2) and to apply the preliminary injunction to certain members of

those classes. The government does not dispute that the plaintiffs' proposed classes meet the

criteria for certification under Federal Rule of Civil Procedure 23(a), but it contends that the classes

are insufficiently ascertainable and fail to qualify for Rule 23(b)(2) certification. The government

also opposes the plaintiffs' request to extend the preliminary injunction to a subset of the proposed

classes. Following a hearing, the Court invited and received supplemental briefing from the parties

on modified class definitions. Upon consideration of the parties' arguments, and for the following

reasons, the Court will grant the plaintiffs' motions to certify two classes under Rule 23(b)(2) and

to apply the preliminary injunction to a subset of each of those classes.

## BACKGROUND

The Court recites only the facts and procedural history relevant to the pending motions. A

detailed description of the statutory and regulatory framework governing the issuance of passports,

as well as the factual background of this case, is set out in the Court's April 18, 2025 Memorandum

and Order granting in part and denying in part the plaintiffs' motion to stay agency action and for

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 84    Filed 06/17/25    Page 3 of 32

82a

a preliminary injunction. *See Orr v. Trump*, --- F. Supp. 3d ---, 2025 WL 1145271, at *2-7 (D. Mass.

Apr. 18, 2025), *appeal docketed*, No. 25-1579 (1st Cir. June 13, 2025).

**I.    <u>Factual Background.</u>**

The State Department has included sex as an identity attribute on passports since 1976.

ECF 53-1, ¶ 5. From 1992 to 2021, the State Department permitted applicants to select a sex

marker that differed from their sex assigned at birth, provided they submitted the requisite medical

documentation supporting their selection. *See id.* ¶¶ 6-7. Then, in 2021, the State Department made

two substantive changes to its policy concerning passport sex markers: (1) applicants were allowed

to self-select their sex marker based on their gender identity; and (2) non-binary, intersex, and

gender non-conforming applicants were permitted to select a third marker, "X," in lieu of an "M"

or "F" marker. *See id.* ¶¶ 7-8.

On January 20, 2025, President Trump signed Executive Order 14168, titled "Defending

Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal

Government" (the "Executive Order"). 90 Fed. Reg. 8615 (Jan. 20, 2025). The Executive Order

states that "[i]t is the policy of the United States to recognize two sexes, male and female," which

"are not changeable and are grounded in fundamental and incontrovertible reality." *Id.* § 2. It then

sets forth the following definitions, among others:

   a)  "Sex" shall refer to an individual's immutable biological classification as
       either male or female. "Sex" is not a synonym for and does not include the
       concept of "gender identity."

       …

   d)  "Female" means a person belonging, at conception, to the sex that produces
       the large reproductive cell.
   e)  "Male" means a person belonging, at conception, to the sex that produces the
       small reproductive cell.

*Id.*

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 85    Page 115    Filed 06/17/25    Page 4 of 32

83a

The Executive Order directed the Secretary of State to implement policy changes to require that passports "accurately reflect the holder's sex," as that term is defined in the Executive Order. *Id.* § 3(d). Pursuant to this directive, the State Department made two substantive changes to its policy concerning passport sex markers in late January 2025: (1) it removed the option for applicants to obtain a passport with a sex marker reflecting either their gender identity or sex assigned at birth, and replaced it with the requirement that a passport reflect an applicant's sex assigned at birth; and (2) it removed the option for non-binary, intersex, or gender non-conforming applicants to obtain a passport with an "X" sex marker. *See* ECF 53-1, ¶¶ 15, 20-21.

## II.    **Procedural Background.**

Plaintiffs Ashton Orr, Zaya Perysian, Sawyer Soe, Chastain Anderson, Drew Hall, Bella Boe, and Reid Solomon-Lane, each of whom is transgender or non-binary, filed the original class action complaint in February 2025. ECF 1. Named as defendants were Donald J. Trump, in his official capacity as President of the United States; the United States of America; Marco Rubio, in his official capacity as Secretary of State; and the U.S. Department of State. *Id.* Against all defendants, the complaint asserted an equal protection claim alleging discrimination on the basis of sex and transgender status, a claim for infringement of the right to travel abroad, and a claim for infringement of the right to informational privacy, all in violation of the Fifth Amendment, as well as a claim for violation of the First Amendment right to free speech and expression. *Id.* ¶¶ 193-235. Against Secretary Rubio and the State Department, the complaint alleged that the Passport Policy and related agency actions violate the Administrative Procedure Act ("APA") because they are unconstitutional, arbitrary and capricious, and without observance of procedure required by the Paperwork Reduction Act ("PRA"). *Id.* ¶¶ 236-51. The plaintiffs sought declaratory and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 5 of 32
84a

injunctive relief, and asked the Court to hold unlawful, vacate, and set aside the Passport Policy under 5 U.S.C § 706(2). *Id.* at 56-57.

In February 2025, the plaintiffs filed a motion to stay agency action and for a preliminary injunction, ECF 29, which the government opposed, ECF 53. The Court held a hearing in March 2025, ECF 64, after which it allowed the parties to submit supplemental briefing regarding the scope of relief, ECF 67, 69. On April 18, 2025, the Court granted in part and denied in part the plaintiffs' motion. ECF 74.

The Court concluded that the plaintiffs are likely to succeed on the merits of their equal protection claim because (1) the Executive Order and Passport Policy discriminate on the basis of sex and the government failed to demonstrate that the policies are substantially related to an important government interest, and (2) the Executive Order and Passport Policy are rooted in irrational prejudice toward transgender Americans. *See id.* at 16-32. The Court further determined that the plaintiffs are likely to succeed on their claims that the Passport Policy violates the APA because it is arbitrary and capricious and because it was adopted without observance of procedure required by the PRA. *See id.* at 33-46. The uncontroverted record evidence—including affidavits submitted by each of the named plaintiffs and expert declarations submitted by Dr. Ayden Scheim, an epidemiologist, and Dr. Sarah Corathers, an endocrinologist—demonstrated that six of the seven original plaintiffs were likely to experience irreparable harm absent preliminary injunctive relief. *See id.* at 46-50. Transgender and non-binary people who possess passports bearing sex markers that conflict with their gender identity and expression are, as Dr. Scheim explained, significantly more likely to experience psychological distress, suicidality, harassment, discrimination, and violence. *See id.* at 47-49. And, as Dr. Corathers reported, obtaining gender-concordant identity documents is part of the standard of care for treating gender dysphoria, a

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 159    Filed 06/17/25    Page 6 of 32

85a

medical diagnosis shared by six of the seven original plaintiffs. *See id.* at 47. Further, the plaintiffs would, as explained in their declarations, experience anxiety and psychological distress or fear for their safety if they were required to travel with passports bearing a sex designation corresponding to their sex assigned at birth, largely because they would effectively "out" themselves every time they presented their passports. *See id.* at 47-48. Indeed, three of the plaintiffs had previously been harassed when using identity documents that listed their sex assigned at birth. *See id.* at 48-49. The plaintiffs averred that they would forgo planned international travel, and related medical and professional opportunities, if they were unable to obtain passports with a sex marker that aligns with their gender identity and expression. *See id.* at 49-50.

Concluding that the balance of the equities and the public interest favored the plaintiffs, the Court awarded preliminary injunctive relief to the six original plaintiffs who did not possess passports bearing a sex marker that aligns with their gender identity. *See id.* at 56; ECF 75.[1] But the Court denied the plaintiffs' request to stay the Passport Policy and order the reinstatement of the prior passport policy under 5 U.S.C. § 705, because the plaintiffs' request exceeded the scope of relief available under that statute. *See* ECF 74, at 55.

On April 25, 2025, the plaintiffs filed an amended complaint that asserted the same claims and sought the same relief as the original complaint but named five additional plaintiffs—Viktor Agatha, David Doe,[2] AC Goldberg, Ray Gorlin, and Chelle LeBlanc—each of whom is transgender or non-binary, and two of whom are also intersex. ECF 76. Five days later, the plaintiffs moved to certify two classes, ECF 77, and to apply the preliminary injunction to certain

---

[1] The Court found that Solomon-Lane was not likely to experience irreparable harm absent interim equitable relief because he possesses a passport with a sex marker corresponding to his gender identity and expression, and his passport remains valid until its expiration in 2028. *See* ECF 74, at 50; ECF 30-8, ¶ 11.

[2] David Doe has been granted leave to proceed under pseudonym. ECF 100.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 159    Filed 06/17/25    Page 7 of 32

86a

members of those classes, ECF 79. The plaintiffs' motion sought certification of the following

classes under Federal Rule of Civil Procedure 23(b)(2):

1. All people who currently want, or in the future will want, a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. All people who currently want, or in the future will want, a U.S. passport and wish to use an "X" sex designation ("X Designation Class").

*See* ECF 76, ¶ 273; ECF 77, at 1. Excluded from the proposed classes were any judge presiding

over this action and the plaintiffs in *Schlacter v. U.S. Department of State*, No. 25-cv-01344

(D. Md. filed Apr. 25, 2025). *See* ECF 76, ¶ 274; ECF 77, at 1.

After receiving the government's oppositions, ECF 88, 89, the Court held a hearing and

took the motions under advisement, ECF 103. At the hearing, the Court observed that the plaintiffs'

proposed class definitions did not tie membership in the classes to an individual's status as

transgender or non-binary, even though gender identity is integral to the plaintiffs' claims. To

address this concern, as well as the government's contention that the proposed classes were

improperly defined by reference to subjective criteria, the Court invited the parties to submit

supplemental briefing on the following modified class definitions:

1. A class of all people (1) who are transgender and/or have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. A class of all non-binary people who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

ECF 104, at 2. These modified class definitions would likewise exclude the plaintiffs in *Schlacter*

and any judge presiding over this action. *See id.*

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 89 of 149    Filed 06/17/25    Page 8 of 32

87a

In response, the government maintained its prior objections to class certification, while noting that the revised class definitions cured some deficiencies in the plaintiffs' proposal. ECF 107, at 1. The government did not raise new objections to these modified class definitions. *See id.* at 1-3. The plaintiffs, for their part, proposed replacing the phrase "all people . . . who are transgender" in the M/F Designation Class definition with the phrase "all people . . . whose gender identity is different from the sex assigned to them under the Passport Policy." ECF 108, at 1. This proposed modification would not substantively modify the definition of the M/F Designation Class because it simply clarifies the term "transgender." *See* ECF 78-13, ¶ 48 (defining the term "transgender"). The plaintiffs also proposed modifying the X Designation Class to include all "transgender, and/or intersex people, and/or people who were not assigned a binary sex at birth," rather than only non-binary people. ECF 108, at 2. Although some of these modifications are not warranted,[3] the plaintiffs' request to use the term "transgender" rather than "non-binary" in the X Designation Class does not significantly alter that class because non-binary people, who do not

---

[3]    The plaintiffs' proposal to expressly include intersex people in the X Designation Class definition will not be adopted. Although two of the plaintiffs are intersex, both have been designated as representatives of the M/F Designation Class. *See* ECF 77, at 1-2. The proposed X Designation Class representatives are non-binary, but neither is intersex. *See id.* at 2. Unlike non-binary people, who do not fully identify with a binary sex, intersex people "are born with sex characteristics that do not fit typical binary notions" of sex. ECF 78-13, ¶ 33. As the State Department previously recognized, some intersex people are, biologically, "born neither male nor female." *Zzyym v. Pompeo*, 958 F.3d 1014, 1024 (10th Cir. 2020). While non-binary people and intersex people may have significant overlapping legal interests, intersex people are uniquely positioned to argue that the Passport Policy "injects inaccuracy into the data" by assigning them a binary sex that lacks any biological basis. *Id.* It is therefore not clear that non-binary class representatives could fully represent the interests of intersex class members. *See* Fed. R. Civ. P. 23(a)(4). For similar reasons, the Court will not adopt the plaintiffs' request to include "people who were not assigned a binary sex at birth" in the X Designation Class definition. ECF 108, at 2. Every plaintiff in this litigation, even those who are intersex, was assigned a binary sex at birth, and the plaintiffs have produced no evidence of any person *not* assigned a binary sex at birth.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 159    Filed 06/17/25    Page 9 of 32

88a

identify exclusively with a binary sex, are a subset of transgender people whose gender identity does not match their sex assigned at birth. *See* ECF 74, at 10; ECF 65, at 18.

In view of the foregoing, the Court will consider whether to certify under Rule 23(b)(2), and whether to apply the preliminary injunction to a subset of, the following two classes:

1. A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class"); and

2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

Both classes would exclude the plaintiffs in *Schlacter* and any judge presiding over this action.

## DISCUSSION

### I.    <u>Motion for Class Certification.</u>

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). Class certification is appropriate only where the district court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a)"—numerosity, commonality, typicality, and adequacy of representation—and one of the provisions of Rule 23(b) are met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). Under Rule 23(b)(2)—the subsection of Rule 23(b) invoked by the plaintiffs here—certification is warranted where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115-9    Filed 06/17/25    Page 10 of 32

89a

The plaintiffs contend that the proposed classes satisfy each of the Rule 23(a) factors and Rule 23(b)(2). The government does not dispute that the proposed classes satisfy the Rule 23(a) factors. It does, however, oppose class certification on two grounds. First, it contends that because the plaintiffs in the *Schlacter* case—who bring comparable claims, and seek comparable relief, to the plaintiffs in this case—are excluded from the class definitions, any relief obtained will not affect the entire class, as required by Rule 23(b)(2). Second, the government argues that the proposed classes are not ascertainable because it is not possible to objectively determine whether someone's gender identity differs from their sex assigned at birth.

A.    The Rule 23(a) Factors.

The proposed classes, as modified, satisfy the Rule 23(a) factors. First, "the class[es] [are] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the United States, there are over 1.5 million people who identify as transgender, *see* ECF 78-13, ¶ 48, and over 1.2 million people who identify as non-binary, *id.* ¶ 49. While the record does not indicate exactly how many people fall within the M/F Designation Class and the X Designation Class, the proposed classes no doubt exceed the "low threshold for numerosity," which the First Circuit has pegged at around 40 members. *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009).

Second, "there are questions of law or fact common to the class[es]." Fed. R. Civ. P. 23(a)(2). "A question is common if it is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Parent/Pro. Advoc. League v. City of Springfield, Massachusetts*, 934 F.3d 13, 28 (1st Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). The commonality requirement presents "a low bar, and courts have generally given it a permissive application." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 11 of 32

90a

2008) (quotation marks omitted). At bottom, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Dukes*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157).

Members of both classes have suffered the same injury because the Passport Policy uniformly prohibits them from obtaining a passport with a sex designation that aligns with their gender identity, which is different from their sex assigned at birth. *See Parent/Pro. Advoc. League*, 934 F.3d at 28 ("[C]ommon answers typically come in the form of 'a particular and sufficiently well-defined set of allegedly illegal policies [or] practices' that work similar harm on the class plaintiffs." (quoting *Parsons v. Ryan*, 754 F.3d 657, 679 (9th Cir. 2014))). As a direct result of the Passport Policy, each class member is unable to obtain an "M," "F," or "X" sex marker that aligns with their gender identity and expression. *See* ECF 53-1, ¶ 21. Questions of law are also common to the classes. As to the APA claims, common questions include (1) whether the claims are reviewable; (2) if so, whether the Passport Policy is arbitrary and capricious because it was not accompanied by a reasoned explanation when promulgated; and (3) whether it was adopted without observance of the procedures required by the PRA. Common questions raised by the equal protection claim include (1) whether the Passport Policy and Executive Order discriminate on the basis of sex or transgender status; (2) if so, whether the policies satisfy the appropriate level of means-ends scrutiny; and (3) whether the policies are rooted in unconstitutional animus toward a disfavored group. The Fifth Amendment right-to-travel and privacy claims raise common questions concerning the scope of these rights and the standard of review applicable to government actions alleged to infringe each right. And common questions pertaining to the First Amendment claim include whether passport sex designations are personal or government speech and whether the forced disclosure of a passport holder's sex assigned at birth is compelled speech.

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 115⁴⁹ Filed 06/17/25     Page 12 of 32

91a

Third, "the claims or defenses of the representative parties are typical of the claims or defenses of the class[es]," Fed. R. Civ. P. 23(a)(3), largely for the same reasons that the commonality requirement is satisfied. *See Dukes*, 564 U.S. at 349 n.5 (noting that the commonality and typicality requirements "tend to merge" (quotation marks omitted)). The proposed class representatives' APA and constitutional claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members"—namely, the adoption and enforcement of the Passport Policy, which bars members of both classes from obtaining passports bearing sex designations that align with their gender identity. *García-Rubiera*, 570 F.3d at 460 (quotation marks omitted).

Fourth, "the representative parties will fairly and adequately protect the interests of the class[es]." Fed. R. Civ. P. 23(a)(4). This requirement has two parts: "The moving party must show first that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). The plaintiffs proposed to represent the M/F Designation Class are Orr, Perysian, Anderson, Hall, Boe, Solomon-Lane, Agatha, Doe, Goldberg, and LeBlanc. ECF 77, at 1-2. The plaintiffs proposed to represent the X Designation Class are Soe and Gorlin. *Id.* at 2. There is no evidence that the proposed class representatives have any interests that conflict with members of their respective classes. To the contrary, the proposed representatives seek relief that will equally benefit themselves and the members of the classes they would represent. Members of the M/F Designation Class seek the ability to obtain an "M" or "F" passport sex designation that aligns with their gender identity, and members of the X Designation Class seek the ability to obtain an "X" designation.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 11549    Filed 06/17/25    Page 13 of 32

92a

The proposed class representatives' chosen counsel—the American Civil Liberties Union ("ACLU"), the ACLU of Massachusetts ("ACLUM"), and Covington and Burling LLP—are also "qualified, experienced, and able to vigorously conduct the proposed litigation." *Andrews*, 780 F.2d at 130 (comma added). Counsel with the ACLU and the ACLUM have decades of combined experience litigating class actions and, more specifically, litigating claims pertaining to transgender individuals' civil rights and civil liberties, including their ability to access identity documents. *See* ECF 78-15 (declaration of Jon W. Davidson, Senior Counsel at the ACLU); ECF 78-16 (declaration of Jessie J. Rossman, Legal Director of the ACLUM). The Covington and Burling team also has significant experience litigating complex civil litigation and class actions, and it has already devoted substantial resources to litigating this case. *See* ECF 78-17.

B.    <u>Rule 23(b)(2).</u>

Federal Rule of Civil Procedure 23(b)(2) permits class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "'[C]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." *Id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

The proposed classes lie in the heartland of Rule 23(b)(2). The government's conduct— that is, its enforcement of the Passport Policy—uniformly impacts members of the M/F and X

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115-9    Filed 06/17/25    Page 14 of 32

93a

Designation Classes by preventing them from obtaining passports with a sex marker consistent with their gender identity. The plaintiffs also seek an "indivisible" remedy: an order enjoining the government from enforcing the Passport Policy against class members and requiring the government to issue them passports in accordance with the policy that was in effect immediately before the adoption of the Passport Policy. *See* ECF 76, at 68. This is the sort of uniform, class-wide remedy contemplated by Rule 23(b)(2). *See Dukes*, 564 U.S. at 360; *Healthy Futures of Texas v. Dep't of Health & Hum. Servs.*, 326 F.R.D. 1, 9 (D.D.C. 2018) ("[T]his Court would need to enter only a single program-wide injunction on behalf of the class if it agrees with Healthy Futures's claims on the merits. Such is precisely the situation that Rule 23(b)(2) envisions."). The plaintiffs have, accordingly, demonstrated that certification is proper under Rule 23(b)(2).

The government resists this conclusion on two grounds, neither of which has merit. It first contends that any remedy obtained by the plaintiffs will not be "indivisible" because the plaintiffs exclude from the proposed classes the plaintiffs in *Schlacter v. U.S. Department of State*—another case brought by transgender and non-binary plaintiffs to challenge the Executive Order and Passport Policy—who would likely fall within the proposed classes were they not expressly excluded. *See generally* ECF 1, *Schlacter v. U.S. Dep't of State*, No. 25-cv-01344 (D. Md.). But as the Supreme Court noted in *Dukes*, the "key to the (b)(2) class" is that the challenged conduct "can be enjoined or declared unlawful only as to all of the *class members* or as to none of them." 564 U.S. at 360 (emphasis added and quotation marks omitted). The key is not, as the government would have it, whether the challenged conduct can be enjoined as to every *potential* class member. Because the *Schlacter* plaintiffs are excluded from the proposed classes, they are not, by definition, "class members." *See* ECF 77, at 1 ("No person who is a plaintiff in *Schlacter . . . is included in*

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 15 of 32

94a

*either class*." (emphasis added)). Their exclusion thus has no impact on whether any remedy obtained in this case is "indivisible."

The government next argues that excluding the *Schlacter* plaintiffs from the proposed classes is tantamount to creating "an opt-out mechanism," which is not permitted for Rule 23(b)(2) classes. ECF 88, at 6; *see Dukes*, 564 U.S. at 362 ("Rule [23] provides no opportunity for (b)(1) or (b)(2) class members to opt out."). This argument conflates the function of a class definition with the function of an opt-out mechanism. As then-Judge Jackson observed in *Healthy Futures of Texas v. Department of Health and Human Services*, "the 'class definition' and 'opt-out' mechanisms involve different decision makers, serve different functions, and take place at markedly different times." 326 F.R.D. at 9. The class definition sets the parameters for determining class membership *before* a class is certified. *See id.*; Herbert B. Newberg & William B. Rubenstein, 3 Newberg & Rubenstein on Class Actions § 7:27 (6th ed. June 2025 update) (hereinafter "Newberg & Rubenstein on Class Actions"). An opt-out mechanism, in contrast, permits the members of an *already-certified* class the opportunity to remove themselves from the class before final judgment is entered. *See Brown v. Colegio de Abogados de Puerto Rico*, 613 F.3d 44, 51 (1st Cir. 2010); *Healthy Futures*, 326 F.R.D. at 9; 6 Newberg & Rubenstein on Class Actions § 18:45. Excluding the *Schlacter* plaintiffs from the proposed classes in this case is, accordingly, consistent with the purposes of Rule 23(b)(2) class certification. *See Healthy Futures*, 326 F.R.D. at 9-10.

The Supreme Court endorsed this approach to certifying nationwide classes in *Califano v. Yamasaki*. In that case, the district court certified under Rule 23(b)(2) a nationwide class of social security beneficiaries "whose benefits have been or will be reduced or otherwise adjusted without prior notice and opportunity for a hearing." 442 U.S. at 689. Class actions asserting similar claims had previously been brought in other districts so, "[a]s a precautionary measure," the district court

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 97     Filed 06/17/25     Page 16 of 32

95a

"excluded all persons who had participated as plaintiffs or members of a plaintiff class in litigation against the Secretary on similar issues" where a decision on the merits had been issued. *Id.* In affirming the district court's certification of this nationwide class, the Supreme Court praised its "sensitivity to ongoing litigation of the same issue in other districts"; that is, its decision to exclude class members in comparable litigation. *Id.* at 703. Exclusion of the *Schlacter* plaintiffs from the proposed classes in this case, as in *Califano*, reflects a similar sensitivity: it ensures that this litigation does "not improperly interfere with the litigation of similar issues" in the Maryland court and generates "the benefit of adjudication by different courts in different factual contexts." *Id.* at 702. Accordingly, the plaintiffs' proposed exclusion of the *Schlacter* plaintiffs is no barrier to certification under Rule 23(b)(2) in this matter.

       C.    <u>Ascertainability.</u>

      The government next opposes certification on the basis that membership in the classes is not sufficiently ascertainable. Membership in the classes depends on an individual's gender identity, which, the government contends, cannot objectively be assessed. *See* ECF 105, at 24-25; ECF 107, at 2-3.

      The rule that classes be "ascertainable" or "definite" is an "implied requirement" of class certification in certain cases. *See* 1 Newberg & Rubenstein on Class Actions § 3:1; *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) ("[T]he definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable."). A class is ascertainable where it is defined by reference to "'objective criteria.'" *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 139 (1st Cir. 2012) (quoting 5 Moore et al., Moore's Federal Practice § 23.21[3][a] (3d ed. 2012)). In *Matamoros v. Starbucks Corporation*, for example, the First Circuit deemed a class comprising "all individuals who were employed as baristas at any Starbucks store" in Massachusetts between

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 115-49     Filed 06/17/25     Page 17 of 32

96a

certain dates to be ascertainable because it was defined by reference to the "objective standard of job titles." 699 F.3d at 138-39.

While the ascertainability requirement applies to Rule 23(b)(3) classes seeking monetary relief, the requirement does not apply to all Rule 23(b)(2) classes seeking declaratory or injunctive relief. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; Joseph M. McLaughlin, 1 McLaughlin on Class Actions: Law & Practice § 4:2 (21st ed. Oct. 2024 update) (hereinafter "McLaughlin on Class Actions") ("The ascertainability requirement applicable to (b)(3) and (b)(1) classes generally does not apply to (b)(2) classes that seek only injunctive or declaratory relief."). Unlike members of Rule 23(b)(2) classes, which are "mandatory," *Dukes*, 564 U.S. at 362, members of Rule 23(b)(3) classes are permitted to opt out of the class to preserve their claims and avoid the preclusive effect of class judgment. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; 1 McLaughlin on Class Actions § 4:2. Upon certification of a Rule 23(b)(3) class, a court must order the distribution of individualized notice to class members apprising them of, among other things, the preclusive effect of class judgment and their opt-out rights. Fed. R. Civ. P. 23(c)(2)(B)(v), (vii). Ensuring that the identity of Rule 23(b)(3) class members can be ascertained is therefore necessary to safeguard those class members' due process rights and ensure that they will receive the requisite notice. *See* 1 Newberg & Rubenstein on Class Actions § 3:7; 1 McLaughlin on Class Actions § 4:2.

Notice to members of Rule 23(b)(2) classes, in contrast, is optional. *See* Fed. R. Civ. P. 23(c)(2)(A). Consistent with the rationale for ensuring that Rule 23(b)(3) classes are ascertainable, the First Circuit has hinged the applicability of the ascertainability requirement to Rule 23(b)(2) classes on whether notice is due to class members. In *Yaffe v. Powers*, it reversed a district court's decision not to certify a Rule 23(b)(2) class based on that court's determination that the class was

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115-9    Filed 06/17/25    Page 18 of 32

97a

not ascertainable. 454 F.2d 1362, 1366 (1st Cir. 1972), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978). "Although notice to and therefore precise definition of the members of the suggested class are important to certification of a subdivision (b)(3) class," the First Circuit explained, "notice to the members of a (b)(2) class is not required and the actual membership of the class need not therefore be precisely delimited." *Id.* Thus, the district court had erred in applying the ascertainability requirement for Rule 23(b)(3) classes to the proposed Rule 23(b)(2) class before it. *Id.* The First Circuit further noted that Rule 23(b)(2) classes are "uniquely suited to civil rights actions in which the members of the class are often incapable of specific enumeration," *id.* (quotation marks omitted), because the benchmark for certification of a Rule 23(b)(2) class is whether the defendant's conduct applies "generally to the class," Fed. R. Civ. P. 23(b)(2).

*Yaffe* contrasts with *Crosby v. Social Security Administration of the United States*, in which the First Circuit affirmed a district court's decision not to certify a Rule 23(b)(2) class of social security claimants where the relief sought by the plaintiffs would have required the distribution of individualized notice to all class members. 796 F.2d 576 (1st Cir. 1986). The *Crosby* plaintiffs proposed a class of "all present and future claimants for disability benefits who have not had a hearing held within a reasonable time and/or who have not had a decision rendered in such a hearing for benefits within a reasonable time from the date of Request of Hearing." *Id.* at 578 (emphasis and quotation marks omitted). As relevant here, the First Circuit reasoned that "[b]ecause the standard of 'within a reasonable time' makes class members impossible to identify prior to individualized fact-finding and litigation," the proposed class failed to satisfy the ascertainability requirement. *Id* at 580. And "[w]ithout an identifiable class of disability

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 19 of 32

98a

claimants," the Court could not grant class-wide relief, which would have required the dissemination of individualized notices to class members. *Id.*

Read together, *Yaffe* and *Crosby* indicate that the ascertainability requirement applies to Rule 23(b)(2) classes only where individualized notice will be sent to class members. This approach accords with the approach taken by other Courts of Appeals[4] and with leading treatises.[5] Here, the ascertainability requirement does not apply because the plaintiffs do not propose distributing notice to members of the proposed classes, and no party contends that notice is required for these classes. *See Yaffe*, 454 F.2d at 1366. The government's concern that the proposed classes are insufficiently definite because putative class members' gender identity cannot be objectively verified thus presents no bar to Rule 23(b)(2) certification. The Court will, accordingly, certify the M/F and X Designation Classes, as modified.

### D.    Appointment of Class Counsel.

Plaintiffs' counsel at the ACLU, the ACLUM, and Covington and Burling will be appointed as class counsel. *See* Fed. R. Civ. P. 23(g)(1). When appointing class counsel, courts must consider:

---

[4] *See Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016) ("[A]scertainability is not an additional requirement for certification of a (b)(2) class seeking only injunctive and declaratory relief."); *Shook v. El Paso Cnty.*, 386 F.3d 963, 972 (10th Cir. 2004) ("[W]hile the lack of identifiability is a factor that may defeat Rule 23(b)(3) class certification, such is not the case with respect to class certification under Rule 23(b)(2)."); *Shelton v. Bledso*, 775 F.3d 554, 561 (3d Cir. 2015) ("Because the focus in a (b)(2) class is more heavily placed on the nature of the remedy sought, and because a remedy obtained by one member will naturally affect the others, the identities of individual class members are less critical in a (b)(2) action than in a (b)(3) action.").

[5] *See, e.g.*, 1 Newberg & Rubenstein on Class Actions § 3:7 ("Of course, this conclusion [that the ascertainability requirement does not apply to Rule 23(b)(2) classes] would not apply to (b)(2) classes in which plaintiffs seek notice and opt-out rights; in such cases, 'a precise class definition becomes just as important as in the Rule 23(b)(3) context.'" (quoting *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004))); 1 McLaughlin on Class Actions § 4:2 (noting that the ascertainability requirement "generally does not apply to (b)(2) classes," but that, "[o]f course, if discretionary notice or opt out rights are afforded (b)(2) class members, the greater precision demanded of a (b)(3) class is demanded").

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 101149 Filed 06/17/25    Page 20 of 32

99a

(1) "the work counsel has done in identifying or investigating potential claims in the action";

(2) "counsel's experience in handling class actions, other complex litigation, and the types of

claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the

resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

For the reasons discussed in connection with Rule 23(a)(4)'s adequacy requirement, each of these

factors favors the plaintiffs. Plaintiffs' counsel have zealously litigated this case since its inception:

they filed the original complaint within a month of the Executive Order's issuance, and they have

since devoted substantial time and energy to this case, which has already proceeded through

multiple rounds of motion practice. Collectively, plaintiffs' counsel have decades of experience

litigating complex civil cases and class actions, and counsel with the ACLU and ACLUM, in

particular, have expertise representing LGBTQ+ individuals. *See generally* ECF 78-15, 78-16, 78-

17. The Covington and Burling team has covered many of the expenses involved with this case,

including expert fees. *See* ECF 78, at 20. Appointment is, accordingly, appropriate under Rule

23(g).

## II.    Motion to Extend the Preliminary Injunction.

The plaintiffs move to apply the preliminary injunction awarded to six of the original

plaintiffs to a subset of the M/F and X Designation Classes—namely, those class members who

face the same irreparable harm (the "PI Class").[6] The plaintiffs define the proposed PI Class to

include all individuals who are (1) members of the M/F Designation Class or the X Designation

Class, and (2) either (a) do not have a currently valid passport, (b) need to renew their current

passport because it expires within one year, (c) need to make changes to their passport to have the

---

[6] The term "PI Class" is used only to refer to the subset of M/F Designation Class and X
Designation Class members who are eligible for preliminary injunctive relief. The PI Class is not
being separately certified under Rule 23(b)(2).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 06/17/25    Page 21 of 32

100a

sex designation on it align with their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged. ECF 80, at 6. The government opposes the motion to extend the preliminary injunction, arguing that the plaintiffs have failed to establish that members of the PI Class will suffer irreparable harm absent a preliminary injunction, and that, regardless, the balance of the equities favors the government.

A.    Legal Standard.

"A preliminary injunction is an extraordinary and drastic remedy . . . that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quotation marks and citations omitted). To secure a preliminary injunction, the plaintiffs must demonstrate: "'(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)). The first and second factors are "the most important," *González-Droz v. González-Colon*, 573 F.3d 75, 79 (1st Cir. 2009), and courts consider them in tandem, *see Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

B.    Likelihood of Success on the Merits.

The plaintiffs contend, and the Court agrees, that the Court's reasoning regarding the original plaintiffs' likelihood of success on their equal protection and APA claims applies with equal force to the PI Class members' claims. The government does not dispute this. Instead, to challenge the PI Class members' likelihood of success on the merits, the government reasserts the same arguments that it raised in opposition to the original preliminary injunction motion. *See* ECF

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 103  149 Filed 06/17/25    Page 22 of 32

101a

89, at 1. The Court previously considered each of these arguments and found them unpersuasive. *See* ECF 74, at 16-46.

The Court's analysis regarding the original plaintiffs' equal protection and APA claims centered on the text of the Executive Order and the Passport Policy, as well as the government's conduct in development and implementation of the policy. The government has not produced any evidence since the first preliminary injunction motion was decided that would alter this analysis. It has not, for example, produced additional evidence pertaining to its reasons for adopting the Passport Policy, which would bear on whether the Policy is substantially related to an important government interest, as required to survive intermediate scrutiny, or whether it is the product of reasoned decisionmaking, as required to survive arbitrary and capricious review. The only individualized attribute of the original plaintiffs that factored into the Court's analysis of these claims was their transgender or non-binary identity. Every member of the proposed classes shares one or both of these identities. The Court therefore concludes that the PI Class members are likely to succeed on the merits of their equal protection and APA claims for the reasons discussed in its April 18, 2025 Memorandum and Order.

    C.    <u>Irreparable Harm.</u>

The plaintiffs contend that, absent preliminary injunctive relief, members of the PI Class would experience irreparable harm that is "identical to the injuries experienced" by Orr, Perysian, Soe, Anderson, Hall, and Boe. ECF 80, at 9. Preliminary injunctive relief is available only where the moving party can "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy," *Rio Grande Cmty. Health Ctr.,*

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 104-1 149 Filed 06/17/25    Page 23 of 32

102a

*Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005), and it is measured on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," *Irizarry*, 587 F.3d at 485.

Under First Circuit precedent, a party seeking class-wide preliminary injunctive relief need not provide individualized proof that each class member is likely to experience irreparable harm, so long as it can establish that the risk of irreparable harm faced by certain class members is representative of the risk faced by all class members. In *United Steelworkers of America, AFL-CIO v. Textron, Inc.*, the defendant appealed a preliminary injunction requiring it to resume paying health insurance premiums for approximately 200 of its retired former employees. 836 F.2d 6, 7-8 (1st Cir. 1987). Although the plaintiffs had provided direct evidence, in the form of an affidavit, of the harm that a few retirees experienced after losing their health insurance, the First Circuit had "no difficulty" finding the preliminary injunction order—which applied to all 200 retirees—lawful. *Id.* at 8-9. Since it was undisputed that the defendant had ceased paying the health insurance premiums for all 200 retirees, the First Circuit held that the district court could take the specific harms faced by two retirees "as illustrative of what could occur among all retirees." *Id.* at 8. Those "illustrative" harms sufficed to demonstrate that every retiree was likely to experience irreparable harm absent preliminary injunctive relief. *See id.* at 9. Citing *Textron*, the Second Circuit has similarly held that "plaintiffs should be allowed to adduce evidence of harm representatively, so long as they lay a foundation that the representative plaintiffs are similarly situated with regard to the issue of irreparable harm." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 58 (2d Cir. 2004); *see also Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (the entry of a class-wide preliminary injunction is appropriate where a court can "infer that all (or virtually all) members of a group are irreparably harmed").

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 105 149    Filed 06/17/25    Page 24 of 32

103a

The named plaintiffs have laid the requisite foundation for the Court to find that the risk of irreparable harm they face is representative of the risk faced by all members of the PI Class. To start, the named plaintiffs who are eligible for preliminary injunctive relief (the "PI-eligible plaintiffs")—that is, every plaintiff except for Solomon-Lane and Goldberg, both of whom have valid passports bearing sex markers consistent with their gender identities, ECF 78-6, ¶ 11; ECF 78-10, ¶ 12—are similarly situated to members of the PI Class. *See LaForest*, 376 F.3d at 58. Each PI-eligible plaintiff is either transgender or non-binary, and each except Soe has been diagnosed with gender dysphoria. *See* ECF 78-1, ¶¶ 5-6; ECF 78-2, ¶¶ 4-5; ECF 78-3, ¶¶ 5-6; ECF 78-4, ¶¶ 6-7; ECF 78-5, ¶¶ 5-6; ECF 78-7, ¶ 5; ECF 78-8, ¶¶ 5, 9; ECF 78-9, ¶¶ 5-6; ECF 78-11, ¶¶ 5, 7; ECF 78-12, ¶¶ 5-6. The PI-eligible plaintiffs, like members of the PI Class, have an imminent need to replace or renew their passport or do not currently possess a passport with a sex designation that aligns with their gender identity. *Compare* ECF 80, at 6, *with* ECF 78-1, ¶¶ 14, 17; ECF 78-2, ¶ 12; ECF 78-3, ¶ 11; ECF 78-4, ¶ 12; ECF 78-5, ¶ 13; ECF 78-7, ¶¶ 9, 11; ECF 78-8, ¶¶ 11, 13; ECF 78-9, ¶ 12; ECF 78-11, ¶ 10; ECF 78-12, ¶ 10. And it is undisputed that the PI-eligible plaintiffs and PI Class members face the same injury: they cannot obtain a passport with a sex designation that aligns with their gender identity because, under the Passport Policy, the State Department will issue passports only with a sex designation that aligns with the holder's sex assigned at birth. *See* ECF 53-1, ¶¶ 15, 21.

Through Dr. Corathers' and Dr. Scheim's expert declarations, the plaintiffs have introduced uncontroverted evidence of the harms that transgender and non-binary people face if they are required to use passports bearing sex designations aligning with their sex assigned at birth rather than their gender identity. *See* ECF 78-13 (Corathers declaration); ECF 78-14 (Scheim declaration). Citing large-scale studies, Dr. Scheim reports that transgender people with gender-

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 25 of 32

104a

discordant identity documents have an elevated risk of encountering problems with airport security and experiencing harassment or violence when traveling, particularly to countries that criminalize transgender expression. ECF 78-14, ¶¶ 22-23. Transgender people who face obstacles in obtaining gender-concordant identity documents are also twice as likely to have suicidal ideation, and experience higher psychological distress, than transgender people who do not encounter such obstacles. *Id.* ¶ 33. In contrast, transgender people who have obtained gender-concordant identity documents generally—and passports, specifically—are significantly less likely to experience anxiety, serious psychological distress, and suicidality. *See id.* ¶¶ 29-35, 37. Transgender people are also significantly less likely to experience discrimination, harassment, and violence when they possess gender-concordant identity documents. *See id.* ¶¶ 25-27, 36, 38. Dr. Corathers likewise reports that "living one's life consistently with one's gender identity, including using identity documents that reflect one's gender identity," is part of the recognized standard of care for treating gender dysphoria, a medical condition that describes "the significant emotional distress" and impairment in functioning "that stems from the incongruence between a person's gender identity and sex designated at birth." ECF 78-13, ¶¶ 53, 58, 77. Taken together, these expert declarations establish that requiring transgender and non-binary people to use passports bearing sex markers corresponding to their sex assigned at birth increases their risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence.

The plaintiffs' declarations demonstrate the imminence of these risks. Every plaintiff avers that they would experience significant anxiety or fear for their safety if required to use a passport bearing a sex marker that corresponds to their sex assigned at birth rather than their gender identity and expression. *See* ECF 78-1, ¶¶ 16-17; ECF 78-2, ¶¶ 14-15; ECF 78-3, ¶¶ 13-14, 16; ECF 78-4, ¶¶ 14-15; ECF 78-5, ¶¶ 14-15; ECF 78-6, ¶¶ 11-12; ECF 78-7, ¶ 11; ECF 78-8, ¶ 14; ECF 78-9,

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 107-1 Filed 06/17/25    Page 26 of 32

105a

¶¶ 10, 14-15, 17; ECF 78-10, ¶¶ 14-16, 18; ECF 78-11, ¶¶ 11-12, 14; ECF 78-12, ¶¶ 12-14. Six of the plaintiffs further report that they have been harassed when presenting identity documents bearing sex markers corresponding to their sex assigned at birth rather than their gender identity. *See* ECF 78-1, ¶¶ 9-10; ECF 78-2, ¶ 8; ECF 78-3, ¶¶ 12-13; ECF 78-9, ¶ 16; ECF 78-10, ¶ 14; ECF 78-11, ¶ 11. Due to these risks, three plaintiffs have already cancelled international travel plans because they were unable, under the Passport Policy, to obtain passports bearing a sex marker that aligns with their gender identity. *See* ECF 78-1, ¶ 15; ECF 78-2, ¶¶ 10, 13; ECF 78-5, ¶ 9. And nearly all of the PI-eligible plaintiffs aver that they are likely or certain to cancel international travel plans if they are unable to update the sex marker on their passports. *See* ECF 78-1, ¶ 17; ECF 78-2, ¶¶ 13-14; ECF 78-3, ¶¶ 14-15; ECF 78-5, ¶¶ 14-15; ECF 78-8, ¶¶ 12, 14; ECF 78-9, ¶¶ 9, 14-15; ECF 78-11, ¶¶ 14-15; ECF 78-12, ¶¶ 11, 14.

Based on this evidence, every PI-eligible plaintiff has established that they are likely to experience irreparable harm. Absent preliminary injunctive relief, these plaintiffs may effectively be forced to out themselves as transgender or non-binary every time they present their passport— whether for international travel or to verify their identity in administrative settings, such as employment paperwork or opening a bank account. *See* ECF 78-1, ¶¶ 7, 16; ECF 78-2, ¶¶ 6, 12; ECF 78-3, ¶¶ 7-8, 12, 14, 16; ECF 78-4, ¶¶ 7-8, 11, 15; ECF 78-5, ¶¶ 8, 14; ECF 78-7, ¶¶ 8-9; ECF 78-8, ¶¶ 9, 14; ECF 78-9, ¶ 15; ECF 78-11, ¶¶ 8, 14; ECF 78-12, ¶¶ 7, 13. The PI-eligible plaintiffs are therefore unable to use their passports without a heightened risk of experiencing anxiety, psychological distress, suicidality, discrimination, harassment, and violence. ECF 78-13, ¶¶ 53, 58, 77; ECF 78-14, ¶¶ 22-38. These are the types of injuries that cannot adequately be measured or compensated by money damages or a later-issued remedy. *See* ECF 74, at 49-50; *Textron*, 836

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 27 of 32

106a

F.2d at 9 (irreparable harm established where retirees faced risk of "serious emotional harm" after their former employer ceased paying life insurance premiums).

The risk of irreparable harm faced by the PI-eligible plaintiffs is representative of the risk of irreparable harm faced by every member of the PI Class. The PI-eligible plaintiffs are, as discussed, similarly situated to members of the PI Class. *See LaForest*, 376 F.3d at 58. And corroborating the empirical research summarized in the plaintiffs' expert declarations, the PI-eligible plaintiffs have uniformly averred that they cannot use their current passports, which reflect their sex assigned at birth, without experiencing significant anxiety and fearing for their safety. Although only around half of the PI-eligible plaintiffs report having been personally harassed or assaulted when presenting a passport or identity document reflecting their sex assigned at birth, all transgender and non-binary people are at greater risk of experiencing discrimination, harassment, or violence if they are required to use a passport reflecting their sex assigned at birth. The Court accordingly concludes that the risk of irreparable harm faced by the PI-eligible plaintiffs is representative of the risk faced by all PI Class members. *See id.*; *Textron*, 836 F.2d. at 8.

In the government's view, the plaintiffs have nevertheless failed to show that all PI Class members face an imminent risk of irreparable harm because membership in the PI Class is not conditioned on whether an individual has concrete international travel plans. *See* ECF 89, at 4. This argument fails because it confuses a condition that is sufficient to establish irreparable harm with a condition that is necessary to do so. The Court previously concluded that the original plaintiffs were likely to experience irreparable harm, absent interim equitable relief, in part because they would be forced to choose between cancelling their international travel plans or using passports that reflect their sex assigned at birth. *See* ECF 74, at 49-50. But as discussed, PI Class members' risk of experiencing irreparable harm also arises from the interference with their

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115    Filed 06/17/25    Page 28 of 32

107a

treatment for gender dysphoria and from their inability to use their passports anywhere without outing themselves. In addition to facilitating international travel, passports function as federal identity documents. The plaintiffs in this case have, for example, used their passports to rent a car, ECF 78-1, ¶ 9; open bank accounts and establish employment eligibility, ECF 78-4, ¶ 13; travel domestically, ECF 78-10, ¶ 13; and identify themselves in administrative settings, ECF 78-6, ¶ 11. PI Class members are likely to experience irreparable harm absent interim equitable relief because they face a heightened risk of interference with treatment for gender dysphoria and of experiencing anxiety, psychological distress, discrimination, harassment, or violence *any* time they use their passports, not simply because they face these risks when using their passports for international travel.

D.    Balance of the Equities and the Public Interest.

The balance of the equities and the public interest favor granting preliminary injunctive relief to members of the PI Class. The plaintiffs have demonstrated that members of the PI Class are likely to face significant hardships absent preliminary injunctive relief. The government contends that the balance of the equities nevertheless tilts in its favor, primarily because of the administrative burden associated with class-wide relief. While this burden may be more than *de minimis*, it does not outweigh the equities favoring the PI Class.

The government first claims that the State Department lacks the capacity to determine which passport applicants are likely to suffer irreparable harm and, therefore, which applicants are eligible for preliminary injunctive relief. *See* ECF 89, at 5-6; ECF 89-1, ¶ 11. That argument fails because the Court has already concluded that all members of the PI Class share the same risk of irreparable harm as the class representatives. The State Department has neither the duty nor the prerogative to independently make that determination. If an individual is a member of the PI Class,

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115 Filed 06/17/25    Page 29 of 32

108a

that individual would be entitled to relief under the preliminary injunction. And because the PI Class is defined by reference to objective criteria—namely, whether someone is a member of the M/F Designation Class or X Designation Class and whether that individual is seeking a passport for one of the four reasons enumerated in the PI Class definition—determining whether an applicant fits the class definition will not be time- or resource-intensive. As the plaintiffs contend, eligibility for relief can be determined through a straightforward form that asks passport applicants to check a box if they meet the criteria for the PI Class. *See* ECF 108, at 5.

Next, the government argues that it would suffer an undue burden if the preliminary injunction were dissolved at a later date, and the State Department were to choose to replace passports that it issued while the injunction was in effect with passports that adhered to the Passport Policy. This argument, which is speculative, does not weigh strongly against extending the preliminary injunction to the PI Class. The government has not produced evidence that the State Department would, in fact, consider reissuing passports issued pursuant to the preliminary injunction if that injunction is later dissolved, much less any evidence that it is likely to do so. *See generally* ECF 89-1. To the contrary, the State Department has stated that all passports issued before the adoption of the Passport Policy that bear an X marker or a sex other than the holder's sex assigned at birth will remain valid until their expiration date. *See Sex Marker in Passports*, U.S. Dep't of State (last visited June 2, 2025), https://perma.cc/N6Y5-EK7D. There is no indication, on this record, that the State Department would adopt a different policy toward any passports issued pursuant to a preliminary injunction that is later dissolved.

The government further contends that the State Department will be burdened by classwide preliminary injunctive relief because it will be required to process passport applications that it may not otherwise have received. This argument has some merit, insofar as every additional passport

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115149 Filed 06/17/25    Page 30 of 32

109a

application that the State Department receives entails its own cost in terms of the time and resources required to process it. But the narrow definition of the PI Class suggests that any additional burden will not be substantial. As discussed earlier, an individual fits within the PI Class only if they are seeking a new passport for one of four reasons. *See* ECF 80, at 6. Three of these reasons pertain to circumstances where the individual would be required to apply for a new passport irrespective of the availability of injunctive relief. *See id.* (applicant qualifies for the PI Class if they (1) lack a valid passport, (2) have a valid passport that will expire within one year, or (3) need to replace a lost, stolen, or damaged passport). The State Department is unlikely to receive a significant number of passport applications that it would not otherwise have received from PI Class members who fit these circumstances. While the State Department is likely to receive relatively more applications from individuals who are applying for the fourth reason—they have a valid passport but want to update their sex marker or name—it has not offered evidence of the number of additional applications from such individuals it anticipates receiving. *See generally* ECF 89-1 (declaration of Matthew Pierce, the Deputy Assistant Secretary for Passport Services). Nor has it identified any specific ways in which the burden associated with processing additional passport applications is likely to impede the State Department's functioning. That burden, consequently, is too ill-defined and speculative to shift the balance of the equities.

Apart from its arguments concerning administrative burdens, the government asserted for the first time at the hearing that the Executive Branch will suffer a "constitutional harm" if it is required to print communications—that is, sex markers—addressed to foreign sovereigns that are inconsistent with its policies. ECF 105, at 53; *see Haig v. Agee*, 453 U.S. 280, 292 (1981) (a passport is "a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer"). Separation of powers considerations exist any time a

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 115  Filed 06/17/25    Page 31 of 32

110a

federal court enters a preliminary injunction—which is, after all, an "extraordinary" remedy, *Voice of the Arab World,* 645 F.3d at 32—against the Executive Branch. Those considerations may be heightened here, where Congress has granted the Executive Branch "broad rule-making authority" concerning the issuance of passports. *Zemel v. Rusk*, 381 U.S. 1, 12 (1965).

Yet the government has failed to develop its argument beyond asserting that *any* injunction pertaining to the Executive's control over the issuance of passports inflicts, in essence, a *per se* constitutional injury. It has not identified any specific ways in which an injunction requiring the State Department to issue passports bearing sex designations with which it disagrees is likely to injure the Executive Branch's relations with foreign sovereigns. PI Class members, on the other hand, have demonstrated that they are likely to succeed on the merits of their claims that the Passport Policy violates their constitutional right to equal protection of the laws and runs afoul of the safeguards of the APA. The preliminary relief awarded by this Court is narrowly tailored to provide relief only to those Americans whose rights have likely been violated by the Passport Policy and who, absent that relief, are likely to suffer irreparable harm. Even assuming a preliminary injunction inflicts some constitutional harm on the Executive Branch, such harm is the consequence of the State Department's adoption of a Passport Policy that likely violates the constitutional rights of thousands of Americans. The balance of the equities and the public interest thus favor the PI Class. *See Textron*, 836 F.2d at 7 ("The heart of the matter is whether 'the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.'" (quoting *Vargas-Figueroa v. Saldana*, 826 F.2d 160, 162 (1st Cir. 1987))).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK       Document 115    Filed 06/17/25    Page 32 of 32
111a

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the plaintiffs' motion for class certification, ECF 77, is GRANTED as MODIFIED by this Court. The following classes are CERTIFIED:

1. A class of all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or who have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an "M" or "F" sex designation that is different from the sex assigned to that individual under the Passport Policy ("M/F Designation Class");

2. A class of all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an "X" designation ("X Designation Class").

Excluded from these classes are any judge presiding over this action and the plaintiffs in *Schlacter v. U.S. Department of State*, No. 25-cv-01344 (D. Md. filed Apr. 25, 2025).

Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, Bella Boe, Reid Solomon-Lane, Viktor Agatha, David Doe, AC Goldberg, and Chelle LeBlanc are APPOINTED as representatives of the M/F Designation Class. Plaintiffs Sawyer Soe and Ray Gorlin are APPOINTED as representatives of the X Designation Class. Plaintiffs' counsel from the American Civil Liberties Union, the American Civil Liberties Union of Massachusetts, and Covington & Burling LLP are APPOINTED as class counsel.

The plaintiffs' motion to apply the preliminary injunction to the classes, ECF 79, is GRANTED. A separate order will issue memorializing the preliminary injunction entered by the Court.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: June 17, 2025                UNITED STATES DISTRICT JUDGE

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 116    Filed 06/17/25    Page 1 of 3
112a

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ASHTON ORR, ZAYA PERYSIAN, SAWYER SOE, CHASTAIN ANDERSON, DREW HALL, BELLA BOE, REID SOLOMON-LANE, VIKTOR AGATHA, DAVID DOE, AC GOLDBERG, RAY GORLIN, AND CHELLE LEBLANC, on behalf of themselves and others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and UNITED STATES OF AMERICA, <br><br> Defendants. | No. 1:25-cv-10313-JEK |

## ORDER OF PRELIMINARY INJUNCTION

**KOBICK, J.**

For the reasons set forth in the Memorandum and Order issued today, ECF 115, the

plaintiffs' motion to apply the preliminary injunction to a subset of the M/F and X Designation

Classes, ECF 79, is GRANTED. Pursuant to Federal Rule of Civil Procedure 65(a), the Court

ORDERS as follows:

1.    The Preliminary Injunction Class ("PI Class") shall include all individuals who are:

(1) a member of the M/F Designation Class or the X Designation Class; and (2) either (a) do not

have a currently valid passport, (b) need to renew their current passport because it expires within

one year, (c) need to make changes to their passport to have the sex designation on it align with

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 119    Filed 06/17/25    Page 2 of 3

113a

their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged.

2.    Defendants Marco Rubio, in his official capacity as Secretary of State, and the U.S. Department of State (jointly, the "Agency Defendants"), as well as all officers, agents, employees, attorneys, and any other persons acting in concert with or behalf of the Agency Defendants, are ENJOINED from enforcing the Passport Policy, as that term is defined in today's Memorandum and Order, *see* ECF 115, at 1-2, as to members of the PI Class. The Agency Defendants are further ENJOINED to process and issue passports to members of the PI Class consistent with the State Department's policy as of January 19, 2025, and to permit members of the PI Class to self-select a sex designation—"M," "F," or "X"—that is different from the sex assigned to those individuals under the Passport Policy.

3.    If the Agency Defendants conclude that it is necessary to request additional information to determine whether a passport applicant is a member of the PI Class, they may instruct applicants to attest, by checking a box, to the following statement when they submit their passport application: "If I am selecting a sex marker that is different than the sex on my original birth certificate, or if I am selecting an 'X' sex marker, I confirm that a least one of the following is true: (1) my gender identity is different from the sex assigned to me at birth, or (2) I have been diagnosed with gender dysphoria. I further confirm that I am applying for a passport because one of the following is true: (1) I do not have a currently-valid passport, (2) I need to renew my current passport because it expires within one year, (3) I need to make changes to my passport to have the sex designation on it align with my gender identity or to reflect a name change, or (4) I need to apply for another passport because my passport was lost, stolen or damaged."

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 116    Filed 06/17/25    Page 3 of 3

114a

4.     No security under Federal Rule of Civil Procedure 65(c) is necessary or warranted in the circumstances of this case, as the class members seek to vindicate important constitutional and statutory rights, and the defendants have not requested any security.

5.     This preliminary injunction shall take effect immediately upon the docketing of this Order and shall remain in effect until the entry of judgment in this matter, unless this Court, the United States Court of Appeals for the First Circuit, or the United States Supreme Court orders otherwise.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: June 17, 2025                                    UNITED STATES DISTRICT JUDGE

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 1 of 17
115a

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**ASHTON ORR**, et al.,

    *Plaintiffs,*

v.

**DONALD J. TRUMP**, in his official capacity
as President of the United States, et al.,

    *Defendants.*

Civil Action No. 1:25-cv-10313-JEK

## DECLARATION OF RYAN M. DOOLEY

I, Ryan M. Dooley, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am Acting Deputy Assistant Secretary for Passport Services of the U.S. Department of State, Bureau of Consular Affairs. I submit this declaration in connection with Defendants' Opposition to Plaintiffs' Motion to Enforce or Modify Preliminary Injunction and for Expedited Briefing (ECF 117). The statements made herein are based on my personal knowledge and on information provided to me in the course of my official duties with the Department of State (the "Department"). I joined the Department in 1996 and have served in the Passport Directorate of the Bureau of Consular Affairs for 25 years. I have been in my current position since June 6, 2025. I previously served as Senior Advisor for Passport Services and as Director of the Miami and San Juan Passport Agencies.

2.    Consistent with Executive Order 14168, the Department's current policy (the "Passport Policy") permits issuing passports with only an "M" or "F" sex marker and requires U.S. passports to reflect the holder's biological sex.

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 123-49     Filed 07/03/25     Page 2 of 17

116a

3.    In compliance with the preliminary injunction issued by the Court on April 18, 2025 (ECF 75) (the "Preliminary Injunction"), the Department issued passports to Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, and Bella Boe with an "M" or "F" sex marker, based on their self-selection, to replace U.S. passports issued to them in January and February 2025 under the Passport Policy.[1]  In compliance with the Preliminary Injunction, the Department also issued a U.S. passport to Plaintiff Sawyer Soe with an "X" marker.[2]

4.    In the Memorandum and Order on Plaintiffs' Motion for Class Certification and Motion to Apply the Preliminary Injunction to the Classes (ECF 115) ("Class Certification"), this Court defined a "M/F Designation Class" as "all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an 'M' or 'F' designation that is different from the sex assigned to that individual under the Passport Policy."  In addition, the Court defined an "X Designation Class" as "all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an 'X' designation."

5.    In the Order of Preliminary Injunction (ECF 116) issued by the District Court on June 17, 2025 ("PI Class Preliminary Injunction," or "Court Order"), the Court enjoined the Secretary of State and the Department (the "Agency Defendants") from enforcing the Passport Policy as to

---

[1] To comply with the Preliminary Injunction, the Department provided these five Plaintiffs with passport replacement forms (Forms DS-5504, ver. 04-2022) for which Office of Management and Budget ("OMB") approval was extended to June 30, 2025.
[2] To comply with the Preliminary Injunction, the Department provided Plaintiff Soe with a passport application form (Form DS-11, ver. 04-2022) for which OMB approval was extended to June 30, 2025.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 3 of 17
117a

those members of the M/F Designation Class and the X Designation Class who "either (a) do not

have a currently valid passport, (b) need to renew their current passport because it expires within

one year, (c) need to make changes to their passport to have the sex designation on it align with

their gender identity or to reflect a name change, or (d) need to apply for another passport because

their passport was lost, stolen, or damaged." This Court defined these members of the M/F

Designation Class and the X Designation Class entitled to relief under the PI Class Preliminary

Injunction as the "PI Class."

6.     In addition to enjoining enforcement of the Passport Policy as to the PI Class, in the PI

Class Preliminary Injunction, the Court imposed an injunction requiring the Agency Defendants

"to process and issue passports to members of the PI Class consistent with the State Department's

policy as of January 19, 2025, and to permit members of the PI Class to self-select a sex

designation – 'M,' 'F,' or 'X' – that is different from the sex assigned to those individuals under

the Passport Policy."

7.     In the Court Order, the Court specified that "[i]f the Agency Defendants conclude that it

is necessary to request additional information to determine whether a passport applicant is a

member of the PI Class, they may instruct applicants to attest, by checking a box, to the following

statement when they submit their passport application:

> If I am selecting a sex marker that is different than the sex on my original birth
>
> certificate, or if I am selecting an 'X' sex marker, I confirm that a least one of the
>
> following is true: (1) my gender identity is different from the sex assigned to me
>
> at birth, or (2) I have been diagnosed with gender dysphoria. I further confirm that
>
> I am applying for a passport because one of the following is true: (1) I do not have

3

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 120-3-49    Filed 07/03/25    Page 4 of 17

118a

a currently-valid passport, (2) I need to renew my current passport because it expires within one year, (3) I need to make changes to my passport to have the sex designation on it align with my gender identity or to reflect a name change, or (4) I need to apply for another passport because my passport was lost, stolen or damaged."

8.    The Department fully understands its obligation to comply with the Court Order. We are dedicated to providing a consistent, effective, and efficient process for the PI Class, which could number into the tens or hundreds of thousands,[3] with applications coming from anywhere in the world to any of our 276 diplomatic posts, including embassies and consulates, and 29 domestic passport centers and agencies.  Since receiving the Court Order, Passport Services has been working diligently to stand up a viable process, to ensure that the passport application process proceeds smoothly for members of the PI Class.  Unlike the earlier implementation of the Passport Policy following issuance of Executive Order 14168, where the changes applied to all passport applications universally, compliance with the Court Order required the Department to develop new manual and electronic systems for identifying members of the PI Class, and new workstreams to accommodate and process the multiple types of applications they may submit, *e.g.*, in-person applications executed on Form DS-11, renewals by mail on Form DS-82, online renewals on Form DS-82, and data corrections by mail or in person on Form DS-5504.  The process was further complicated by the fact that Class Counsel opted not to have notifications sent to potential class members so as to determine who is in the PI Class.  The Department therefore needed to generate

---

[3] At this time, the Department has no way of determining the number of U.S. citizens actually or potentially within the PI Class.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 5 of 17

119a

a way for PI Class Members to self-identify when applying for, renewing, or replacing a passport. These new and labor-intensive processes could not be accomplished in short order, though the Department has moved as expeditiously as possible to put them in place.

9.    Following receipt of the Court Order, on June 18, 2025, Passport Services' Office of Adjudication instructed domestic passport agencies and centers to temporarily suspend processing any new or in-process application for any individual who may be requesting a sex marker inconsistent with their sex and began to formulate a functional form of attestation to be required of members of the PI Class.  The same guidance was subsequently issued to American Citizen Services units at diplomatic posts abroad.  Incorporating an essential ancillary document such as the attestation into existing worldwide workflows, including processing systems for intake, adjudication, and recording in multiple databases, is complex but necessary to ensure that PI Class members are identified for compliance with the Court Order.  Challenges include differing systems for processing passport applications accepted domestically and those adjudicated at U.S. embassies and consulates abroad.

10.  On July 1, 2025, the Department began issuing passports with the sex marker requested by the applicant through the submission of an attestation ("Attestation"; see Exhibit A) indicating that the applicant is a member of the PI Class and indicating with which sex marker their passport should be printed.  On July 2, 2025, the Department posted a link to the Attestation on its Travel.State.gov website, along with instructions (see Exhibit B) for members of the PI Class to use in conjunction with their passport applications (Form DS-11), passport renewal applications (Form DS-82), and passport data correction applications (Form DS-5504).

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 122-149    Filed 07/03/25    Page 6 of 17

120a

11. To ensure compliance with the Court Order, the Department also created a new Information Request Letter ("IRL"; Exhibit C) to be sent to passport applicants who do not include the Attestation but who the Department has reason to believe may be members of the PI Class. Use of the IRL should enhance customer service and minimize the need to replace passports inadvertently issued to unidentified PI Class members under the Passport Policy while the Court Order is in effect. Passport Services is committed to ensuring that the passport application process proceeds as smoothly as possible for all members of the PI Class, and that every effort is made to comply with the Court Order.

12. The Department does not intend to revise the passport forms. To comply with the Court Order via passport form revision would require more than simply adding a new checkbox to forms DS-11, DS-82, and DS-5504 specific to the Court Order and the PI Class, and any such process would likely take months to accomplish. Making significant changes to forms requires multiple levels of policy and legal review as well as design work. Such processes may implicate other statutory obligations, such as the Rehabilitation Act of 1973 and the Privacy Act of 1974, and thus require careful consideration. Changing the layout and content of forms also requires coordination with contractors responsible for data entry, and months of programming time are required to ensure passport adjudication does not come to a halt. The Department therefore has chosen the most expeditious path by electing to create and distribute the Attestation, in conjunction with using an Information Request Letter. Nevertheless, developing the relevant processes still required significant time and effort on a very tight timeframe.

13. On July 2, 2025, the Department issued guidance to domestic passport centers, domestic passport agencies, and U.S. embassies and consulates regarding use of the Attestation and IRL to

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 7 of 17

121a

identity members of the PI Class for purposes of compliance with the Court Order. The Department intends to maintain the new processes and procedures developed to comply with the Court Order for as long as the Court Order is in force, subject only to necessary alterations to address issues that may arise to ensure full compliance with the Court Order.

14. Between issuance of the Court Order on June 17, 2025, and issuance of worldwide guidance on July 2, the Department accommodated a small number of apparent members of the PI Class who had urgent travel and requested a U.S. passport with a sex marker consistent with E.O. 14168 to facilitate their immediate travel. As with other members of the PI Class, under the procedures established by the Department to comply with the Court Order, such members may now submit that passport with Form DS-5504 and an Attestation, for issuance of a replacement passport with their desired sex marker at no charge other than an optional fee for expedited processing.

15. The new Attestation will allow the Department to issue passports with an "X" marker for passport applications domestically and for those overseas that are not needed on an emergency basis. Certain applicants seeking emergency passports may have difficulty obtaining such documents with "X," as not all Department systems are equally capable of printing all configurations of passports. Under the procedures established by the Department to comply with the Court Order, the Department will offer those individuals the ability to replace, at no charge other than an optional fee for expedited processing, the emergency passport issued to them with an "M" or "F" sex marker with a full validity passport with an "X" marker complying with the Court Order as long as the Court Order is in force.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 8 of 17
122a

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  July 3, 2025.

_____
Ryan M. Dooley

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 123-49    Filed 07/03/25    Page 9 of 17
123a

# EXHIBIT A

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 126-149   Filed 07/03/25    Page 10 of 17
124a

## Attestation of *Orr v. Trump* Class Membership

**Attestation to accompany Forms DS-11, DS-82, and DS-5504 submitted by members of a class certified in *Orr v. Trump*, Case No. 1:25-cv-10313, in the U.S. District Court for the District of Massachusetts, who are eligible for Preliminary Injunctive relief**

**You must submit this completed and signed attestation with your application or within 90 days after the Department notifies you it is needed. Failure to do so will result in your application being adjudicated in your sex, consistent with Executive Order 14168.**

If I am selecting a sex marker that is different from the sex marker on my original birth certificate, or if I am selecting an "X" sex marker, as indicated by the sex marker checkbox I have selected below, I confirm that at least one of the following is true:

1)  My gender identity is different from my sex, or
2)  I have been diagnosed with gender dysphoria.

I further confirm that I am applying for a passport or data correction because one (or more) of the following is true:

1) I do not have a currently valid passport,
2) I need to renew my current passport because it expires within one year,
3) I need to make changes to my passport to have the sex designation on it align with my gender identity or to reflect a name change, or
4) I need to apply for another passport because my passport was lost, stolen, or damaged.

Sex Marker Requested for U.S. Passport (**applicant must select one**):

☐ M for male (also check "M" for "Sex" on application form)
☐ F for female (also check "F" for "Sex" on application form)
☐ X (do not check "M" or "F" for "Sex" on application form)

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 27-2     Filed 07/03/25     Page 11 of 17

125a

Certification:

I declare under penalty of perjury that the foregoing is true and correct and that I am not a party plaintiff in *Schlacter v. Department of State*, Case No. 1:25-cv-01344, in the U.S. District Court for the District of Maryland.

Signature of applicant or parent/guardian if the applicant is a minor

_____

Name of applicant

_____ (please print)

Name of parent/guardian (if necessary)

_____ (please print)

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 23-2    Filed 07/03/25    Page 12 of 17
126a

# EXHIBIT B

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 91-1    Filed 07/03/25    Page 13 of 17
pg 129 of 149
127a

# Sex Markers in Passports

The White House issued Executive Order 14168: "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" in January 2025.  After the U.S. District Court for the District of Massachusetts' ruling in June 2025 in *Orr v. Trump*, we are extending preliminary relief for two classes of individuals:

- Certain individuals seeking a passport in M or F, and
- Certain individuals seeking a passport in X.

If you are a class member, you are eligible to receive a passport with your sex marker of choice (M, F, or X) if:

- You do not have a valid passport,
- You need to renew your current passport before it expires within one year,
- You need to change your passport, so the sex printed on the passport matches your selected gender identity, or to reflect a name change, or
- You need to apply for a new passport because your current passport is lost, stolen, or damaged.

## Applying for your U.S. passport

By submitting a completed attestation form with your passport application, you are identifying yourself as a class member and letting us know what sex marker you want in your passport. If we receive an application without an attestation form and determine you may be a class member, we will send you a letter requesting the attestation form. You must submit the form within 90 days.

We will issue your passport in your sex, as defined by EO 14168, if:

- You are not a class member;
- You do not provide a signed attestation form with your application; or
- You do not provide the attestation form within 90 days after we request one.

## Completing your passport application

Download a PDF of your Form DS-11, DS-82, or DS-5504. Due to technical limitations, you cannot use our form filler tool or renew online.

If you are selecting M or F, select it on the attestation and application. If you are selecting X, leave the sex field blank on your application and select it on the attestation.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 108-19    Filed 07/03/25    Page 14 of 17
page 130 of 149

128a

**Frequently asked questions**

Is my passport still valid if I have an X marker on it, or if it lists a sex other than my sex as defined by EO 14168?

Yes. Your current passport will remain valid until its expiration date.

Can I travel outside of the United States using a passport with an X marker, or using a passport that lists a sex other than my sex as defined by EO 14168?

Yes. U.S. passports are proof of U.S. citizenship and identity and can be used for entry into the United States. Please refer to U.S. Customs and Border Protection if you have questions about returning to the United States with your travel document.

As long as your current passport has not expired, there are no restrictions to use the passport, unless another country has limitations.

My birth documentation does not have any information about sex on it. What should I do?

You can still apply for a passport or to replace your passport. If we need more information from you, we will contact you after you apply. We will request that you submit certain documents and records to help us establish your sex for your new passport.

You printed the wrong sex on my passport by mistake. What should I do?

You can correct your passport if there is a data or printing error. A data error may include an issue with your name, sex, or place of birth. A printing error may include data is missing on the biographical page, discoloration, or crooked printing. We will correct

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 108-19    Filed 07/03/25    Page 15 of 17

129a

the error at no charge if the passport is still valid. Please follow the steps on our <u>Change or Correct a Passport page</u>.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 108-19    Filed 07/03/25    Page 16 of 17

130a

# EXHIBIT C

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 131-149    Filed 07/03/25    Page 17 of 17
131a

**708**

# MISCELLANEOUS

**<u>OPENING</u>**
**00-**
Thank you for your recent passport application.

**<u>BODY</u>**

**23 – Sex Marker Attestation (No Closing - Custom Ending)**
Your application has conflicting sex marker information.

If you are a member of a class entitled to preliminary injunctive relief as ordered by the Court in *Orr v. Trump*, Case No. 25-cv-10313, in the United States District Court for the District of Massachusetts, please provide a signed attestation.  A template is attached to this letter and is also available on travel.state.gov.

If you are not a class member as defined above or do not provide a signed attestation, a passport will be issued in your sex, consistent with Executive Order 14168.

Send the requested item(s) and a copy of this letter to the full address at the top of the letter. If you do not respond within ninety (90) days of the date shown on this letter, we will issue your passport in your sex, consistent with Executive Order 14168.  If you need more time, please respond to this letter requesting an extension.

We will return your documents when we complete your application.  By law, passport fees are non-refundable.

Thank you,

Customer Service Department

Last Updated: June 2025 *(CA/PPT/S/A)*                                                                          1

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 124-9    Filed 07/09/25    Page 1 of 4

132a

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ASHTON ORR**, et al.,<br><br>    *Plaintiffs,*<br><br>v.<br><br>**DONALD J. TRUMP**, in his official capacity as President of the United States, et al.,<br><br>    *Defendants.* | Civil Action No. 1:25-cv-10313-JEK |

## DECLARATION OF ANDRINA M. AGNEW

I, Andrina M. Agnew, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1.    I am Director of the Office of Program Management & Operational Support for Passport Services of the U.S. Department of State, Bureau of Consular Affairs.  I submit this declaration in connection with Defendants' Motion to Dissolve the June 17, 2025, Preliminary Injunction and for a Stay of that Injunction Pending Resolution of the Motion to Dissolve and Request for an Indicative Ruling concerning the April 18, 2025, Preliminary Injunction.  The statements made herein are based on my personal knowledge and on information provided to me in the course of my official duties with the Department of State ("Department").  I have served in the Passport Directorate of the Bureau of Consular Affairs for 20 years and in my current position since February 2024.

2.    Under its regulatory authority, 22 C.F.R. § 51.20(a), the Department has prescribed certain forms to be completed by individuals applying for U.S. passport services, including Form DS-11 for passport applications, Form DS-82 for passport renewal applications by mail, and Form

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 22-19    Filed 07/09/25    Page 2 of 4
133a

DS-5504 for passport data correction applications. Applicants are required to complete the applications and provide information that the Department deems material to its adjudication of the applicant's claim of identity and citizenship.

3. These passport application forms are subject to the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq.*, which requires approval from the Office of Information and Regulatory Affairs, a division of the Office of Management and Budget ("OMB"), for information collections by Federal agencies.

4. On June 25, 2025, OMB approved the Department's revisions to Forms DS-11, DS-82, and DS-5504 to comply with Executive Order 14168. Before the Department can make the revised application forms available on its Travel.State.gov website and to passport agencies, passport centers, and U.S. embassies and consulates, the Department must await updates by the Department's "lockbox" provider, Citibank, N.A., and by the U.S. Department of the Treasury to systems used for data entry and payment processing.

5. The lockbox is essentially a data entry, scanning, and payment processor, where passport applications submitted in paper format are routed for payment processing and data entry. This data entry allows the Department to route and manage workloads and facilitates faster adjudication time when applications are being evaluated by adjudicators. Even after the Department's introduction of an online renewal system, approximately 75% of all passport applications continue to be processed through the lockbox, representing approximately 50,000 to 100,000 applications per day.

6. It is necessary for Citibank and Treasury to update their systems to process the revised forms, as these systems depend on the use of a barcode printed on each iteration of these forms to

2

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 02749    Filed 07/09/25    Page 3 of 4

134a

permit speedy data entry and routing of the forms for adjudication. The barcodes, when scanned, permit the lockbox staff to see a digital facsimile of the form in front of them, permitting rapid entry of the form's data into Department systems. The Department currently estimates that the systems updates by Citibank and Treasury, which are currently ongoing, will take between two to three more months to complete.

7.   In early February 2025, the Department was able to quickly revert to the prior versions of Forms DS-11, DS-82, and DS-5504 to comply with Executive Order 14168, as Citibank's system was already programmed to recognize those versions' barcodes for data entry and routing.

8.   Without the functionality of the barcodes, lockbox data processing time would likely increase by orders of magnitude, as manual data entry from paper applications would be required and would functionally halt all passport adjudication operations. Absent these necessary systems updates, passport wait times would likely increase exponentially, as the lockbox workload would become impossible to process, and increased demand for in-person appointments at agencies for urgent travel would further compound the problem.

9.   In addition, the Department makes an online "form filler" option available to passport applicants. The Department estimates that the process of updating the "form filler" versions of the revised passport application forms, which is currently ongoing, will take approximately two months to complete.

10. Once the systems updates by Treasury and Citibank described above are complete, the Department will order paper versions of the revised passport application forms to be printed and distributed to acceptance facilities, passport centers, passport agencies, and U.S. embassies and

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 02-149    Filed 07/09/25    Page 4 of 4

135a

consulates.  The Department estimates that this process of printing and distributing paper copies of the revised passport application forms will take an additional six to eight weeks.

11.  The time-consuming steps outlined above for rolling-out revised passport application forms are routine and generally are not initiated until OMB approval is granted.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  July 3, 2025.

Andrina M. Agnew

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 129    Filed 07/09/25    Page 1 of 6

136a

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

**ASHTON ORR**, et al.,

 *Plaintiffs,*

v.

**DONALD J. TRUMP**, in his official capacity as President of the United States, et al.,

 *Defendants.*

Civil Action No. 1:25-cv-10313-JEK

## SECOND DECLARATION OF RYAN M. DOOLEY

I, Ryan M. Dooley, do hereby state and declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am Acting Deputy Assistant Secretary for Passport Services of the U.S. Department of State, Bureau of Consular Affairs. I submit this declaration in support of Defendants' Motion to Dissolve the June 17, 2025 Preliminary Injunction and for a Stay of that Injunction Pending Resolution of the Motion to Dissolve and Request for an Indicative Ruling concerning the April 18, 2025, Preliminary Injunction. The statements made herein are based on my personal knowledge and on information provided to me in the course of my official duties with the Department of State (the "Department"). I joined the Department in 1996 and have served in the Passport Directorate of the Bureau of Consular Affairs for 25 years. I have been in my current position since June 6, 2025. I previously served as Senior Advisor for Passport Services and as Director of the Miami and San Juan Passport Agencies.

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 149    Filed 07/09/25    Page 2 of 6

137a

2.    To implement Executive Order 14168 (the "Executive Order"), the Department's current policy (the "Passport Policy") permits issuing passports only with an "M" or "F" sex marker and requires U.S. passports to reflect the holder's sex consistent with the Executive Order.

3.    In compliance with the preliminary injunction issued by the Court on April 18, 2025 (ECF No. 75) (the "Preliminary Injunction"), the Department issued passports to Plaintiffs Ashton Orr, Zaya Perysian, Chastain Anderson, Drew Hall, and Bella Boe with an "M" or "F" sex marker, based on their self-selection, to replace U.S. passports issued to them in January and February 2025 under the Passport Policy.  In compliance with the Preliminary Injunction, the Department also issued a U.S. passport to Plaintiff Sawyer Soe with an "X" marker, based on that plaintiff's self-selection.  The issuance of these six passports required close coordination among Department employees in Washington, DC, Boston, MA, and Vancouver, BC, Canada.

4.    On June 17, 2025, the District Court issued a Memorandum and Order on Plaintiffs' Motion for Class Certification and Motion to Apply the Preliminary Injunction to the Classes (ECF 115) ("Class Certification").  In it, the Court defined a "M/F Designation Class" as "all people (1) whose gender identity is different from the sex assigned to them under the Passport Policy and/or have been diagnosed with gender dysphoria, and (2) who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport issued with an 'M' or 'F' designation that is different from the sex assigned to that individual under the Passport Policy."  In addition, the Court defined an "X Designation Class" as "all people whose gender identity is different from the sex assigned to them under the Passport Policy and who have applied, or who, but for the Passport Policy, would apply, for a U.S. passport with an 'X' designation."

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 127-49    Filed 07/09/25    Page 3 of 6

138a

5.    Also on June 17, 2025, the District Court issued an Order of Preliminary Injunction (ECF 116) ("Court Order").    In it, the Court enjoined the Secretary of State and the Department (the "Agency Defendants") from enforcing the Passport Policy as to those members of the M/F Designation Class and the X Designation Class who "either (a) do not have a currently valid passport, (b) need to renew their current passport because it expires within one year, (c) need to make changes to their passport to have the sex designation on it align with their gender identity or to reflect a name change, or (d) need to apply for another passport because their passport was lost, stolen, or damaged."    This Court defined these members of the M/F Designation Class and the X Designation Class entitled to relief under the Court Order as the "PI Class."

6.    In addition to enjoining enforcement of the Passport Policy as to the PI Class, in the Court Order the Court imposed an injunction requiring the Agency Defendants "to process and issue passports to members of the PI Class consistent with the State Department's policy as of January 19, 2025, and to permit members of the PI Class to self-select a sex designation – 'M,' 'F,' or 'X' – that is different from the sex assigned to those individuals under the Passport Policy." The Court specified that if the Agency Defendants conclude that it is necessary to request additional information to determine whether a passport applicant is a member of the PI Class, they may instruct applicants to attest, by checking a box, to a statement when they submit their passport application.

7.    In response to the Court Order, the Department needed to create an attestation ("Attestation") to be submitted by members of the PI Class when applying for a new or replacement U.S. passport, to account for potential operational burden and implementation hurdles.    The Department then had to incorporate the Attestation into existing worldwide

3

Case No. 1:25-mc-00063-SKC-CYC    Document 23-2    filed 11/14/25    USDC Colorado
Case 1:25-cv-10313-JEK    Document 41-1    Filed 07/09/25    Page 4 of 6
139a

workflows, including processing systems for intake, adjudication, and recording in multiple databases. The level of effort to accomplish this between issuance of the Court Order on June 17, 2025, and July 1, 2025, was considerable, but the Department succeeded despite the additional administrative burdens that compliance entailed. The Department intends to maintain the new processes and procedures developed to comply with the Court Order for as long as the Court Order is in force, subject only to necessary alterations to address issues that may arise to ensure full compliance with the Court Order.

8. In compliance with the Court Order, the Department further drafted and issued guidance to domestic passport centers, domestic passport agencies, and U.S. embassies and consulates regarding use of the Attestation to identify members of the PI Class for purposes of compliance with the Court Order. Consular staff at each of the overseas posts and adjudicative staff at each of the 29 domestic passport agencies had to read, review, and know how to apply the guidance. The Department estimates that a total of approximately 2,000 work hours were required for employees responsible for passport adjudication to review the procedures set out in this new guidance. These updates have also been distributed to the National Passport Information Center ("NPIC") to respond to customer inquiries. Since June 17, 2025, NPIC has received over 1,600 inquiries related to sex markers.

9. Each U.S. passport issued by the Department to a member of the PI Class in compliance with the Court Order requires additional time and effort for processing that otherwise would be used for adjudicating and issuing passports to U.S. citizens who are not members of the PI Class. Plaintiffs submitted estimates to this Court that 1.6 million Americans identify as transgender and 1.2 million Americans identify as nonbinary, for a total of 2.8 million potential members of the PI

Case No. 1:25-mc-00063-SKC-CYC   Document 23-2   filed 11/14/25   USDC Colorado
Case 1:25-cv-10313-JEK   Document 102-2   Filed 07/09/25   Page 5 of 6
140a

Class entitled to relief under the Court Order. The Department currently assesses that an extra two minutes per application could be spent adjudicating applications submitted by members of the M/F Designation Class (53,333 extra work hours total for 1.6 million applications) and an extra 60 minutes per application could be spent adjudicating applications by members of the X Designation Class (1.2 million extra work hours total for 1.2 million applications) due to the additional technical processes required. Thus, the total extra work hours that could be spent adjudicating applications by members of the PI Class is assessed to be approximately 1,253,333 extra hours.

10. If an applicant appears to be requesting a sex marker that differs from their sex at birth, their application is suspended, and the Department sends the applicant an Information Request Letter asking if they are a member of the PI Class. Applicants are given 90 days to respond and each letter sent can add several days of processing time to each application. Additionally, to issue a passport with an "X" sex marker, a systems override must be submitted, since the capability was removed from issuance systems to comply with the Executive Order and will take months to add it in a future systems update. Indeed, it took the Department more than nine months after the policy decision to begin issuing routine "X" passport books on a worldwide basis.

11. After issuance of the Court Order and prior to the distribution of official guidance, the Department issued passports for 70 members of the PI Class in their preferred sex marker. To date, the Department has adjudicated a total of 104 passport applications[1] submitted by applicants with an Attestation confirming their membership in the PI Class. The majority of applications

---

[1] At the time of adjudication, a PI Class member may be ineligible to be issued a U.S. passport under applicable statutes and regulations. Accordingly, the number of PI Class members who are issued U.S. passports in compliance with the Court Order is expected to be somewhat smaller than the number of passport applications with Attestations submitted by PI Class members.

Case No. 1:25-mc-00063-SKC-CYC     Document 23-2     filed 11/14/25     USDC Colorado
Case 1:25-cv-10313-JEK     Document 41-1     Filed 07/09/25     Page 6 of 6

141a

submitted with an Attestation are likely still in the initial processing steps and have not begun to be adjudicated. As with all passport applications, adjudication of PI Class members' applications are and will be conducted by Department employees.

12. In developing new administrative processes for compliance with the Court Order, the Department preserved the ability to track passport applications by members of the PI Class for later replacement should the Court Order be vacated by a higher court. With each additional passport issued in compliance with the Court Order, the aggregate cost and administrative burden of a subsequent replacement process grows. The Department estimates that the additional administrative cost of revoking and replacing passports issued in compliance with the Court Order, including notice to holders, taking administrative action as to their existing passports, and adjudicating and issuing them new passports under the Department's Passport Policy, could be as much as $130 per passport and one work hour per passport.

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: July 9, 2025.

Ryan M. Dooley

| 07/11/2025 | 130 | District Judge Julia E. Kobick: ELECTRONIC ORDER entered. |
|---|---|---|

The defendants' Motion to Dissolve the June 17, 2025 Preliminary Injunction and for a Stay of that Injunction Pending Resolution of the Motion to Dissolve, ECF 127, is **DENIED**.

This case involves changes that the State Department made to its policy concerning passport sex markers (the "Passport Policy") in accordance with Executive Order 14168 (Jan. 20, 2025). On April 18, 2025, the Court granted in part the plaintiffs' motion for a preliminary injunction and enjoined the enforcement of the Passport Policy as to six of the original plaintiffs. ECF 74, 75. The Court concluded, among other things, that the plaintiffs are likely to succeed on the merits of their claims challenging the Executive Order and Passport Policy for four independent reasons. Specifically, the Court concluded that the Executive Order and Passport Policy likely violate the equal protection principles safeguarded by the Fifth Amendment because they (1) discriminate on the basis of sex and do not survive intermediate judicial scrutiny because they are not substantially related to an important governmental interest, and (2) are based on irrational prejudice toward transgender Americans. *See id.* at 16-32. The Court further concluded that the plaintiffs are likely to succeed on their claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), because the Passport Policy (3) is arbitrary and capricious and (4) was adopted without observance of procedure required by the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq. See* ECF 74, at 33-46. The government defendants appealed the Court's decision on June 13, 2025, *see* ECF 111, and the appeal is now pending in the First Circuit.

On June 17, 2025, the Court granted as modified the plaintiffs' motions to certify two classes and to extend the preliminary injunction to a subset of those classes (the "PI Class"). ECF 115, 116. The parties agreed that their arguments regarding the original plaintiffs' likelihood of success on the merits applied with equal force to members of the PI Class. *See* ECF 80, at 7-9; ECF 89, at 1-2. The Court accordingly concluded that PI Class members were likely to succeed on their equal protection and APA claims for the same reasons as the original plaintiffs. ECF 115, at 21-22.

On July 9, 2025, the government filed a motion to dissolve the June 17, 2025 preliminary injunction, arguing that the Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), "is a significant change in law that warrants dissolution of the preliminary injunction." ECF 127, at 5. In the government's view, "Skrmetti undermines this Court's conclusion that the Passport Policy discriminates on the basis of sex and is therefore subject to heightened scrutiny." *Id.* The government also contends that the plaintiffs are unlikely to succeed on their claim that the Passport Policy was adopted without observance of procedure required by the PRA because the Office of Management and Budget ("OMB") recently approved the operative passport application forms in conformance with the PRA. *See id.* at 11-12; ECF 127-1, ¶ 4.

A motion to dissolve a preliminary injunction "depend[s] on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994). "The familiar quartet includes likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Id.* The final two factors merge where the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The moving party "bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Alto v. Black*, 738 F.3d 1111, 1220 (9th Cir. 2013)

(quotation marks and citation omitted); *see Concilio de Salud Integral de Loiza, Inc. v. Prez-Perdomo*, 551 F.3d 10, 16 (1st Cir. 2008).

The government has not carried that burden here. This Court previously concluded that members of the PI Class were likely to succeed on the merits of four claims, only two of which the government now challenges based on subsequent changes in law and fact. Whether or not *Skrmetti* alters the Court's conclusion that the Executive Order and Passport Policy must be reviewed under intermediate scrutiny—an issue on which the Court expresses no opinion—the government has not argued that *Skrmetti* or any other change in law disturbs the Court's independent conclusion that PI Class members are likely to succeed on their claim that the Executive Order and Passport Policy are based on unconstitutional animus toward transgender Americans. *See* ECF 127 , at 5-10. And although the government contends that it has cured its failure to comply with the procedures required by the PRA, it has not identified any change in law or fact that alters the Court's conclusion that PI Class members are likely to succeed on their independent claim that the Passport Policy is arbitrary and capricious, in violation of the APA. *See id.* at 11-12. Thus, even if the Court were to agree with the government as to the two challenged claims, its prior conclusions as to the likelihood of success on the other two claims—namely, the animus-based equal protection claim and the arbitrary-and-capricious claim under the APA—would remain unchanged.

The government has likewise failed to demonstrate that the balance of the equities now tilts in its favor. Members of the PI Class remain likely to experience a constitutional harm absent preliminary injunctive relief. *Cf. id.* at 2 ("[B]ecause the Court's assessment of the equities was heavily influenced by its belief that thousands of Americans would likely suffer a constitutional wrong absent an injunction, the Court should now conclude that the balance of harms favors the government."). And the Court already factored into its previous balance-of-the-equities analysis the equities that the government argues now weigh in its favor. *Compare* ECF 127 , at 11-15 (citing the Executive's "core foreign affairs prerogatives," the "significant resource costs expended in developing and implementing a process for the PI Class," and the "additional administrative costs" the State Department might incur if the preliminary injunction is later vacated), *with* ECF 115 , at 28-31 (addressing each argument and concluding that the balance of the equities nevertheless favors members of the PI Class).

The government's motion to dissolve the June 17, 2025 preliminary injunction, ECF 127 , is accordingly **denied**. For the same reasons, the Court would deny any motion to stay that injunction pending an appeal. *See* Fed. R. App. P. 8(a)(1) (C); *Acevedo-Garca v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) ("Stays of injunctive orders . . . are evaluated under the traditional four-part standard applied to injunctions."); ECF 127 , at 15 ("Defendants also respectfully request the Court to indicate whether it is inclined to grant a stay of the June 17, 2025 injunction pending appeal based on the present record."). The Court would likewise deny, for the reasons stated in this order, any motion to dissolve the April 18, 2025 preliminary injunction. *See* Fed. R. Civ. P. 62.1; ECF 127 , at 15 (government asking Court to indicate whether "it would dissolve the April 18, 2025 preliminary injunction currently on appeal to the First Circuit"). (Currie, Haley) (Entered: 07/11/2025)

# United States Court of Appeals
## For the First Circuit

———————————

No. 25-1579

VIKTOR AGATHA; CHASTAIN ANDERSON; BELLA BOE; DAVID DOE; AC
GOLDBERG; RAY GORLIN; DREW HALL; CHELLE LEBLANC; ASHTON ORR; ZAYA
PERYSIAN; SAWYER SOE; and REID SOLOMON-LANE, on behalf of themselves and others
similarly situated;

Plaintiffs, Appellees,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S.
DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; and
the UNITED STATES OF AMERICA;

Defendants, Appellants.

———————————

Before

Montecalvo, Rikelman, and Aframe,
Circuit Judges.

———————————

## ORDER OF COURT

Entered:  September 4, 2025

The government has moved for a stay pending its appeal of several orders entered
by the district court that preliminarily enjoined the U.S. Department of State ("Department") and
its Secretary from enforcing a policy ("Passport Policy"), promulgated by the Department in
connection with an executive order ("Executive Order") issued by President Donald J. Trump, that
would require U.S. passports to state the biological sex of their bearer at birth.  See Mot. for Stay
Pending Appeal, Orr v. Trump, No. 25-1579 (1st Cir. July 18, 2025).  Under the Department's
prior policy, passport applicants could select a sex marker of "M," "F," or "X," which was not
required to correspond with the applicant's biological sex.  In addition to the government's motion,
we have received and considered a response from the plaintiffs, who are transgender or non-binary
Americans representing two certified classes, and a reply from the government.

As the party seeking a stay pending appeal, the government bears the burden of
justifying the extraordinary relief it requests.  See Nken v. Holder, 556 U.S. 418, 433-34 (2009).

We consider four factors: (1) whether the government has made "a strong showing that [it] is likely to succeed on the merits"; (2) whether the government has shown that it "will be irreparably injured absent a stay"; (3) "whether issuance of the stay will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." Does 1-3 v. Mills, 39 F.4th 20, 24 (1st Cir. 2022) (quoting Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos., 996 F.3d 37, 44 (1st Cir. 2021)).  The first two factors "are the most critical."  Nken, 556 U.S. at 434.

We begin with the likelihood of success on the merits.  The district court concluded that the plaintiffs were likely to succeed on their claim that the Department's implementation of its Passport Policy was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA").  See Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 33-43; 7 U.S.C. § 706(2)(A). In its stay papers, the government, relying on Franklin v. Massachusetts, 505 U.S. 788 (1992), and Bradford v. Department of Labor, 101 F.4th 707 (10th Cir. 2024), cert. denied, 145 S. Ct. 1047 (2025), contends that the Passport Policy is not subject to review under the APA because it was "compelled by" the President's Executive Order.  But agency action that carries out a presidential directive is ordinarily subject to APA review.  See New York v. Trump, 133 F.4th 51, 70 n.17 (1st Cir. 2025); Nebraska v. Su, 121 F.4th 1, 15 (9th Cir. 2024) ("The Supreme Court has never excepted a final rule from APA review because it carried out a presidential directive."); Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1327 (D.C. Cir. 1996).  And, unlike in Bradford, the Executive Order at issue here, which instructed the Secretary to "implement changes to require . . . passports" to "accurately reflect the holder's sex," Exec. Order No. 14,168, 90 Fed. Reg. 8615, 8616 (Jan. 20, 2025), did not leave the agency with "no discretion," Bradford, 101 F.4th at 731.  Rather, the district court concluded -- and the government does not presently dispute -- that the Department made several "independent determinations in formulating" the Passport Policy. See Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 35-36.

The government argues that agency action implementing a presidential directive is nevertheless unreviewable when a statute commits the action to the President's sole discretion. And it asserts that title 22, section 211a, which concerns the contents of passports, is one such statute.  Even assuming for present purposes that section 211a is such a statute, the government has not substantially developed the point or provided any decision from the U.S. Supreme Court or any federal court of appeals in which Franklin's prohibition of APA review of presidential action was extended to prohibit review of action taken by an agency, otherwise indisputably covered by the APA, see 5 U.S.C. § 701(b)(1), because the action was directed by the President in his sole discretion.  Thus, whatever the ultimate merits of the argument, which appears to be a matter of first impression in the federal courts of appeals, we cannot conclude on the present submissions that the government has made a strong showing that the Passport Policy is unreviewable under the APA.  And the government's cursory assertion in two sentences that the Passport Policy, if reviewable, passes muster under the APA, is insufficient to meet its burden to demonstrate a strong likelihood of success on the merits of this appeal.  See Mot. for Stay Pending Appeal at 19, Orr v. Trump, No. 25-1579 (1st Cir. July 18, 2025).

Given our view that the government has not made a strong showing that it is likely to succeed on the merits of its appeal of the APA claim and given that the district court based its

preliminary injunction on the plaintiffs' APA claim and, independently, on their animus-based Equal Protection Clause claim, we need go no further in considering the likelihood of success on the merits. That is especially so given that the government has not claimed in its stay papers that the APA claim could not fully support the preliminary relief that the district court granted.

We do note, however, that in regard to the Equal Protection Clause claim premised on "unconstitutional animus toward transgender Americans," the government in its motion fails to engage meaningfully with the district court's analysis. Rather, the government devotes only two sentences to challenging the district court's assessment of the plaintiffs' animus-based Equal Protection Clause claim. See Mot. for Stay Pending Appeal at 17, Orr v. Trump, No. 25-1579 (1st Cir. July 18, 2025) ("Moreover, because these are valid reasons for the Passport Policy's prohibition on self-identification, that policy is not inexplicable by anything but animus. The district court plainly erred in concluding otherwise." (citation modified)). And before the district court, the government left undeveloped its contentions that the express "purposes" section of the Executive Order justifies the Passport Policy and that the government has an interest in using an "objective" criterion for determining sex. See, e.g., New Jersey v. Trump, 131 F.4th 27, 41-42 (1st Cir. 2025) (finding waiver under analogous circumstances). Further, in its written decision, the district court identified four overarching considerations underlying its conclusion that the plaintiffs are likely to succeed on their animus claim. Mem. & Order on Plfs.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 27-30. The government does not grapple in its motion to stay with the four prongs of the district court's reasoning as to the animus claim, and instead offers only the two sentences we describe above in disputing the district court's ruling on this claim. As a result, the government has failed to meet its burden to secure a stay.[1] See, e.g., New Jersey, 131 F.4th at 41 (denying the requested stay and observing that the government "d[id] not address the significant additional burdens that the [d]istrict [c]ourt identified in finding that the [p]laintiff-[s]tates would suffer irreparable harm in the absence of preliminary injunctive relief").

The remaining factors for the requested relief also do not favor the government's stay request. In its motion papers, the government mostly describes certain long-term institutional interests of the executive branch that may be harmed if the challenged policy is enjoined. In contrast, based on the named plaintiffs' affidavits and the expert declarations submitted by the plaintiffs, the district court made factual findings that the plaintiffs will suffer a variety of immediate and irreparable harms from the present enforcement of the challenged policy, including "a greater risk of experiencing harassment and violence" while traveling abroad. Mem. & Order on Pls.' Mot. to Stay Agency Action and for Prelim. Inj., Orr v. Trump, No. 25-cv-10313 (D. Mass. Apr. 18, 2025), ECF No. 74 at 50. Relatedly, in granting class-wide injunctive relief, the district court pointed to immediate and irreparable harms on a class-wide basis, explaining that the

---

[1] The government's motion to stay focuses on a different claim by the plaintiffs, a sex discrimination claim, and the impact on that claim of the decision in United States v. Skrmetti, 145 S. Ct. 1816 (2025). But the district court carefully explained in its order denying the government's previous motion to dissolve the preliminary injunction that its rulings as to the likelihood of success on the APA claim and the animus-based Equal Protection Clause claim stand as independent bases for its grant of injunctive relief. See Order, Orr v. Trump, No. 25-cv-10313 (D. Mass. July 11, 2025), ECF No. 130.

plaintiffs had offered "uncontroverted evidence of the harms that transgender and non-binary people face" if required to use such passports. Mem. & Order on Pls.' Mot. for Class Certification and Mot. to Apply the Prelim. Inj. to the Classes, <u>Orr</u> v. <u>Trump</u>, No. 25-cv-10313 (D. Mass. June 17, 2025), ECF No. 115 at 24.  In light of the district court's factual findings on irreparable harm, and the government's failure to contest the plaintiffs' evidence before the district court, the government "has not sufficiently demonstrated that the balance of harms and equities" favors upending the status quo and subjecting the plaintiffs to the immediate harms identified by the district court.  <u>See</u> <u>NetChoice, LLC</u> v. <u>Fitch</u>, No. 25A97, 2025 WL 2350189, at *1 (U.S. Aug. 14, 2025) (Kavanaugh, J., concurring).

For all these reasons, the motion for a stay pending appeal is <u>DENIED</u>.

So ordered.

By the Court:

Anastasia Dubrovsky, Clerk

cc:  Hon. Julia Eleanor Kobick, Robert Farrell, Clerk, United States District Court for the District of Massachusetts, James D. Esseks, Jon Warren Davidson, Jessie J. Rossman, Jennifer Herrmann, Aditi Fruitwala, Zoe Kreitenberg, Isaac D. Chaput, Li Nowlin-Sohl, Robert Gianchetti, Sruti J. Swaminathan, Lewis Yelin, Donald Campbell Lockhart, Rayford A. Farquhar, Charles W. Scarborough, Abraham R. George, M. Jared Littman, Joshua Harrell